## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Cedar Rapids Lodge & Suites, LLC,
James T. Rymes, Rhonda Coborn,
Michael Coborn, Scott Shisler, Julie Shisler,        Case No: 14-CV-04839 SRN/KMM
and Pamela J. Cobb Revocable Trust,

        Plaintiffs,                                    **MEMORANDUM OPINION**
                                          **AND ORDER**

v.

John F. Seibert, Julie Kalla-Bargy Seibert, JFS
Development, Inc. f/k/a JCS Development, Inc.,
Trinity Business Consulting Inc., Royal Business
Consulting Corp., and Preferred Business
Consulting Corp.,

        Defendants.

---

Amy J. Swedberg, Charles G. Frohman, and Martin S. Fallon, Maslon LLP, 90 South Seventh Street, Suite 3300, Minneapolis, Minnesota 55402, and Brian D. Thomas, Chloe F.P. Golden, and Robert H. Miller, Sheehan Phinney Bass & Green P.A., 1000 Elm Street, Manchester, New Hampshire 03105, for Plaintiffs.

Alexander J. Beeby and Thomas J. Flynn, Larkin Hoffman Daly & Lindgren, Ltd., 8300 Norman Center Drive, Suite 1000, Minneapolis, Minnesota 55437, for Defendants.

---

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

      This matter is before the Court on Defendants' Motion to Dismiss under Rule 12 [Doc. No. 183] ("Motion to Dismiss") and Plaintiffs' Motion for Leave to Amend [Doc. No. 192] ("Motion to Amend").  For the reasons set forth below, the Court grants Plaintiffs' Motion to Amend and denies Defendants' Motion to Dismiss.

1

## II.     BACKGROUND

When evaluating a motion to dismiss under Rule 12(b)(6), the Court assumes the facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff.  *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013) (citing *Gross v. Weber*, 186 F.3d 1089, 1090 (8th Cir. 1999)).  Thus, the Court recites the facts as alleged in Plaintiffs' Complaint.  Because the Court determines that Plaintiffs' Motion to Amend should be granted in full, *see infra* Part III.A., it recites the facts and claims as set forth in the proposed Second Amended Complaint [Doc. No. 192-1] ("SAC"), noting changes from earlier pleadings where appropriate.

### A. The Parties

Plaintiffs are judgment creditors of Defendants John F. Seibert ("John Seibert") and JFS Development, Inc. ("JFS Development").  (SAC ¶¶ 1, 3.)  Plaintiffs filed this action in 2014, alleging that Defendants had engaged in various fraudulent transfers to prevent Plaintiffs from collecting their judgment.  (*See* Compl. [Doc. No. 1].)

Defendant John Seibert is a real estate developer residing in Minnesota.  (*Id.* ¶ 4.) Defendant Julie Kalla-Bargy Seibert ("Julie Seibert") is his wife, also residing in Minnesota. (*Id.* ¶ 8.)  JFS Development is a Minnesota hospitality development and management company owned by John Seibert, which was formally dissolved in 2011.  (*Id.* ¶ 75.) Defendant Trinity Business Consulting Inc. ("Trinity") is a Minnesota corporation incorporated by John Seibert in June 2013.  (*Id.* ¶¶ 7, 339.)  Defendant Preferred Business Consulting Corp. ("Preferred") is a Minnesota corporation incorporated by John Seibert in

January 2014. (*Id.* ¶¶ 5, 118.) Defendant Royal Business Consulting Corp. ("Royal") is a Minnesota corporation incorporated by John Seibert in August 2014. (*Id.* ¶¶ 6, 230.)

## B. Factual and Procedural Background

In December 2009, Plaintiffs filed a complaint against John Seibert and JFS Development in Iowa federal district court, alleging, *inter alia*, fraud, civil racketeering (RICO violations), and breach of fiduciary duty in relation to a hotel development project in Cedar Rapids. (*Id.* ¶ 12.) The Iowa court entered a judgment against John Seibert for $12,176,735.22 in damages in November 2012, and for $2,150,707.12 in attorneys' fees and costs in January 2013. (*Id.* ¶¶ 13-14.) The Iowa court entered a judgment against JFS Development for $978,891.39. (*Id.* ¶ 3.) The Iowa court also issued a $77,928.68 sanctions judgment against John Seibert during the litigation of the Iowa action. (*Id.* ¶ 24.)

Plaintiffs had filed for prejudgment attachment of assets owned by John Seibert and JFS Development in early 2010, but the motion was denied. (*Id.* ¶¶ 18-19.) During the three years between the complaint and the judgment in the Iowa action, from late 2009 to late 2012, John Seibert's self-reported net worth changed from approximately $5.4 million to negative $1.3 million. (*Id.* ¶¶ 15, 21-22.)

Plaintiffs allege that John Seibert liquefied and secreted his assets while publicly holding himself out to be insolvent. In August 2011, at a hearing on Plaintiffs' motion for contempt of court, John Seibert represented to the Iowa court that he was "broke" and could not pay the $77,928.68 sanctions judgment. (*Id.* ¶ 30.) The Magistrate Judge in that case held John Seibert in contempt of court, but declined to incarcerate him, finding a lack of clear and convincing evidence that he was able to comply with the sanctions order. (*Id.*

3

¶ 31.) But Plaintiffs allege that, over the course of 2011, John Seibert was "systematically liquidating hundreds of thousands of dollars from his business interests and secreting and/or transferring the cash proceeds." (*Id.* ¶ 33.) For example, in May 2011, John Seibert liquidated his interest in Forest Lake Enterprises, LLC and Forest Lake Operations, LLC, which operated a Culver's restaurant in Forest Lake, Minnesota, for $173,125.00. (*Id.* ¶ 34.) Additionally, in October 2011, John Seibert finalized the sale of his interest in a family farm and used $150,000.00 of the $158,928.39 proceeds to pay down the mortgage on his home. (*Id.* ¶¶ 34, 499.)

After the conclusion of the Iowa action, Plaintiffs took efforts to collect the judgment. In 2012 and 2013, Plaintiffs obtained charging orders against John Seibert's 49% interest in a Culver's restaurant in Monticello, Minnesota. (*Id.* ¶¶ 36, 39, 43.) Shortly after the second charging order, John Seibert secretly transferred his interest to his son-in-law, Eric Knott, for $10,000.00. (*Id.* ¶ 46.) The interest was valued at approximately $330,750.00 at the time. (*Id.* ¶¶ 48-52.)

Between 2010 and 2013, Plaintiffs allege, John Seibert transferred $105,324.23 to his wife Julie Seibert. (*Id.* ¶ 69.) In 2010, John Seibert liquidated his interest in Coon Rapids Lodge for $35,132.50, and converted the proceeds into cash and a $30,500.00 cashier's check made payable to Julie Seibert. (*Id.* ¶¶ 56-61.) Plaintiffs allege several other money transfers to Julie Seibert in 2010 and 2011, and also that after John Seibert began working for BriMark Builders, LLC ("BriMark") in 2012, he regularly endorsed his paychecks over to his wife. (*Id.* ¶¶ 62-68.) John Seibert "retained effective control of these transferred assets, however, by using Julie Seibert's credit card to incur his personal

4

expenses." (*Id.* ¶ 71.) Additionally, Plaintiffs allege that JFS Development transferred $7,418.00 to Julie Seibert on February 14, 2011, without receiving reasonably equivalent value in exchange. (*Id.* ¶ 63.)

John Seibert worked for BriMark from May 2012 to August 2014. (*Id.* ¶¶ 84-121, 155-58.) The President of BriMark, Brian Wogernese, is a longtime friend and business colleague of John Seibert. (*Id.* ¶¶ 85, 104.) From May 2012 until June 2013, John Seibert was paid a bi-weekly salary of $910.00 for his work at BriMark. (*Id.* ¶ 86.) He routinely endorsed these checks over to his wife. (*Id.* ¶¶ 62-68, 88-93.) In June 2013, Plaintiffs served John Seibert with notice of intent to garnish his wages at BriMark. (*Id.* ¶ 94.) Immediately, John Seibert stopped receiving regular salary payments from BriMark and instead received "reimbursement of expenses" and a series of irregular "commissions" for executed construction contracts. (*Id.* ¶¶ 95-98.) One such commission, of $25,927.90, was paid out in the interim between Plaintiffs' notice of intent to garnish wages and service of their first garnishment summons on BriMark. (*Id.* ¶ 100.) After Plaintiffs sent the garnishment summons to BriMark, Brian Wogernese forwarded to John Seibert an email that he had received from BriMark's attorney, urging Wogernese to "come clean and not try to delay the inevitable" with regard to the garnishment. (*Id.* ¶ 104.)

Around the same time that Plaintiffs were attempting to garnish his wages with BriMark, John Seibert incorporated the real estate development corporation Trinity. (*Id.* ¶ 108.) Julie Seibert was named President and sole shareholder, and John Seibert was named Vice-President. (*Id.* ¶¶ 109-10.) Julie Seibert works as a hairdresser and has no experience or education in real estate development. (*Id.* ¶ 109.) Plaintiffs allege that John

Seibert began negotiating with BriMark to have his wages paid to Trinity, but abandoned that course of action to prevent exposing Julie Seibert to liability.  (*Id.* ¶¶ 112-15.)

John Seibert next attempted to be paid by BriMark through his company Preferred, which he incorporated in January 2014 and of which he was the President and sole shareholder.  (*Id.* ¶ 118.)  Plaintiffs allege that no corporate formalities were observed in the incorporation of Preferred, and that Preferred's principal place of business and registered business address is John Seibert's home. (*Id.* ¶¶ 125-26.)

John Seibert negotiated with BriMark to establish a "Sales Representative Agreement" between Preferred and BriMark, and directed BriMark's billing department to make the check for his next expense reimbursement out to Preferred.  (*Id.* ¶¶ 132-33.)  John Seibert ostensibly terminated his employment with BriMark on February 11, 2014, but continued his development work for the company and began submitting invoices, through Preferred, as an independent contractor.  (*Id.*  ¶¶ 136-42.)   Shortly after John Seibert's employment with BriMark purportedly ended, however, Plaintiffs discovered that he was still representing BriMark publicly.  (*Id.* ¶¶ 144-45.)  Plaintiffs inquired with BriMark as to whether John Seibert had been rehired on March 18, 2014, and while BriMark initially stated that he had not, it official rehired John Seibert ten days later.  (*Id.* ¶¶ 146-55.)  John Seibert worked for BriMark for five more months, and then negotiated an "Agreement of Resignation and Release" that agreed to pay him $200,000 in installments over a year and a half, and to pay $20,000 commissions for any of John Seibert's potential projects that came to fruition.  (*Id.* ¶ 158-59.)  John Seibert did not disclose this agreement to the Plaintiffs. (*Id.* ¶ 162.)

6

After leaving BriMark, John Seibert worked on a number of development projects through Preferred. Plaintiffs allege that Preferred had between 19 and 26 professional development projects underway in 2014, with expected payments in that year of $1.4 million. (*Id.* ¶ 171, 192.) These payments, to the extent they were made, have not been accounted for. (*Id.* ¶¶ 172-212.) At some point during 2014, John Seibert took on a partner in development, Jim Bortz of Cobblestone Hotel Group (which was associated with BriMark), and split fees with him 50/50. (*Id.* ¶¶ 192, 194-210.)

In late summer 2014, Plaintiffs became aware that John Seibert was working on development projects through Preferred. (*Id.* ¶ 215.) On August 19, 2014, John Seibert incorporated Royal, installing himself as the CEO and sole shareholder. (*Id.* ¶¶ 230-31.) Corporate formalities were not observed, and Royal's principal place of business and registered business address are the same as Preferred's: John Seibert's home. (*Id.* ¶¶ 233, 235.) Plaintiffs allege that upon their discovery of John Seibert's development projects with Preferred, Preferred fraudulently transferred the development rights to at least 12 pending projects to Royal, to evade the Plaintiffs' collection efforts. (*Id.* ¶ 216.) These projects were for hotel and large-scale development in Minnesota, Kentucky, Indiana, Ohio, Florida, and South Dakota, and were at varying stages of development. (*Id.* ¶¶ 216, 242-46, 250-55.) A few months later, in November 2014, Plaintiffs filed their initial Complaint in this action, alleging fraudulent transfers between John Seibert, JFS Development, Eric and Jennifer Knott (John Seibert's son-in-law and daughter), and Julie Seibert. (Compl. ¶¶ 112-70.)

Plaintiffs allege that John Seibert avoided receiving value for his development efforts because of Plaintiffs' collection efforts against him. While he worked on development projects through Royal, John Seibert in some instances refrained from signing on as lead developer, anticipating that he could first settle the instant case and "be released." (*Id.* ¶¶ 252, 254-55, 263-64.) When a letter of intent was executed for a project in North Port, Florida, John Seibert requested that the realtor not use his or Royal's name in any press release. (*Id.* ¶ 259.) In September 2015, John Seibert reached out to SkyWatch Group, LLC, ("SkyWatch") to seek a financing package for six projects that he was developing through Royal. (*Id.* ¶ 261.) In an email to an individual at SkyWatch, John Seibert stated that he would ordinarily take an ownership position in the development in lieu of part of his payment, but that he was prevented from doing so because of Plaintiffs' judgment and lawsuit against him. (*Id.*, Ex. 37 [Doc. No. 192-2].) He further stated, "Once we can reach a settlement, we would be interested in once again exploring that option." (*Id.*)

In their Second Amended Complaint, Plaintiffs added allegations that John Seibert regarded Royal's projects "as things having economic value, and considered the details and status of those development projects, including their locations, franchise affiliations, investor funding and bank relationships" as confidential business information. (*Id.* ¶ 267.) Of 22 projects John Seibert identified as pending developments with Royal in February 2016, John Seibert's records at the time implied that most were funded and expected to proceed in 2016. (*Id.* ¶¶ 269-70; Ex. 39 [Doc. No. 192-2].) In the spring and summer of 2016, Plaintiffs allege that John Seibert was actively developing 37 hotel and apartment projects, at varying stages, through Royal. (*Id.* ¶ 273; *see id.* ¶¶ 274-310.) For each of these

projects, Royal's Business Consulting Development Agreement would have required an initial $10,000 retainer. (*Id.* ¶ 322.)

In May 2016, Plaintiffs became aware of Royal and began to levy its stock. (*Id.* ¶¶ 400-01.) Around this time, Plaintiffs allege that John Seibert began to transfer Royal's projects to Trinity, the corporation that he had previously formed with his wife as the President and sole shareholder. (*E.g., id.* ¶¶ 400-403.)[1] In the spring of 2016, Plaintiffs allege that John Seibert, acting through Trinity, embarked on a new business relationship with SkyWatch, under which SkyWatch would pay a monthly fee to Trinity for John Seibert's work. (*Id.* ¶¶ 360, 376, 398.) In an email describing Trinity as a "development consultant" for SkyWatch, John Seibert listed 11 Trinity/SkyWatch development projects, 6 of which had previously been developed by Royal. (*Id.* ¶¶ 404-10.) Plaintiffs allege that no fewer than 20 pending development projects were transferred from Royal to Trinity before late May 2016, and that each transferred project "involved a collection of valuable work product," including connections with individual franchisors, financing banks, property sellers, and investors. (*Id.* ¶¶ 412, 419, 424.)

Then, on June 30, 2016, John Seibert declared bankruptcy under Chapter 7. (*Id.* ¶ 429.) In his bankruptcy schedules, John Seibert failed to disclose that he was Vice-

---

[1]    For example, Plaintiffs allege that Royal worked on a project to develop the Running Aces hotel and casino. In May 2016, John Seibert attached a Royal "company profile" in an email to the general manager of Running Aces Harness Racing Facility. (SAC ¶ 400.) But two weeks later, when preparing to sign a development contract for Running Aces, John Seibert specified that Trinity would be signing the contract. (*Id.* ¶ 402.)

President of Trinity, and did not disclose any relationship with SkyWatch.[2]  (*Id.* ¶¶ 432-36.)

Just a few weeks after producing these schedules to the bankruptcy court, John Seibert

submitted an invoice to SkyWatch for $10,700 for services rendered, instructing SkyWatch

to make the payment to Trinity.  (*Id.* ¶ 448.)  John Seibert submitted several more such

invoices after his bankruptcy.  (*Id.* ¶¶ 455-58, 470-71, 474-76.)  In their Second Amended

Complaint, Plaintiffs allege several additional payments made to Trinity during 2017, from

the Running Aces casino development contract and from SkyWatch.  (*Id.* ¶¶ 477-86.)

These payments were deposited into Trinity and then a significant portion were later

withdrawn in cash by Julie Seibert.  (*Id.* ¶¶ 485-86.)

      Plaintiffs filed an adversary action in John Seibert's bankruptcy, seeking to classify

the three Iowa judgments as non-dischargeable.  (*See In re Seibert*, No. 16-ap-4103, Compl.

against Debtor John F. Seibert to Determine Dischargeability of Debt [Adversary Doc. No.

1].)  While that action was pending, the bankruptcy trustee took over the instant case and

negotiated a partial settlement.  The settlement dismissed claims against Defendants Eric

Knott, Jennifer Knott, and Monticello Ventures KS, LLC, in exchange for $200,000.00.

(Decl. of Robert H. Miller [Doc. No. 189] ("Miller Decl."), Ex. 1 [Doc. No. 189-1] (Notice

of Hr'g and Mot. for Approval of Settlement ("Settlement Mot."), at 3-4).)[3]  The Plaintiffs

in this case received $100,000.00 from that settlement and the bankruptcy estate received

---

[2]      John Seibert also failed to disclose Julie Seibert's relationship to Trinity in his
bankruptcy schedules, listing her occupation as "cosmetologist" and her employer as Vivid
Details Salon, Inc.  (*Id.* ¶¶ 441-42.)

[3]      All references to page numbers in this Opinion are those assigned by the CM/ECF
system.

the remaining $100,000.00.  (*Id.*, at 4.)  In addition, the settlement assigned to the Plaintiffs "[a]ll known and unknown claims against Julie Seibert in the Fraudulent Transfer Litigation," and "[a]ll known and unknown claims against any other third-party that could be asserted in the Fraudulent Transfer Litigation including, but not limited to, claims against Trinity Business Consulting, any of the SkyWatch Inn entities, Preferred Business Consulting Group, Royal Business Consulting and any other entity related to the debtor's or Julie Seibert's pre-petition business activities."  (*Id.*, at 5.)  Plaintiffs agreed to seek no further disbursements from the bankruptcy estate, and to return surplus funds to the bankruptcy estate should they recover from the assigned claims more than the total of the Iowa judgments.  (*Id.*, at 5-7.)  In her motion to the bankruptcy court seeking approval for this settlement, the trustee stated:

> The trustee believes that the settlement is in the best interest of the creditors and the estate.  The trustee believes that resolution will allow her to efficiently complete the administration of the estate without having to incur the substantial legal fees anticipated in litigating the remaining claims in the Fraudulent Transfer Litigation.  The trustee believes that litigating the Fraudulent Transfer Litigation will be lengthy and expensive.  The Fraudulent Transfer Litigation has been pending since November 2014 and the attorneys' fees incurred are significant . . . .  The paramount interest of creditors involves the trustee recovering the greatest net return possible for the bankruptcy estate.  The interests of creditors will be served by streamlined resolution and minimization of fees.  The trustee also has concerns about the collectability of any judgment that may be obtained in the Fraudulent Transfer Litigation.  The interest of creditors will also be served by the withdrawal of the Cedar Rapids Plaintiffs' claim, which is in excess of $18 million and is the largest unsecured claim in the case.  The trustee believes that the settlement represents the greatest net return for all creditors.

(*Id.*, at 7.)  No response was filed opposing the settlement, and the bankruptcy court approved it on May 24, 2017.  (*Id.*, Ex. 2 (Order dated May 24, 2017).)

In Plaintiffs' adversary proceeding, the bankruptcy court granted Plaintiffs' motion for summary judgment and found two of the three Iowa judgments were excepted from discharge. (*See In re Seibert*, No. 16-ap-4103, Mot. for Summ. J. by Plaintiffs [Adversary Doc. No. 10]; *id*, Order dated Sept. 28, 2017 [Adversary Doc. No. 26].) John Seibert appealed that decision, and that appeal is currently pending with this Court. *See Seibert v. Cedar Rapids Lodge & Suites, LLC*, No. 17-cv-4756, Notice of Appeal [Bankr. Appeal. Doc. No. 1].)

## C. Plaintiffs' Claims

Plaintiffs' Second Amended Complaint alleges that John Seibert made a series of fraudulent transfers himself and through his alter egos Preferred and Royal, with intent to hinder, delay, or defraud his creditors. It alleges that Julie Seibert received fraudulent transfers of cash and stock from John Seibert and JFS Development. It further alleges that Trinity received a series of fraudulent transfers. Finally, it alleges that John Seibert and Julie Seibert both participated in a conspiracy to engage in fraudulent transfers.

Count I alleges that John Seibert liquidated his interest in a family farm and transferred the proceeds into his homestead—exempt from collection efforts—by paying down his mortgage. Plaintiffs allege that John Seibert did this with intent to hinder, delay, or defraud the Plaintiffs, in violation of Minn. Stat. § 513.44(a)(1). (SAC ¶¶ 501-06.) Count II alleges that John Seibert transferred $105,324.23 to Julie Seibert, with intent to hinder, delay, or defraud the Plaintiffs, in violation of Minn. Stat. § 513.44(a)(1). (*Id.* ¶¶ 507-11.) Count III alleges that the transfers of money to Julie Seibert were made without receiving reasonably equivalent value in exchange and left John Seibert under-capitalized

for the business he was pursuing, in violation of Minn. Stat. § 513.44(a)(2).  (*Id.* ¶¶ 512-17.)
Count IV alleges that the transfers of money to Julie Seibert were made without receiving
reasonably equivalent value in exchange and were made while John Seibert was insolvent or
rendered him insolvent, violating Minn. Stat. § 513.45(a).  (*Id.* ¶¶ 518-23.)  Count V alleges
that Preferred is John Seibert's corporate alter ego and that justice requires piercing
Preferred's corporate form.  (*Id.* ¶¶ 524-28.)

Count VI alleges that Royal is John Seibert's corporate alter ego and that justice
requires piercing Royal's corporate form.  (*Id.* ¶¶ 529-33.)  Count VII alleges that the
transfer of development projects to Royal was done with intent to hinder, delay, or defraud
Plaintiffs, in violation of Minn. Stat. § 513.44(a).  (*Id.* ¶¶ 534-38.)  Count VIII alleges that
the transfer of development projects to Royal was made without receiving reasonably
equivalent value in exchange and left John Seibert (qua Preferred) under-capitalized for the
business he was pursuing, in violation of Minn. Stat. § 513.44(a)(2).  (*Id.* ¶¶ 539-44.)  Count
IX alleges that the transfer of development projects to Royal was made without receiving
reasonably equivalent value in exchange and was made while John Seibert (qua Preferred)
was insolvent or rendered him insolvent, violating Minn. Stat. § 513.45(a).  (*Id.* ¶¶ 545-50.)
Count X alleges that the transfer of development projects to Trinity was done with intent to
hinder, delay, or defraud Plaintiffs, in violation of Minn. Stat. § 513.44(a).  (*Id.* ¶¶ 551-55.)
Count XI alleges that John Seibert transferred Royal as a going concern to Trinity, and did
so with intent to hinder, delay, or defraud the Plaintiffs, in violation of Minn. Stat.
§ 513.44(a).  (*Id.* ¶¶ 556-62.)

Count XII alleges that the transfer of development projects to Trinity was made without receiving reasonably equivalent value in exchange and left John Seibert (qua Royal) under-capitalized for the business he was pursuing, in violation of Minn. Stat. § 513.44(a)(2). (*Id.* ¶¶ 563-68.) Count XIII alleges that the transfer of development projects to Trinity was made without receiving reasonably equivalent value in exchange and was made while John Seibert (qua Royal) was insolvent or rendered him insolvent, violating Minn. Stat. § 513.45(a). (*Id.* ¶¶ 569-73.) Count XIV alleges that John Seibert was the constructive owner of Trinity's stock, because he was in full control of the company. Thus, Count XIV alleges that John Seibert's direction that all Trinity stock be issued to Julie Seibert was a fraudulent transfer, intended to hinder, delay, or defraud the Plaintiffs in violation of Minn. Stat. § 513.44(a). (*Id.* ¶¶ 574-80.) Count XV alleges that Julie Seibert agreed and knowingly and willfully conspired to execute the fraudulent transfers described above. (*Id.* ¶¶ 581-90.) Count XVI alleges that John Seibert agreed and knowingly and willfully conspired to execute the fraudulent transfers described above. (*Id.* ¶¶ 591-600.)

## D. Parties' Motions

Defendants have jointly filed a Motion to Dismiss. Defendants argue that Plaintiffs lack standing to bring this case because the bankruptcy trustee was prohibited from assigning the action to Plaintiffs. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss under Rule 12 [Doc. No. 185] ("Defs.' Mem. in Supp."), at 9-15.) Defendants further argue that, even if the trustee was empowered to assign the action, the trustee did not assign any claims against John Seibert. (*Id.*, at 15-16.) Additionally, Defendants claim that the Court lacks subject-matter jurisdiction because the Complaint does not plead the residency of the

14

members of Cedar Rapids Lodge & Suites, LLC., and because the trustee's participation in the case destroyed diversity.  (*Id.*, at 17; Defs.' Reply in Supp, of Mot. to Dismiss under Rule 12 [Doc. No. 190] ("Defs.'s Reply"), at 9.)

Defendants also argue that Plaintiffs have failed to state a claim upon which relief can be granted.  Defendants argue that Plaintiffs failed to properly plead their fraudulent transfer claims.  (Defs.' Mem. in Supp., at 20-26.)  Defendants further argue that Plaintiffs' claims regarding the transfer of development projects do not state a claim for fraudulent transfer because they do not allege that the transfer of assets occurred.  (*Id.*, at 27-31.)  Finally, Defendants assert that conspiracy to commit fraudulent transfer is not a viable cause of action under Minnesota law.  (*Id.*, at 31-33.)

Three months after Defendants filed their Motion to Dismiss, Plaintiffs filed a Motion to Amend.  Plaintiffs argue that motions to amend should be freely granted absent indicia of bad faith or other good reason, and that no reason exists to withhold leave here.  (Mem. of Law in Supp. of Pls.' Mot. for Leave to Amend [Doc. No. 194] ("Pls.' Mem. in Supp."), at 3.)  Defendants oppose the Motion, arguing that the amendment would be futile and that justice favors denial.  (Mem. of Law in Opp. to Mot. to Amend Compl. [Doc. No. 199] ("Defs.' Mem. in Opp.").)

## III.    DISCUSSION

### A.  Motion for Leave to Amend

Plaintiffs have already amended their complaint once as a matter of course.  (*See* First Am. Compl. [Doc. No. 163].)  After the first amendment, "a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ.

P. 15(a)(2). Nonetheless, "[t]he court should freely give leave when justice so requires." *Id.* The decision whether to grant leave to amend "is left to the sound discretion of the district court." *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 497 (8th Cir. 2008). "A court abuses its discretion when it denies a motion to amend a complaint unless there exists undue delay, bad faith, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment." *Id.*

Plaintiffs' proposed Second Amended Complaint removes five counts that were present in the First Amended Complaint, and adds two new counts: Counts XI and XIV. (*Compare* First Am. Compl. ¶¶ 502-618, *with* SAC ¶¶ 501-600.) Plaintiffs note that the requested amendment comports with the governing deadline for the amendment of pleadings in this case. (*See* Pls.' Mem. in Supp., at 3 (citing Pretrial Scheduling Order [Doc. No.182]).)

Although Plaintiffs' Motion to Amend was filed after Defendants' Motion to Dismiss, Defendants assert that "[t]he essence of the plaintiffs' allegations remain the same," (Defs.' Mem. in Opp., at 3), and that "the defendants' arguments made in their motion to dismiss apply with equal force to the plaintiffs' latest proposed amendment and are incorporated herein by reference," (*id.*, at 8). For the sake of efficiency, and to avoid the unnecessary parsing of an outdated pleading while addressing Defendants' Motion to Dismiss, the Court will therefore address the Motion to Amend first.

Defendants argue that the Court should deny Plaintiffs' Motion because it fails to cure the subject-matter jurisdiction and pleading deficiencies of the First Amended Complaint. (Defs.' Mem. in Opp., at 7-13.) As will be discussed below, the Court holds

that subject-matter jurisdiction is proper and Plaintiffs have met their pleading standard.  *See infra* Part II.B.  Thus, the Court finds that Plaintiffs' proposed amendment would not be futile.

Additionally, Defendants argue that justice supports denial of the motion because Plaintiffs' assertions are frivolous and Plaintiffs have had years to amend their pleadings since the case was filed in 2014.  (*Id.*, at 15-18.)  The Court does not find these arguments persuasive.  Defendants' points of disagreement with the Second Amended Complaint are not adequate reasons to deny leave to amend.  *See Popoalii*, 512 F.3d at 497.  Plaintiffs have pointed to the delay caused by hard-fought discovery disputes and John Seibert's bankruptcy as reasons that they were unable to amend the complaint until now.  (Pls.' Mem. in Supp, at 4-5.)  Further, Plaintiffs' Motion to Amend complies with the governing deadline for the amendment of pleadings.  (*See* Pretrial Scheduling Order, at 1.)  The Court sees no reason that leave to amend should not be "freely given" here.  Fed. R. Civ. P. 15(a)(2).  Thus, Plaintiffs' Motion to Amend is granted, and the Court will evaluate Defendants' Motion to Dismiss as it applies to the Second Amended Complaint.

### B.  Motion to Dismiss

#### 1.  Legal Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure states that a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Although the complaint need not contain "detailed factual allegations," it must plead facts sufficient "to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Thus, to survive a motion to dismiss, the plaintiff's

"obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." *Benton v. Merrill Lynch & Co., Inc.*, 524 F.3d 866, 870 (8th Cir. 2008) (quotations and citation omitted). Rather, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation and citation omitted). This plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court assesses plausibility by drawing "on its judicial experience and common sense." *Id.* at 679.

Fraud claims are subject to a higher pleading standard. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The 9(b) standard applies to Plaintiffs' fraudulent transfer claims that rely upon proving intent to hinder, delay or defraud, but it does not apply to Plaintiffs' constructive fraud claims. *See Kranz v. Koenig*, 240 F.R.D. 453, 455 (D. Minn. 2007) ("Rule 9(b) applies to fraudulent conveyance claims."); *In re RFC & ResCap Liquidating Tr. Litig.*, No. 13-cv-3451, 2017 WL 1483374, at *6 (D. Minn. Apr. 25, 2017) ("Because constructive fraudulent transfer claims—unlike actual fraud—do not rely on proving intent or a materially false representation, the Court applies the more relaxed pleading standards of Federal Rule of Civil Procedure 8(a)."). Accordingly, for Counts I, II, VII, X, XI, and XIV, Plaintiffs must "identify the 'who, what, where, when, and how' of the alleged fraud." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (quoting *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001)).

"The level of particularity required depends on, *inter alia*, the nature of the case and the relationship between the parties." *Id.*

### 2. Subject Matter Jurisdiction

#### a.    Standing

Defendants argue that the bankruptcy trustee's assignment of these claims to Plaintiffs was unlawful because a bankruptcy trustee is not entitled to assign avoidance powers. (Defs.' Mem. in Supp., at 11-14.) Defendants also argue that the claims allegedly assigned by the trustee were not property of the estate that could be transferred under an approved settlement agreement. (Defs.' Reply, at 4-5.) Even if the trustee was empowered to transfer these claims, Defendants assert that the language of the settlement agreement did not assign any claims against John Seibert. (Defs.' Mem. in Supp., at 15-16.)

The Court notes that Defendants made no objection to the settlement when it was submitted for approval to the bankruptcy court, and the time for appeal of that decision has lapsed. *See* Fed. R. Bankr. P. 8002(a)(1). Plaintiffs argue that Defendants cannot now collaterally attack the bankruptcy court's decision to approve the settlement. (Pls.' Mem. in Opp., at 7-8.) "Standing is a component of subject matter jurisdiction that may be challenged at any time during the proceeding." *In re Foster*, 516 B.R. 537, 544 (B.A.P. 8th Cir. 2014) (citing *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975)). Thus, Defendants may raise this dispositive issue even after failing to object to the settlement when it was entered. *Id.*; *see also In re Canion*, 196 F.3d 579, 585 (5th Cir. 1999) (permitting creditor to challenge bankruptcy court's subject-matter jurisdiction over its fraudulent transfer action

after losing on the merits, even though the creditor initially consented to transferring the case to the bankruptcy court).

The trustee in a Chapter 7 bankruptcy "can commence lawsuits to set aside prebankruptcy advantages obtained by creditors which offend the bankruptcy policy of fair sharing." 1 Richard A. Aaron, *Bankruptcy Law Fundamentals* § 1.3 (2017). These "avoidance powers" are derived from statute, and most were created specifically for Chapter 7 bankruptcy proceedings. *See* 11 U.S.C. §§ 544, 547, 548. But the bankruptcy trustee is also empowered to step into the shoes of a creditor and bring claims under state law. Under § 544(b), "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim." 11 U.S.C. § 544(b). The bankruptcy trustee was substituted as plaintiff in this case after John Seibert filed bankruptcy, because the trustee had the power to take over the suit under 11 U.S.C. § 544(b). (*See* Order Substituting Party [Doc. No. 72].) The trustee then negotiated a settlement settling some of the claims and assigning the rest to Plaintiffs.

Defendants argue that the trustee may not transfer avoidance actions because they are not property of the estate. (Defs.' Reply, at 4-5.) Courts disagree as to whether § 544(b) fraudulent transfer claims are property of the bankruptcy estate, but a majority of courts appear to conclude that they are. The First, Fifth, and Ninth Circuit Courts of Appeals have held that fraudulent transfer actions are property of the estate. *See In re Moore*, 608 F.3d 253, 258-61 (5th Cir. 2010); *In re Ontos, Inc.*, 478 F.3d 427, 431 (1st Cir. 2007) ("The Bankruptcy Code broadly defines the property of the estate to be comprised of all 'legal or

equitable interests of the debtor in property as of the commencement of the case.'  It is well established that a claim for fraudulent conveyance is included within this type of property." (citation omitted)); *In re Lahijani*, 325 B.R. 282, 287 (B.A.P. 9th Cir. 2005) ("Causes of action owned by the trustee are intangible items of property of the estate that may be sold." (citing *In re P.R.T.C., Inc.*, 177 F.3d 774, 781 (9th Cir. 1999)); *see also Nat'l Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 708-09 (7th Cir. 1994) (stating, in dicta, that the right to "recoup a fraudulent conveyance, which outside of bankruptcy may be invoked by a creditor, is property of the estate").

In *Moore*, the Fifth Circuit held that a state-law fraudulent transfer action is property of the bankruptcy estate because it "pursues property in which the debtor retains an equitable interest."  608 F.3d at 259 n.7 (quoting *In re Bradley*, 326 F. App'x 838, 839 (5th Cir. 2009) (per curiam)); *see also In re MortgageAmerica Corp.*, 714 F.2d 1266, 1275 (5th Cir. 1983) ("An action under the Fraudulent Transfers Act is essentially one for property that properly belongs to the debtor and which the debtor has fraudulently transferred in an effort to put it out of the reach of creditors . . . .  The transferee may have colorable title to the property, but the equitable interest—at least as far as the creditors (but not the debtor) are concerned—is considered to remain in the debtor so that creditors may attach or execute judgment upon it as though the debtor had never transferred it.").  In *Moore*, the Fifth Circuit also stated an alternative basis for holding that fraudulent transfer claims are property of the estate.  The court held, "[a]lthough fraudulent-transfer claims under Texas state law could not be brought by the debtor, . . . such claims become estate property 'once

bankruptcy is under way' by virtue of the trustee's successor rights under § 544(b)."
*Moore*, 608 F.3d at 261 (quoting *Havlik*, 20 F.3d at 708-09).)

Some courts have held that avoidance actions are not property of the bankruptcy estate. *See In re Petters Co., Inc.*, 550 B.R. 438, 451 (Bankr. D. Minn. 2016) ("The statutory powers on which a trustee sues to avoid and recover are not themselves assets of the estate." (citing *In re Arzt*, 252 B.R. 138, 141 (B.A.P. 8th Cir. 2000)); *In re DartCo, Inc.*, 203 B.R. 285, 295 n.19 (Bankr. D. Minn. 1996) ("[T]echnically speaking, avoidance powers and rights of recovery under 11 U.S.C. §§ 544-551 are not property of the bankruptcy estate. . . .  Once the trustee exercises avoidance powers, of course, the recovered assets become property of the estate. . . .  However, the right of recovery itself probably cannot be said to be property reposing in the estate; it is created independently by statute, and lodges with whomever the statute empowers to wield it.").

Defendants cite *In re Cybergenics Corp.*, 226 F.3d 237 (3d Cir. 2000), for the proposition that avoidance claims are not property of the estate. (Defs.' Reply, at 4.)  But *Cybergenics* did not quite reach that conclusion.  Although the court in *Cybergenics* held that a fraudulent transfer claim was not the property of the debtor-in-possession in a Chapter 11 bankruptcy, and thus was not sold off in an auction of the debtor-in-possession's assets, it distinguished the assets of the debtor-in-possession from the property of the bankruptcy estate itself. *See* 226 F.3d at 246.  The Court stated, "'Cybergenics' assets' and 'property of the estate' have different meanings. . . .  Issues relating to property of the estate are simply not relevant to the inquiry into whether the fraudulent transfer claims in the Committee's complaints were assets of Cybergenics as debtor or debtor-in-possession." *Id.*  Although the

court went on to state in dicta that it would not find a fraudulent transfer action to be property of the estate, the Court considers this case too different from the circumstances before it to be persuasive. *Id.*, at 246 n.16.

The Eighth Circuit has not explicitly held that avoidance claims are property of the bankruptcy estate. But in *Harstad v. First Am. Bank*, 39 F.3d 898 (8th Cir. 1994), it implicitly accepted that proposition. The *Harstad* court considered whether a Chapter 11 debtor-in-possession may bring an avoidance action after the confirmation of a plan of reorganization, which ordinarily "'vests all of the property of the estate in the debtor.'" *Id.*, at 902 (citing 11 U.S.C. § 1141(b)). The court held that the debtor-in-possession's failure to preserve the action under 11 U.S.C. § 1123(b)(3) preempted the "general provision of § 1141 that dumps all remaining post-confirmation estate property into the lap of the debtor." *Id.*, at 903. Thus, the Eighth Circuit's reasoning implicitly accepted the proposition that an avoidance action is property of the estate that ordinarily reverts back to the debtor at the approval of a plan of reorganization.

The cases strongly favor finding that the fraudulent transfer claims here were property of the estate, and the Court so finds. The next issue to consider is whether the trustee was permitted to transfer those claims to Plaintiffs as a part of the settlement agreement.

Courts also disagree as to whether trustees may transfer avoidance claims. The Ninth Circuit has held that the trustee may transfer any avoidance claims. *See Lahijani*, 325 B.R. at 288 (citing *P.R.T.C., Inc.*, 177 F.3d at 781). In *Moore*, the Fifth Circuit held that trustees can transfer claims that they inherit under 11 U.S.C. § 544(b). 608 F.3d at 261.

Several courts have held that trustees cannot transfer any claims under their avoidance powers. *See In re Boyer*, 372 B.R. 102, 105 (D. Conn. 2007) ("The sale or assignment of avoidance claims to an objecting creditor is not permitted if the creditor intends to pursue the claims on its own behalf."), *aff'd on other grounds*, 328 F. App'x 711 (2d Cir. 2009); *In re Waterford Funding, LLC*, No. 09-br-22584, 2017 WL 439308, at *3 (Bankr. D. Utah Feb. 1, 2017) (holding that trustee was "legally precluded from" assigning claims under § 544(b) and § 548); *In re Clements Mfg. Liquidation Co., LLC*, 558 B.R. 187,189 (Bankr. E.D. Mich. 2016) ("The Court therefore holds that the Chapter 7 trustee in this case may not assign any of the avoidance actions/powers as he seeks to do in the proposed settlement."); *In re Carragher*, 249 B.R. 817, 820 (Bankr. N.D. Ga. 2000) ("Absent extraordinary circumstances, a trustee is prohibited from selling, transferring, or assigning the right to assert and maintain an estate's avoidance action to an individual creditor.").

Plaintiffs emphasize, however, that most of these decisions do not distinguish between avoidance claims that the bankruptcy statute creates specifically for the trustee and pre-existing claims inherited from creditors under § 544(b). *See Boyer*, 372 B.R. at 105 (analogizing constructive trust claims to avoidance claims generally); *Clements*, 558 B.R. at 189 (holding that the trustee may not assign "any of the avoidance actions/powers"); *Carragher*, 249 B.R. at 820 (rejecting a proposed settlement that would sell any avoidance claims of the estate with regard to a specific entity). The Court has found only two cases holding that trustees do not have the power to transfer, specifically, § 544(b) claims. *See Clements*, 558 B.R., at 189; *Waterford Funding*, 2017 WL 439308, at *3. And § 544(b)

claims are unique among the trustee's avoidance powers, because they do not create a cause of action, but allow the trustee to step into the shoes of a creditor with an existing claim. *See Moore*, 608 F.3d at 261 ("We focus narrowly on the trustee's ability to sell causes of action that he has inherited from creditors under § 544(b)—causes of action that exist independent of the bankruptcy proceeding."); *Cybergenics*, 226 F.3d at 243 ("The avoidance power provided in section 544(b) is distinct from others because a trustee or debtor in possession can use this power only if there is an unsecured creditor of the debtor that actually has the requisite nonbankruptcy cause of action.").

At the same time, many of the cases Defendants cite as prohibiting transfer of avoidance powers refer only to statutorily-created actions, making no mention of § 544(b) claims. *See In re Vogel Van & Storage, Inc.*, 210 B.R. 27, 31-32 (N.D.N.Y. 1997) (holding that a trustee may not transfer a § 547 preferential transfer action); *In re McGuirk*, 414 B.R. 878, 879 (Bankr. N.D. Ga. 2009) (holding that the trustee was not permitted to sell its "unique statutory powers" under §§ 547, 548 and 549); *In re Harrold*, 296 B.R. 868, 872 (Bankr. M.D. Fla. 2003) ("Concluding the trustee is acting as an individual creditor, the gravamen of the issue in this case is whether any creditor in a Chapter 7 bankruptcy case may exercise the avoidance powers afforded to the Chapter 7 Trustee under 11 U.S.C. §§ 547 and 548. The answer appears to be a resounding "no.'").

The Eighth Circuit has not opined on the question of whether a trustee can transfer § 544(b) fraudulent transfer claims. The Eighth Circuit has indicated that creditors can pursue § 548 avoidance claims after showing that a trustee cannot be relied upon to assert them. *In re Lauer*, 98 F.3d 378, 388 (8th Cir. 1996). The Eighth Circuit has also stated that

a trustee may grant a creditor derivative standing to use the trustee's avoidance powers when the bankruptcy court finds that derivative standing is "necessary and beneficial to the fair and equitable resolution" of the bankruptcy proceedings. *In re Racing Servs., Inc.*, 540 F.3d 892, 902 (8th Cir. 2008) (quoting *In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001)) (emphasis removed).

The Court agrees with the Fifth Circuit's reasoning in *Moore*. The court concluded that "[a]llowing a trustee to sell § 544(b) rights of action is in accord with the trustee's existing powers," such as the ability to authorize creditor suits under a Chapter 11 plan of reorganization and to authorize derivative exercise of the avoidance powers. *Moore*, 608 F.3d at 261-62. Additionally, the trustee's sale of § 544(b) rights of action is subject to approval by the bankruptcy court, which will consider the "core bankruptcy principles" of "asset value maximization and equitable distribution" in deciding whether to grant approval. *Id.* at 262 n.18. The facts underlying *Moore* are notably similar to the facts here. The creditor had a fraudulent transfer and alter ego action pending when the debtor filed Chapter 7 bankruptcy. *Id.*, at 255. Also, this creditor held 86% of the debtor's unsecured debt, which eased concerns that transferring the § 544(b) claims would prejudice other creditors. *Id.*, at 261 n.18. Here, Plaintiffs filed this case over a year before John Seibert filed bankruptcy, and held the largest unsecured claim in the bankruptcy. (*See* Compl.; Settlement Mot., at 7.)

Because a full transfer of these claims by assignment confers greater rights than would a grant of derivative standing, any assignment of § 544(b) claims ought to also meet the "necessary and beneficial" standard stated in *Racing Services*. *See* 540 F.3d at 902. The

trustee's statements in the Motion for Approval of Settlement satisfy this standard. The trustee stated that "[t]he interests of creditors will be served by the streamlined resolution and the minimization of fees," and by the withdrawal of Plaintiffs' claim, "which is in excess of $18 million and is the largest unsecured claim in the case." (Settlement Mot., at 7.) The trustee anticipated that this case would give rise to "substantial legal fees" in a "lengthy and expensive" litigation, and expressed "concerns about the collectability of any judgment that may be obtained." (*Id.*) Weighing the burdens of pursuing the action against the advantages of assigning it and resolving the bankruptcy, the trustee decided that assigning the claims was "in the best interests of the creditors and the estate." (*Id.*) The Court agrees, and will uphold the trustee's assignment here.

Defendants' final standing argument is that the trustee's assignment did not include claims against John Seibert himself, the debtor. (Defs.' Mot. in Supp., at 15-16.) The trustee assigned all known and unknown claims against Julie Seibert, Eric and Jennifer Knott, and "any other third party that could be asserted in the Fraudulent Transfer Litigation." (Settlement Mot., at 5.) Defendants argue that John Seibert, as the debtor in the bankruptcy, was not a "third party," and thus claims against him were not included in the assignment. (Defs.' Mot. in Supp., at 15-16.)

Plaintiffs respond that John Seibert was a third-party to the settlement agreement in which these claims were assigned, because his claims were not settled in that agreement. (Pls.' Mem. in Opp., at 9.) The Court considers this interpretation to be reasonable, given that the trustee held out the settlement as an agreement "between the estate and [the

27

Plaintiffs]." (Settlement Mot., at 8.)  Accordingly, for the reasons described above, the Court finds that Plaintiffs have standing to bring this action.[4]

### b. Diversity

In their Motion to Dismiss, Defendants argue that Plaintiffs failed to plead diversity of citizenship because they did not plead the residency of the members of Cedar Rapids Lodge & Suites, LLC.  (Defs.' Mem. in Supp., at 17.)  Plaintiffs have cured this in their Second Amended Complaint, which clearly pleads the residency of the members of Cedar Rapids Lodge & Suites, LLC, none of whom destroy diversity.  (*See* SAC ¶ 9.)

In their reply brief, Defendants raised a new diversity argument, asserting that the trustee's residency destroys diversity because she was a party to the action before she assigned it.  (Defs.' Reply, at 9.)  Setting aside the fact that arguments first raised in a reply brief are generally considered waived, *see* D. Minn. LR 7.1(c)(3)(B), this argument is meritless.  Defendants' only support for this argument is a citation to *Branson Label, Inc. v. City of Branson*, 793 F.3d 910 (8th Cir. 2015), in which the court determined that parties had used assignment to improperly manufacture diversity, in violation of 28 U.S.C. § 1359. Defendants have made no argument, and the Court sees no indication, that the trustee's assignment in this case was designed to manufacture diversity.  Instead, the trustee assigned the case back to the parties who initially filed it, who were properly diverse from the start.

---

[4]    Defendants also raise an argument in their Motion to Dismiss that Plaintiffs lack standing because their judgment debt against John Seibert was discharged in bankruptcy. (Defs.' Mem. in Supp., at 16.)  Since that brief was filed, however, the bankruptcy court issued a decision excepting two of the three Iowa judgments from discharge.  (*See In re Seibert*, No. 16-ap-4103, Mot. for Summ. J. by Plaintiffs; *id*, Order dated Sept. 28, 2017.)

Accordingly, the Court concludes that diversity confers subject-matter jurisdiction to hear Plaintiffs' claims.

### 3. Failure to State a Claim

#### a.     The Minnesota Uniform Voidable Transfer Act

The Minnesota Uniform Fraudulent Transfer Act ("MUFTA"), or the Minnesota Uniform Voidable Transfer Act ("MUVTA"), as it is now known, is designed to "prevent debtors from placing property that is otherwise available for the payment of their debts out of the reach of their creditors." *Citizens State Bank Norwood Young Am. v. Brown*, 849 N.W.2d 55, 60 (Minn. 2014); Minn. Stat. §§ 513.41-.51. "To cover the variety of situations in which debtors may attempt to place assets beyond the reach of creditors, MUFTA allows creditors to recover assets that a debtor transfers with fraudulent intent, Minn. Stat. § 513.44(a)(1), as well as those transfers that the law treats as constructively fraudulent, *see* Minn. Stat. §§ 513.44(a)(2), 513.45." *Finn v. Alliance Bank*, 860 N.W.2d 638, 644 (Minn. 2015).

To prove a fraudulent transfer under Minn. Stat. § 544(a)(1), MUVTA's "actual fraud" provision, Plaintiffs must show "[a] transfer made or obligation incurred by a debtor . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." Because actual intent to defraud is "rarely susceptible of direct proof," MUVTA specifies that courts may consider eleven "badges of fraud" to determine whether a transfer was made with intent to hinder, delay, or defraud. *Finn*, 860 N.W.2d at 645 (quoting *Citizens State Bank*, 849 N.W.2d at 60). The statute specifies that "[i]n determining actual intent under paragraph (a), clause (1), consideration may be given, among other factors, to whether:

(1)     The transfer or obligation was to an insider;

(2)     The debtor retained possession or control of the property transferred after the transfer;

(3)     The transfer or obligation was disclosed or concealed;

(4)     Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5)     The transfer was of substantially all the debtor's assets;

(6)     The debtor absconded;

(7)     The debtor removed or concealed assets;

(8)     The value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)     The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)    The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)    The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

Minn. Stat. § 513.44(b).  The Eighth Circuit has indicated that "the presence of three badges of fraud is sufficient" to state a claim for actual fraudulent transfer.  *In re Sherman*, 67 F.3d 1349, 1357 (8th Cir. 1995).

A plaintiff may also recover for constructive fraud, under Minnesota Statutes sections 513.44(a)(2) and 513.45(a).  To prove fraudulent transfer under Minn. Stat. § 513.44(a)(2)(i), Plaintiffs must show that the debtor made a transfer "without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . . was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction." Similarly, to prove fraudulent transfer under Minn. Stat. § 513.45(a), Plaintiffs must show that, after Plaintiffs' judgment against the debtor arose, the debtor made a transfer or incurred an obligation "without receiving a reasonably equivalent value in exchange . . . and

the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer."

Upon proof of a fraudulent transfer, a creditor's remedies include the avoidance of the transfer, an attachment of the asset transferred, and appropriate equitable relief. Minn. Stat. § 513.47.

### b.    Alleged Pleading Deficiencies

Defendants assert that Plaintiffs fail to adequately plead their constructive fraud claims because they "repeatedly make conclusory statements that Mr. Seibert 'received less than reasonably equivalent value in exchange for' certain transfers without any supporting allegations about what, or the value of what, Mr. Seibert did or did not receive." (Defs.' Mem. in Supp., at 23.) The Court disagrees. That the transferor received less than reasonably equivalent value is a necessary element in Counts III, IV, VIII, IX, XII, and XIII of Plaintiffs' Second Amended Complaint. For each of those counts, Plaintiffs allege that the underlying transfers were unidirectional, that is, that nothing was received in exchange. (*See* SAC ¶¶ 63, 67, 216, 403, 411-12, 434, 583, 593.) These were the transfers of money to Julie Seibert, John Seibert's wife, repeatedly over the course of three years, and the transfers of pending development projects to Royal and, later, to Trinity. Plaintiffs allege that John Seibert used these transfers to repeatedly and systematically move his assets out of his creditors' reach. In light of those allegations, it is plausible that these transfers were not made in exchange for any consideration. Plaintiffs have plausibly pleaded that the transferor "received less than reasonably equivalent value" in their constructive fraud claims. *See* Minn. Stat. §§ 513.44(a)(2), 45(a).

Defendants assert that Plaintiffs fail to adequately plead their actual fraud claims because they fail to make factual allegations supporting their claims of "actual intent to hinder, delay, or defraud." (Defs.' Mem. in Supp., at 23, 26.) Again, the Court disagrees. Plaintiffs allege sufficient facts to raise a plausible claim that transfers were made with actual intent "to hinder, delay, or defraud" Plaintiffs. Counts I, II, VII, X, XI, and XIV require actual intent to hinder, delay, or defraud a creditor. *See* Minn. Stat. § 513.44(a)(1). This intent requirement may be plausibly pleaded by pleading badges of fraud. *See Finn*, 860 N.W.2d at 645. At the outset, the Court notes that all of the transfers Plaintiffs allege to be fraudulent occurred after the Plaintiffs filed the Iowa action in late 2009. This is a badge of fraud that applies to all of Plaintiffs' actual fraud claims. *See* Minn. Stat. § 513.44(b)(4).

With regard to Count I, Plaintiffs allege that John Seibert sold his interest in a family farm, an asset that is not exempt from collection, and used the proceeds to pay down the mortgage on his home, which is exempt. (SAC ¶¶ 503-05.) "[U]nder Minnesota law a debtor in contemplation of bankruptcy may convert nonexempt property into exempt property, so long as the conversion does not violate the Uniform Fraudulent Conveyance Act." *In re Tveten*, 402 N.W.2d 551, 556 (Minn. 1987). Plaintiffs allege several badges of fraud in association with this transfer, including (1) that the transfer was concealed from the Iowa court, when John Seibert represented that he was "broke" while the sale of his interest was being finalized, (SAC ¶ 34); (2) that the transfer occurred shortly after John Seibert incurred a substantial debt (the $77,928.68 sanctions judgment), (*id.* ¶¶ 24, 34); and (3) that John Seibert retained possession and control of the asset by converting it to exempt property, (*id.* ¶¶ 503-05).

32

Count II alleges that the transfers of money to Julie Seibert were made with fraudulent intent. (*Id.* ¶ 509.) Plaintiffs allege several badges of fraud, including (1) that Julie Seibert is an insider, (*id.* ¶ 8; *see* Minn. Stat. § 513.41(8)(i)(A)); (2) that John Seibert retained control of the assets by using Julie Seibert's credit card for his personal expenses, (SAC ¶ 71); and (3) the transfers occurred over the course of 2010-2013, during which time John Seibert incurred a substantial debt, the Iowa action judgments, (*id.* ¶¶ 13-14).

Count VII alleges that John Seibert, through his alter ego Preferred, transferred pending development projects to Royal with intent to hinder, delay, or defraud Plaintiffs. (*Id.* ¶¶ 524-28, 534-38.) Plaintiffs allege several badges of fraud, including (1) that the transfer was to an insider, (*id.* ¶ 231; *see* Minn. Stat. § 513.41(8)(i)(D)); (2) that John Seibert retained control of the transferred assets, because he is the sole shareholder of Royal, (SAC ¶ 231); and (3) that John Seibert concealed the assets by avoiding having his name attached to Royal or to the projects, (*id.* ¶¶ 259, 263).

Count X alleges that John Seibert, through his alter ego Royal, transferred pending development projects to Trinity with intent to hinder, delay, or defraud Plaintiffs. (*Id.* ¶¶ 529-33, 551-55.) Plaintiffs allege several badges of fraud, including (1) that the transfer was to an insider, (*id.* ¶¶ 341-42; *see* Minn. Stat. § 513.41(8)(i)(D)); (2) that John Seibert retained control of the transferred assets, because he is actually in control of Trinity, (SAC ¶¶ 341-42); and (3) that John Seibert concealed the assets by misrepresenting the number of development projects pending with Trinity, (*id.* ¶¶ 459-67).

Count XI alleges that John Seibert, through his alter ego Royal, transferred all of the assets of Royal as a going concern to Trinity, and did so with intent to hinder, delay, or

defraud Plaintiffs' collection efforts. (*Id.* ¶¶ 529-33, 556-62.) Plaintiffs allege several badges of fraud, including (1) that the transfer was to an insider, (*id.* ¶¶ 341-42; *see* Minn. Stat. § 513.41(8)(i)(D)); (2) that John Seibert retained control of the transferred assets, because he is actually in control of Trinity, (SAC ¶¶ 341-42); and (3) the transfer was for little or no consideration, because Royal was left an "empty shell," (*id.* ¶¶ 425-26).

Finally, Count XIV alleges that John Seibert was the constructive owner of all Trinity stock, because of his central role in the operation of the company, and that he fraudulently transferred Trinity's stock to Julie Seibert when he caused it to be issued to her. (*Id.* ¶¶ 342, 574-80.) Plaintiffs allege several badges of fraud, including (1) that the transfer was to an insider, (*id.* ¶ 8; *see* Minn. Stat. § 513.41(8)(i)(A)); (2) that John Seibert concealed the assets by failing to disclose Trinity in his bankruptcy schedules, (*id.* ¶¶ 435-36, 441-42); and (3) the transfer occurred shortly after a substantial debt was incurred, namely, the Iowa action judgments against John Seibert, (*id.* ¶¶ 13-14, 339).

Plaintiffs have alleged several badges of fraud for each claim of actual fraud. And overall, the Plaintiffs' allegations paint a picture of calculated and willful concealment. *See supra* Part I.B. In light of all these allegations, the Court holds that Plaintiffs have adequately pleaded their actual fraud claims.

### c.    Transfer of Property Interest

Defendants assert that Plaintiffs' claims against Royal and Trinity should be dismissed, because the alleged transfers were of nothing more than unearned future income and unrealized plans for service contracts. (Defs.' Mem. in Supp., at 27-31.) Defendants argue that nothing of value was transferred between Preferred, Royal, and Trinity, because

the alleged development projects were nothing more than vague expectations of potential development contracts. (Defs.' Reply, at 13-14.)

Plaintiffs respond that MUVTA defines "transfer" broadly, and that it applies to the transfer of a business's "intangible assets," including "research and development, technical knowledge and methodologies, good will, business relationships, proprietary materials and confidential business information and established business." (Pls.' Mem. in Opp., at 32.) Plaintiffs argue that John Seibert expressly attached value to the development projects of his companies, and guarded them as confidential information, as did other developers he worked with. (*Id.*, at 35-37; *see, e.g.*, SAC ¶¶ 418-24.) Plaintiffs point to the Running Aces casino and hotel project as illustrative. (Pls.' Mem. in Opp., at 38-39.) On the eve of John Seibert's bankruptcy, the Running Aces representatives were working with Royal on the development. (*See* SAC ¶ 400.) But Plaintiffs had recently learned of Royal and levied its stock. (*Id.* ¶ 401.) So John Seibert directed the Running Aces representative to put Trinity's name on the paperwork. (*Id.* ¶ 402.) Within two months, John Seibert had declared bankruptcy and Running Aces had signed a development contract with Trinity. (*Id.* ¶¶ 429, 452.)

MUVTA defines a transfer as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset." Minn. Stat. § 513.41(16). It defines an asset as "property of a debtor," with three exceptions not relevant here, and defines property as "anything that may be subject of ownership." *Id.* §§ 513.41(2), (12). The Court agrees with Plaintiffs that "assets" under MUVTA can include intangible business assets, such as confidential information, business

35

relationships, and good will.  *See Schwartz v. Virtucom, Inc.*, No. 08-1059, 2009 WL 1311816, at *4 (Minn. Ct. App. May 12, 2009) (holding, in a MUVTA analysis, that a company's "name, established business, good will, and reputation" were "assets with measurable value"); *Quinn v. Elite Custom Transporters & Motorcoaches, LLC*, No. 10-cv-118, 2011 WL 1869391, at *5 (D. Minn. May 16, 2011) ("[A]s part of the asset transfer there was also a transfer of goodwill and other intangible assets. . . . [I]t is clear that there was some value to the intangible assets transferred.").

Plaintiffs allege that the projects transferred between Preferred, Royal, and Trinity were valuable assets, encompassing John Seibert's "relationships with the individual franchisors, the individual financing banks, the individual sellers of the properties for the hotel sites, and the investors and investment groups . . . as well as all of his trade secrets, confidential information, industry knowledge and contacts, intangibles and goodwill." (SAC ¶ 418.)  That at least some of these projects had real value is demonstrated by the transfer of the Running Aces project on the eve of the signing of a development contract. That project translated into real income for Trinity, which it would not have received had the development stayed with Royal.  (*See id.* ¶¶ 477-82.)  The Court acknowledges Defendants' insistence that the majority of the projects did not translate into a development contract like the Running Aces project.  But it is clear that this issue is more appropriately a fact question, to be considered after the close of discovery, than a pleading issue.  The Plaintiffs have stated a claim that assets were transferred between Preferred, Royal, and Trinity.

### d.  Conspiracy to Commit Fraudulent Transfer

Finally, Defendants argue that conspiracy to commit fraudulent transfer is not a viable cause of action, and that Plaintiffs' Counts XV and XVI should be dismissed.  (Defs.' Mem. in Supp., at 31-33.)  Defendants assert that Minnesota law requires conspiracy claims to be predicated on a tort, and that fraudulent transfer is not a tort.  (*Id.*)  Plaintiffs respond that Minnesota law requires only that conspiracy claims be predicated on an "underlying civil wrong," and, alternatively, that fraudulent transfer claims are torts.  (Pls.' Mem. in Opp., at 40-43.)

Courts in this district have generally followed the rule that, under Minnesota law, "[a] civil conspiracy claim requires an underlying tort."  *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 986 (8th Cir. 2008) (citing *D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997)); *see Woods v. K.R. Komarek, Inc.*, No 15-cv-4155, 2017 WL 231868, at *6 (D. Minn. May 26, 2017) (dismissing conspiracy counterclaim when defendant's tort-based counterclaims, but not its breach-of-contract counterclaim, were dismissed); *Carlson v. A.L.S. Enters., Inc.*, No. 07-cv-3970, 2008 WL 185710, at *5 (D. Minn. Jan. 18, 2008) ("'[A] civil conspiracy claim is merely a vehicle for asserting vicarious or joint and several liability,' and hence such a 'claim' is dependent upon a valid underlying tort claim." (citation omitted)); *Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1070 (D. Minn. 2003) ("Conspiracy, under Minnesota law, is based on the commission of an underlying tort.").

Plaintiffs argue that *Harding v. Ohio Casualty Insurance Co.*, the leading Minnesota Supreme Court case on this issue, does not necessarily require an underlying tort for a

conspiracy claim, but only an underlying "civil wrong."  (Pls.' Mem. in Opp., at 41 (citing *Harding v. Ohio Cas. Ins. Co.*, 41 N.W.2d 818, 824 (Minn. 1950)).)  In *Harding*, the Minnesota Supreme Court does appear to use the terms "tort" and "civil wrong" interchangeably.  *Id.*, at 824-25.  The Court need not decide whether *Harding* has been too narrowly interpreted, however, because it concludes that Plaintiffs' conspiracy claims are predicated on an underlying tort.

Courts are split on the question of whether fraudulent transfer can support a claim of conspiracy.  *See Sheehan v. Saoud*, 650 F. App'x 143, 154 (4th Cir. 2016) (collecting cases).  Several courts have permitted conspiracy claims based on fraudulent transfer.  *See Chepstow Ltd. v. Hunt*, 381 F.3d 1077, 1090 (11th Cir. 2004) (citing *Peoples Loan Co. v. Allen*, 34 S.E.2d 811, 824 (Ga. 1945)); *Forum Ins. Co. v. Camparet*, 62 F. App'x 151, 152 (9th Cir. 2003) (citing *Taylor v. S & M Lamp Co.*, 12 Cal. Rptr. 323, 327 (Cal. Ct. App. 1961)); *Dalton v. Meister*, 239 N.W.2d 9, 18 (Wis. 1976); *McElhanon v. Hing*, 728 P.2d 256, 263 (Ariz. App. 1985), *partially vacated on other grounds,* 728 P.2d 273 (Ariz. 1986); *Kekona v. Abastillas*, No. 24051, 2006 WL 1562086, at *18 (Haw. Ct. App. Jun. 8, 2006), *partially vacated on other grounds,* 150 P.3d 823 (Haw. 2006).  They generally reason that, "upon passage of the Uniform Fraudulent Conveyance Act, a conveyance to defraud a general creditor became a legal wrong, properly the subject of a suit for civil conspiracy." *McElhanon*, 728 P.2d at 293.

Some courts have held that fraudulent transfer is not a tort. Several of these decisions emphasize that fraudulent transfer, in its constructive fraud form, does not require proof of intent to defraud.  *United States v. Neidorf*, 522 F.2d 916, 918 (9th Cir. 1975) ("[U]nlike

tort, the liabilities here arise independently of any fraudulent conduct by either the transferee or the transferor."); *FDIC v. S. Prawer Co.*, 829 F. Supp. 453, 456 (D. Me. 1993) ("'[T]he action is not one for actual fraud where a complete cause of action may be stated by a showing of the bare facts of a voluntary conveyance resulting in insolvency.'" (quoting *United States v. Franklin Nat'l Bank*, 376 F. Supp. 378, 382 (E.D.N.Y. 1973))); *see also Sheehan*, 650 F. App'x at 155 (stating, in dicta, that a claim under the actual fraud provision of the West Virginia Uniform Fraudulent Transfer Act could conceivably support a conspiracy claim, but that a claim under the constructive fraud provision could not).

While Minnesota courts have not addressed the express question of whether a MUVTA claim can be the predicate tort for civil conspiracy, they have permitted conspiracy claims based on common-law fraud. *See Mooney v. UnitedHealth Grp. Inc.*, No. A13-2093, 2014 WL 3558178, at *5 (Minn. Ct. App. July 21, 2014); *Odegard v. Dep't of Emp't & Econ. Dev't*, No. A04-2168, 2005 WL 2129106, at *3 (Minn. Ct. App. Sept. 6, 2005); *accord Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 926 (8th Cir. 2004).

Plaintiffs allege that John and Julie Seibert "agreed and knowingly and willfully conspired among themselves to hinder, delay, and defraud Plaintiffs in the collection of their judgment against John Seibert." (SAC ¶ 582; *see also id.* ¶¶ 586, 592, 596.)  It is clear that Plaintiffs' conspiracy claims are based on allegations of actual fraud, through Minn. Stat. § 513.44(a)(1), rather than constructive fraud, through Minn. Stat. § 513.44(a)(2) or Minn. Stat. § 513.45.  The actual fraud provision of MUVTA, like common-law fraud, requires proof of fraudulent intent.  *Compare* Minn. Stat. § 513.44(a)(1) (requiring intent to hinder, delay, or defraud the creditor), *with Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732,

747 (Minn. 2000) (stating that common-law fraud requires, *inter alia*, a false representation made with intent to induce reliance). Thus, the concern stated by some courts, that fraudulent transfer can be proven without proving fraudulent intent, does not apply here. *See Neidorf*, 522 F.3d at 918; *Prawer*, 829 F. Supp. at 456. Relatedly, Defendants also assert that permitting fraudulent transfer claims to serve as the underlying basis for civil conspiracy claims would "absurdly" permit causes of action against a non-tortfeasor, as opposed to the tortfeasor. (Defs.'Mem. in Supp., at 33.) Again, here, the allegations of actual fraudulent conduct do not lead to such a result.

Defendants rely on the Ninth Circuit's decision in *United States v. Neidorf*, 522 F.3d at 918, to emphasize that fraudulent transfer claims sound in quasi-contract, not tort. But *Neidorf* considered whether fraudulent transfer should be subject to the statute of limitations for tort, not whether fraudulent transfer can support a conspiracy claim. *Id.* Further, the Ninth Circuit has recognized conspiracy to commit fraudulent transfer when the state law in question supports it. *See Camparet*, 62 F. App'x at 152 (citing *Allen*, 34 S.E.2d at 824). Defendants also argue that fraudulent transfer is not a tort because the statutory remedy is not damages, but access to improperly transferred assets and appropriate equitable relief. (Defs.' Mem. in Supp., at 33.) But the creditor's harm from fraudulent transfer is that it has been deprived of access to the assets from which it could collect the debt. The relief provided by MUVTA effectively remedies that harm, by allowing avoidance of the transfer or attachment of the transferred asset. *See* Minn. Stat. § 514.47. And while Defendants contend that "[t]he argument that fraudulent transfer claims sound in tort creates . . . absurd anomalies," (Defs.' Mem. in Supp., at 33), it would be truly anomalous if common-law civil

fraud can serve as the underlying tort for a conspiracy claim, but a similar statutory allegation of actual fraudulent conduct cannot.

Finally, Defendants argue that Plaintiffs' conspiracy claims also fail because a corporation cannot conspire with itself. (Defs.' Mem. in Supp., at 33 (citing *Howard v. Minn. Timberwolves Basketball Ltd. P'ship*, 636 N.W.2d 551, 557 (Minn. Ct. App. 2001)).) However, unlike the authority on which Defendants rely, which arises under antitrust law, the allegations here sufficiently plead that John and Julie Seibert were acting as separate entities, capable of engaging in conspiracy with each other. *See Howard*, 636 N.W.2d at 557.

The Court concludes that Plaintiffs' conspiracy claims, as plead, are consistent with Minnesota law. They are based on a predicate tort, the actual-fraud form of fraudulent transfer. *See* Minn. Stat. § 513.44(a)(1). The Court does not address whether a constructive fraud claim under MUVTA could support a conspiracy claim. *See* Minn. Stat. §§ 513.44(a)(2), 513.45.

## IV.    CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Plaintiffs' Motion for Leave to Amend [Doc. No. 192] is **GRANTED.**

2. Defendants' Motion to Dismiss under Rule 12 [Doc. No. 183] is **DENIED**.


Dated:  February 7, 2017                     **s/Susan Richard Nelson**
                                             SUSAN RICHARD NELSON
                                             United States District Judge