## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
## (MINNEAPOLIS DIVISION)

Cedar Rapids Lodge & Suites, LLC,
James T. Rymes, Rhonda Coborn,
Michael Coborn, Scott Shisler, Julie Shisler
Pamela J. Cobb Revocable Trust,

       Plaintiffs,

                              Case No:  14-CV-04839 SRN/KMM

v.

John F. Seibert; Julie Kalla-Bargy Seibert;        **SECOND AMENDED COMPLAINT**
JFS Development, Inc. f/k/a JCS
Development, Inc., a Minnesota corporation;
Preferred Business Consulting Corp., a Minnesota
corporation; Royal Business Consulting Corp., a
Minnesota corporation; Trinity Business Consulting
Inc., a Minnesota corporation

       Defendants.

Plaintiffs Cedar Rapids Lodge & Suites, LLC, James T. Rymes, Rhonda Coborn, Michael Coborn, Scott Shisler, Julie Shisler, Pamela J. Cobb Revocable Trust (collectively, "Plaintiffs") for their Second Amended Complaint ("Second Amended Complaint") against Defendants John F. Seibert; Julie Kalla-Bargy Seibert; JFS Development, LLC f/k/a JCS Development, LLC; Preferred Business Consulting Corp.; Royal Business Consulting Corp.; and Trinity Business Consulting Inc. (collectively, "Defendants") state and allege as follows:

### I. PARTIES

1.    Plaintiffs are judgment creditors who collectively hold three separate judgments against Defendant John F. Seibert ("John Seibert") in the original principal amounts listed below (collectively, the "Seibert Judgments"), all of which were originally entered in the United States

District Court for the Northern District of Iowa, Cedar Rapids Division, in Court File No. C09-175-LRR (the "Iowa RICO Action"):

    (i)    $77,928.68 entered on December 7, 2011, in the Iowa RICO Action and docketed in the Hennepin County District Court as a foreign judgment on January 17, 2012, in Court File No. 27-CV-11-25199;

    (ii)    $12,176,735.22 entered on November 6, 2012, in the Iowa RICO Action and docketed in the Hennepin County District Court as a foreign judgment on March 18, 2013, in Court File No. 27-CV-13-1054; and

    (iii)    $2,150,707.12 entered on January 4, 2013, in the Iowa RICO Action and docketed in the Hennepin County District Court as a foreign judgment on March 22, 2013, in Court File No. 27-CV-13-1055.

The total amount of the Seibert Judgments, not including statutory interest accruing since the dates of each judgment, is in excess of $14 million.  None of the Seibert Judgments has been satisfied in full.

    2.    On September 28, 2017, the United States Bankruptcy Court for the District of Minnesota ruled that the $12,176,735.22 Iowa RICO judgment and $2,150,707.12 Iowa RICO attorney's fees judgment against John Seibert were *non-dischargeable* in Seibert's bankruptcy. The Court held that "Seibert's debt to the Plaintiffs in the total amount of $17,254,329.11 as of the petition date… [which by rule included accrued interest] is excepted from discharge under 11 U.S.C. § 523(a)(2)(A).  See Declaration of Robert H. Miller (Decl.), Exhibit 1.

    3.    Plaintiffs are also judgment creditors of Defendant JFS Development Inc. f/k/a JCS Development Inc. ("JFS Development") and hold a judgment against JFS Development in the original principal amount of $978,891.39, not including statutory interest accruing since the date of the judgment entered on March 5, 2012, in the Iowa RICO Action and docketed in the Hennepin County District Court as a foreign judgment on April 20, 2012, in Court File No. 27-CV-12-6044 (the "JFS Development Judgment").  Plaintiffs have been unable to collect any portion of the JFS Development Judgment.

4.      Defendant John Seibert is an individual residing at 16271 Royal Road, Ramsey, MN 55303 (the "Seibert Homestead").

5.      Defendant Preferred Business Consulting Corp. ("Preferred") is a Minnesota corporation with a principal place of business and registered office address at the Seibert Homestead.  John Seibert incorporated Preferred and is its sole shareholder.

6.      Defendant Royal Business Consulting Corp. ("Royal") is a Minnesota corporation with a principal place of business and registered office address at the Seibert Homestead.  John Seibert incorporated Royal and is its sole shareholder.

7.      Defendant Trinity Business Consulting Inc. ("Trinity") is a Minnesota corporation with a principal place of business and registered office address at the Seibert Homestead.  John Seibert incorporated Trinity and his wife, Defendant Julie Kalla-Bargy Seibert, is its sole shareholder.

8.      Defendant Julie Kalla-Bargy Seibert ("Julie Seibert") is an individual residing at the Seibert Homestead, and is the current wife of John Seibert.  Julie Seibert is an "insider" of John Seibert as such term is defined under Minnesota's Uniform Fraudulent Transfer Act ("UFTA"), Minn. Stat. § 513.41(8)(i)(A).  Julie Seibert is also an "insider" of JFS Development under UFTA, Minn. Stat. § 513.41(8)(ii)(F), an "insider" of Preferred under UFTA, Minn. Stat. § 513.41(8)(ii)(F), an insider of Royal under UFTA, Minn. Stat. § 513.41(8)(ii)(F), and an insider of Trinity under UFTA, Minn. Stat. § 513.41(8)(ii)(A-C).

## II.  JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between all Plaintiffs and all Defendants.  The members of Plaintiff Cedar Rapids Lodge & Suites, LLC ("CRLS") are: James T. Rymes, domiciled in New Hampshire; Rhonda Coborn and Michael Coborn, domiciled in Iowa; Scott Shisler and Julie Shisler, domiciled in Kansas; and the Pamela J. Cobb Revocable Trust, whose sole member, Pamela Cobb, is domiciled in Florida. Defendants John Seibert and Julie Seibert are domiciled in Minnesota; Defendant JFS Development is a Minnesota corporation with its principal place of business in Minnesota; Defendant Preferred is a single-member LLC, with John Seibert, domiciled in Minnesota, as its single member; Defendant Royal is a single-member LLC, with John Seibert, domiciled in Minnesota, as its single member; and Defendant Trinity is a single-member LLC with Julie Seibert, domiciled in Minnesota, as its single member. The amount in controversy against each Defendant exceeds the jurisdictional minimum of $75,000.00.

10.     Personal jurisdiction is appropriate as the individual Defendants all reside in and transact business in the State of Minnesota, and the corporate Defendants were organized in the State of Minnesota.

11.     Venue in this court is proper pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391 because all Defendants either reside or transact their affairs in this judicial district.

## III.  BACKGROUND FACTS

**A.      John Seibert's Transfer and/or Disposal of Over $6 Million in Assets from 2009 to 2012, While the Iowa RICO Action Was Pending and Prior to Entry of the $14 Million Seibert Judgments.**

12.     On December 3, 2009, Plaintiffs filed an 86-page, 18-count Complaint and Petition for Equitable Relief (the "Iowa Complaint") in the Iowa RICO Action asserting multiple claims against JFS Development, John Seibert and other defendants for intentional misrepresentation and fraud, fraudulent non-disclosure, civil racketeering under 18 U.S.C. § 1962 (RICO), breach of fiduciary duty, mismanagement, negligence, waste and/or misappropriation and claims for an accounting and declaratory relief all relating to Plaintiffs' investment in an AmericInn® hotel in Cedar Rapids, Iowa.  Plaintiffs' Iowa Complaint sought monetary damages, declaratory judgment and other equitable relief.

13.     Approximately three years after Plaintiffs' Iowa Complaint was filed in the Iowa RICO Action, and after John Seibert's multiple successful attempts to delay trial on Plaintiffs' claims, Plaintiffs were awarded a $12,176,735.22 judgment against John Seibert that was entered and docketed in the Iowa RICO Action on November 6, 2012.

14.     Plaintiffs obtained a second, $2,150,707.12 judgment against John Seibert for Plaintiffs' attorneys' fees and costs incurred in the Iowa RICO Action, and was entered and docketed on January 4, 2013.

15.     On July 1, 2009, just *five months before* Plaintiffs' Iowa Complaint was filed in the Iowa RICO Action, John Seibert provided a personal financial statement to the Bank of Elk River as part of a loan application (the "2009 Financial Statement").  In that 2009 Financial Statement, John Seibert represented that his net worth was $5,373,195.00 based on real and personal property asset holdings in excess of $6.7 million dollars.

16.     In the 2009 Financial Statement, John Seibert estimated the value of his interest in JFS Development at that time to be worth $700,000.00.

17.     The 2009 Financial Statement also disclosed that John Seibert was earning annual income in excess of $300,000.00, and that John Seibert owned a 49% interest in a Monticello Culver's restaurant that was acquired in 2008 and had an estimated value of $575,000.00 as of July 1, 2009.

18.     Following the filing of the Iowa RICO Action, Plaintiffs filed a January 20, 2010 motion for pre-judgment attachment in the Iowa RICO Action to secure their anticipated future judgment.  Among other things, Plaintiffs sought to impose a lien on the multi-million dollars of non-exempt assets then-owned and possessed by John Seibert and JFS Development.

19.     Defendants John Seibert and JFS Development opposed Plaintiffs' request for a pre-judgment attachment, and the Court denied Plaintiffs' motion.

20.     As a result, during the three-year period from the time the Iowa RICO Action was filed until the Court entered its $12,176,735.12 judgment against John Seibert in that action, John Seibert and JFS Development retained the ability to transfer, secret and/or dispose of their assets.

21.     On or about July 31, 2012, just before the Iowa RICO Action's rescheduled trial date, John Seibert's attorney provided Plaintiffs' attorney with a Personal Statement of Net Worth (the "2012 Financial Statement") disclosing that, as of *that* date, John Seibert's assets totaled only $271,211.00 and that he had a ***negative*** net worth of ($1,283,875.00).

22.     Thus, based on John Seibert's own representations, during the three year period (from 2009 to 2012) that the Iowa RICO Action was pending against him, John Seibert's net worth *decreased by approximately $6.6 million* dollars from $5,373,195.00 on July 1, 2009 to ($1,283,875.00) on July 31, 2012.

23.     During this same three-year period while the Iowa RICO Action was pending against him, Defendant John Seibert's total assets *decreased by approximately $6.5 million* dollars from $6,723,445.00 on July 1, 2009, to $271,211.00 as of July 31, 2012.

**B.     Defendants' Ongoing Course of Fraudulent Conduct**

**1.     John Seibert Violates Court Orders, and is Held in Contempt of Court in the Iowa RICO Action for Discovery Abuses Related to Production of His Financial Documents.**

24.     The first of the Seibert Judgments, entered in the Iowa RICO Action on December 7, 2011, was a sanctions order against John Seibert for the intentional withholding and destruction of documents in violation of court orders and spoliation of evidence.  Specifically, on October 3, 2011, the Court issued an order finding John Seibert in contempt of court and entered judgment against him for $77,928.68.

25.     This judgment comprised the full cost of the forensics examination of computers, cellphones and peripherals belonging to John Seibert, his son-in-law Eric Knott, and JFS Development, necessitated by John Seibert's intentional and repeated evasion of federal court discovery requirements, failure to provide requested discovery, and failure to make requested financial disclosures.

26.     During the forensic examination, the court-appointed forensics expert, Rick Stieghorst of Milwaukee-based Midwest Legal & eData Services, Inc., determined that one of John Seibert's laptop computers had been rendered nonfunctional in an apparent attempt to conceal information.  Mr. Stieghorst also determined that seven hard drives that had previously been connected to John Seibert's laptop computers had not been disclosed despite Plaintiffs' repeated discovery requests and in violation of the Iowa Court's orders requiring disclosure.  In addition, Mr. Stieghorst determined that two hard drives that *had* been produced by John Seibert "could not be forensically imaged due to internal physical damage done to both drives."

27.     In addition to those abuses, Mr. Stieghorst determined that there were approximately 34,025 documents on John Seibert's computers that, although responsive to Plaintiffs' discovery requests, had not been produced in violation of the Iowa Court's orders compelling disclosure.

28.     Mr. Stieghorst also recovered 5,196 additional documents responsive to Plaintiffs' discovery requests, including several of what proved to be the "key" documents most relevant to the underlying Iowa RICO Action, that had been intentionally deleted from these computers by John Seibert at some time *after* he received the Plaintiffs' litigation hold letter.

29.     Mr. Stieghorst also determined that entire electronic file folders labeled "Cedar Rapids" had been dumped into the recycle bin and/or deleted from John Seibert's laptop computer on February 15, 2011—the day before the court-ordered forensic examination of his computers was to begin.

30.     After John Seibert failed to pay the court-ordered sanction, Plaintiffs moved for contempt of court and petitioned the Court to incarcerate John Seibert until he complied with its order to pay the sanction.  At the August 23, 2011 hearing on the Plaintiffs' motion, John Seibert objected, claiming that he was "broke" and that he should not be forced to pay for either the forensic analysis or Plaintiffs' attorneys fees incurred in seeking the sanction.

31.     In his Report and Recommendation following that hearing, Iowa Magistrate Judge Jon S. Scoles considered jailing Defendant Seibert, but noted that "Seibert only holds the key to the cell door [to cure the contempt] *if* he has the money to pay.  Before an individual may be jailed for failing to pay a financial obligation, there must be clear and convincing evidence of his ability to comply with the Court's Order.  That evidence is lacking here."  The Magistrate

nevertheless recommended that Seibert be ordered to pay the entire amount as a contempt sanction.  See Decl., Ex. 2.

32.    In reviewing the Magistrate's Report and Recommendation, the Iowa Court upheld the Magistrate's finding of contempt, and also observed  that Seibert's pleas of poverty were "without merit" because Seibert had refused to produce "any evidence that shows categorically and in detail that he is financially unable to comply with the Motion to Compel, that his failure to pay is not self-induced or that he made good faith efforts to comply."  See Decl., Ex. 3.

33.     At the same time that John Seibert was pleading poverty to the Iowa federal court in August 2011, he was actually earning a significant monthly income from undisclosed hotel and restaurant business interests and was systematically liquidating hundreds of thousands of dollars from his business interests and secreting and/or transferring the cash proceeds.

34.    Specifically, John Seibert received at least $655,947.04 from the following cash disbursements from his business interests contemporaneously to his August 2011 representation to the Iowa federal court that he was "broke" and had no funds to pay the $77,928.68 sanction awarded to the Plaintiffs:

(i)    $35,132.50 in June 2010, from the liquidation of John Seibert's interest in Coon Rapids Lodge, LLC ("Coon Rapids Lodge") that operated an AmericInn hotel in Coon Rapids, Minnesota, which Julie Seibert deposited into her personal bank account;

(ii)    $112,303.00 in January 2011, from the liquidation of John Seibert's interest in Austin Lodge, LLC that operated an AmericInn hotel in Austin, Minnesota;

(iii)    $173,125.00 on May 13, 2011, from the liquidation of John Seibert's interest in Forest Lake Enterprises, LLC and Forest Lake Operations, LLC, that operated a Culver's restaurant in Forest Lake, Minnesota;

(iv)     $6,184.15 in July 2011, from a distribution on John Seibert's interest in Monticello Culver's then co-owned with his son-in-law, Eric Knott;

(v)      $2,857.00 in July 2011, from a distribution on John Seibert's interest in KSW Enterprises, LLC ("Plymouth Culver's") that he co-owned with Eric Knott and other individuals to operate a Culver's restaurant in Plymouth, Minnesota;

(vi)     $5,714.00 and $8,571.00 in cash disbursements from John Seibert's interest in Plymouth Culver's within the six months prior to his August 2011 objection;

(vii)    $158,928.39 in proceeds from the sale of his interest in a family farm held in the Revocable Trust of Gordon R. Seibert and Lauretta H. Seibert; documents recovered from Mr. Seibert's computer show that the sale began before the August 2011 sanctions hearing and closed on October 24, 2011, just *one month* after John Seibert claimed he had no funds to pay the $77,928.68 sanction awarded to Plaintiffs, and three weeks after the Court ordered him to pay the sanction to the Plaintiffs; and

(viii)   $153,132.00 in December 2011, from the liquidation of John Seibert's interest in Plymouth Culver's ($97,685 of which he allegedly used to pay another creditor, Riverwood Bank, $2,324 of which he received in cash and $53,123 of which is still owing on a standby letter of credit).

**2.     John Seibert Transfers his Interest in Monticello Culver's to his Son-In-Law Eric Knott for Less than Equivalent Value, and in Violation of Charging Orders Issued by the Hennepin County District Court**

35.     On November 10, 2008, Monticello Ventures, LLC ("Monticello Culver's") was formed as a Minnesota limited liability company with John Seibert as its chief manager. On or about December 8, 2008, John Seibert executed an Operating Agreement for Monticello Culver's as its chief manager.

36.     On December 8, 2008, John Seibert executed a Subscription Agreement for Monticello Culver's which stated he would contribute $294,000 for a 49% equity interest in Monticello Culver's and Eric Knott would contribute $306,000 for a 51% equity interest in Monticello Culver's, each on or before December 15, 2008.

37.     On December 15, 2008, Monticello Culver's acquired real estate (the "Monticello Real Property") and personal property to be used in the operation of a Culver's restaurant.

38.     On July 1, 2009, John Seibert represented in the 2009 Financial Statement that the market value of his 49% interest in Monticello Culver's was $575,000.

39.     On March 21, 2012, Plaintiffs obtained entry of a charging order pursuant to Minn. Stat. § 322B.32 in Court File No. 27-CV-11-25199 charging John Seibert's equity interests in the Monticello Culver's, with the first of the Seibert Judgments in the amount of $77,928.68 (the "2012 Charging Order").

40.     On March 22, 2012, counsel for Plaintiffs sent letters to Monticello Culver's and the other companies identified in the 2012 Charging Order (the "Notice of 2012 Charging Order") enclosing a copy of the 2012 Charging Order and directing the companies not to distribute funds or assets to John Seibert on account of his equity interests but to instead turn over to Plaintiffs' attorneys all funds and assets payable to John Seibert until Plaintiffs' $77,928.68 judgment was satisfied in full.

41.     After entry of the 2012 Charging Order and at a hearing before Hennepin County District Court Judge Marilyn Rosenbaum on April 16, 2012, in Court File No. 27-CV-11-25199, John Seibert acknowledged under oath that he owned a 49% equity interest in Monticello Culver's.

42.     On April 20, 2012, John Seibert served on Plaintiffs' attorney and filed with the Hennepin County District Court in Court File No. 27-CV-11-25199 his sworn answers to the 2012 Charging Order (the "2012 Sworn Answers").  The 2012 Sworn Answers attached copies of the Operating Agreement for Monticello Culver's John Seibert executed as its Chief Manager and a copy of the 2008 Subscription Agreement evidencing that John Seibert acquired his 49% interest in Monticello Culver's in exchange for $294,000 on December 15, 2008.

43.     On March 15, 2013, a hearing was held before Hennepin County District Court Judge Marilyn Rosenbaum in Court File No. 27-CV-13-1054 on Plaintiffs' motion for a charging order pursuant to Minn. Stat. § 322B.32, charging John Seibert's equity interests in Monticello Culver's and multiple other companies with the second of the Seibert Judgments in the amount of $12,176,735.22 (the "2013 Charging Order").  John Seibert did not appear at the March 15, 2013 hearing.

44.     On March 21, 2013, the 2013 Charging Order was entered and docketed in Hennepin County District Court File No. 27-CV-13-1054.

45.     On March 22, 2013, counsel for Plaintiffs sent letters to Monticello Culver's and the other companies identified in the 2013 Charging Order (the "Notice of 2013 Charging Order") enclosing a copy of the 2013 Charging Order and directing the companies not to distribute funds or assets to John Seibert on account of his equity interests but to instead turn over to Plaintiffs' attorneys all funds and assets payable to John Seibert until Plaintiffs' $12,176,735.22 judgment was satisfied in full.

46.     Approximately one year after entry of the 2012 Charging Order and two days after the hearing on the 2013 Charging Order, John Seibert and Eric Knott entered into a secret Liquidation Agreement dated March 17, 2013 (the "Monticello Transfer Agreement"), in which John Seibert agreed to sell his 49% interest in Monticello Culver's to Eric Knott for $10,000 at a closing to occur on or before April 15, 2013.

47.     In connection with Monticello Culver's grant of a new $1 Million Mortgage, Riverwood Bank obtained an appraisal of Monticello Culver's' real and personal property from Landmark Appraisal Corp. effective as of July 31, 2013 (the "2013 Monticello Appraisal").

48.     The 2013 Monticello Appraisal concluded that the market value of Monticello Culver's' assets as of July 31, 2013, was $1,775,000.

49.     As of January 1, 2012, Monticello Culver's had total liabilities in the amount of $1,167,535.80.

50.     Accordingly, the approximate value of the equity in the Monticello Culver's as of July 31, 2013, was $675,000.

51.     As of July 31, 2013, the approximate market value of John Seibert's 49% interest in Monticello Culver's (that he transferred to his son-in-law Eric Knott three months earlier for $10,000) was $330,750.

52.     John Seibert's 49% interest in Monticello Culver's had a reasonably equivalent value well in excess of the $10,000 purchase price he paid to his son-in-law, Eric Knott, for that interest on or about April 15, 2013.

53.     Prior to the transfer of John Seibert's 49% interest in Monticello Culver's to Eric Knott, John Seibert had actual knowledge of the 2012 Charging Order and the 2013 Charging Order that imposed a judgment lien on John Seibert's interest in Monticello Culver's.

54.     In yet another violation of the terms of the 2012 Charging Order and the 2013 Charging Order, John Seibert also failed to deliver or disclose to Plaintiffs' attorneys the $10,000 cash consideration that Eric Knott paid to John Seibert for John Seibert's 49% equity interests in the Monticello Culver's.

55.     Although the Monticello Culver's fraudulent transfer claim was ultimately settled by the bankruptcy Trustee[1] by the clawback of $200,000 from Eric Knott to the Seibert bankruptcy estate (and the subsequent payment of a significant portion of this money to the

---

[1] John Seibert filed for Chapter 7 personal bankruptcy on June 30, 2016.

Plaintiffs), the Monticello Culver's transfer remains relevant to this complaint as a "badge of fraud," which conclusively establishes that John Seibert has engaged in the fraudulent transfer of his assets with the intent to hinder, delay and defraud John Seibert's creditors and with the particular intent to defraud Plaintiffs.

### 3.   John Seibert Fraudulently Transfers Money and Property to his Wife Julie Seibert.

#### i.   John Seibert Fraudulently Transferred Cash to Julie Seibert

##### a.   $30,500.00 Proceeds of Coon Rapids Lodge Sale

56.     On or about June 18, 2010, John Seibert received proceeds in the amount of $35,132.50 from the liquidation of his interest in Coon Rapids Lodge. These proceeds came in the form of check number 12958 dated June 16, 2010, payable to John Seibert personally, that was drawn on the hotel's bank account at M&I Bank (the "Coon Rapids Liquidation Proceeds"). See Decl., Ex. 4.

57.     John Seibert originally endorsed the check for the Coon Rapids Liquidation Proceeds to his wife, Julie Seibert. John Seibert then crossed out the endorsement to Julie Seibert and instead cashed the check directly at M&I Bank. See Decl., Ex. 4.

58.     In exchange for the Coon Rapids Liquidation Proceeds check, John Seibert received cash in the amount of $4,632.50 and a cashier's check drawn on M&I Bank in the amount of $30,500.00 made payable to Julie Seibert. See Decl., Ex. 5.

59.     Both the $4,632.50 in cash, which has never been accounted for, and the $30,500.00 cashier's check transferred to Julie Seibert should have been available to satisfy the Plaintiffs' judgment.

60.     In her sworn answer to the Plaintiffs' original complaint, Julie Seibert stated that she did not receive this $30,500.00 cashier's check. See Decl., Ex. 6.

61.    A copy of her July 2010 TCF Bank statement recovered during discovery, however, reveals that Julie Seibert not only received this check, *but endorsed it with her signature and deposited it into her account* at TCF Bank on June 21, 2010.  See Decl., Ex. 7.

**b.  Additional cash transfers from John Seibert to Julie Seibert**

62.    Plaintiffs have also uncovered additional fraudulent transfers of cash from John Seibert to Julie Seibert totaling at least $39,299.70, including the following specific fraudulent transfers:

| Date | Amount |
|------|--------|
| 5/10/2010 | $   1,500.00 |
| 5/00/2010 | $   3,121.35 |
| 8/9/2010 | $   3,121.35 |
| 8/17/2011 | $   2,900.00 |
| 9/16/2011 | $   4,517.00 |
| 10/4/2010 | $   1,000.00 |
| 10/16/2010 | $   7,000.00 |
| 11/00/2010 | $   2,300.00 |
| 11/15/2010 | $   5,000.00 |
| 11/18/2010 | $      340.00 |
| 1/22/2011 | $   1,800.00 |
| 4/6/2011 | $   2,000.00 |
| 5/11/2011 | $   1,500.00 |
| 5/27/2011 | $   2,000.00 |
| 8/15/2011 | $      700.00 |
| 8/16/2011 | $      500.00 |
| Total | **$  39,299.70** |

63.    Plaintiffs also discovered that Defendant JFS Development transferred $7,418.00 to Julie Seibert on February 14, 2011, without receiving reasonably equivalent value in exchange and with the intent to hinder, delay and defraud the Plaintiffs.

**ii.      John Seibert Fraudulently Transferred Non-Exempt Income to Julie Seibert**

64.     As specifically described below, from May 20, 2012, until June 21, 2013, (when Plaintiffs first discovered that John Seibert was working for BriMark Builders, LLC ("BriMark") and began garnishing income John Seibert earned from that employment), John Seibert received a regular, bi-weekly salary from BriMark in the gross amount of $910. and the average net amount of $768.31.

65.     Only 75% of the approximately $43,768.26 in total income paid to Seibert by BriMark from August, 2012 to July, 2013, was exempt from judgment collection.  As such, 25% of that total income, or $10,941.99, was not exempt and should have been available to satisfy the Seibert Judgments.

66.     Those paychecks were not available to satisfy the Seibert Judgments, however, because immediately upon receiving them from BriMark, John Seibert signed the checks over to his wife Julie Seibert with his endorsement and "Pay to the order of Julie Seibert."  A summary of these transferred checks is set forth in the table below:

| Date | Check Number | Amount | Non-Exempt Portion |
|---|---|---|---|
| 8/3/12 | 10140 | $785.35 | $196.34 |
| 8/17/12 | 10158 | $785.36 | $196.34 |
| 8/31/12 | 10177 | $785.35 | $196.34 |
| 9/28/12 | 10227 | $785.35 | $196.34 |
| 10/12/12 | 10253 | $785.36 | $196.34 |
| 10/26/12 | 10279 | $785.35 | $196.34 |
| 11/9/12 | 10304 | $785.36 | $196.34 |
| 11/23/12 | 10327 | $785.36 | $196.34 |
| 12/7/12 | 10354 | $785.35 | $196.34 |
| 12/21/12 | 10382 | $785.35 | $196.34 |
| 1/4/13 | 10410 | $767.15 | $191.78 |
| 1/18/13 | 10432 | $768.31 | $192.07 |
| 2/1/13 | 10455 | $768.30 | $192.07 |
| 2/15/13 | 10478 | $768.31 | $192.07 |
| 3/1/13 | 10503 | $768.30 | $192.07 |
| 3/15/13 | 10528 | $768.31 | $192.07 |
| 3/29/13 | 10553 | $768.30 | $192.07 |
| 4/12/13 | 10581 | $768.31 | $192.07 |

| Date | Check Number | Amount | Non-Exempt Portion |
|------|--------------|--------|--------------------|
| 4/26/13 | 10607 | $768.30 | $192.07 |
| 5/10/13 | 10635 | $768.31 | $192.07 |
| 5/24/13 | 10660 | $768.30 | $192.07 |
| 6/7/13 | 10688 | $768.31 | $192.07 |
| 6/21/13 | 10716 | $768.31 | $192.07 |
| 7/5/13 | 10747 | $25,927.90 | $6,481.97 |
| TOTAL | | $43,768.26 | $10,941.99 |

67.     In total, John Seibert transferred $10,941.99 in non-exempt cash income to Julie Seibert from August 2012 to July 2013 (collectively, the "Julie Seibert Non-Exempt Income Transfers") knowing of his indebtedness or impending indebtedness to Plaintiffs as a result of the Iowa RICO Action.

### iii.     Additional BriMark Payment Transfers from John Seibert to Julie Seibert

68.     From July 8, 2013, through December 9, 2013, John Seibert received additional checks from BriMark made payable to him, in the total amount of $17,164.44.  As before, John Seibert transferred these checks to his wife, Julie Seibert, by signing over each check with the endorsement "Pay to the order of Julie Seibert."  These funds should also have been available to satisfy the Seibert Judgments but for John Seibert's fraudulent transfers of these checks to Julie Seibert.  A summary of these checks is set forth in the table below:

| Date | Check Number | Amount |
|------|--------------|--------|
| 7/8/13 | 6654 | $1,207.22 |
| 7/16/13 | 6799 | $415.25 |
| 7/29/13 | 6875 | $2,103.92 |
| 8/12/13 | 7075 | $790.99 |
| 8/22/13 | 7239 | $1,427.47 |
| 8/28/13 | 7279 | $1,371.20 |
| 9/9/13 | 7348 | $821.46 |
| 9/16/13 | 7415 | $972.25 |
| 9/24/13 | 7484 | $425.26 |

| Date | Check Number | Amount |
|---|---|---|
| 10/1/13 | 7571 | $1,344.84 |
| 10/7/13 | 7629 | $621.01 |
| 10/15/13 | 7678 | $1,330.13 |
| 10/21/13 | 7728 | $400.29 |
| 10/29/13 | 7795 | $85.44 |
| 11/5/13 | 7861 | $946.89 |
| 11/7/13 | 7904 | $471.95 |
| 11/25/13 | 8047 | $620.96 |
| 12/2/13 | 8097 | $884.38 |
| 12/9/13 | 8151 | $923.63 |
| TOTAL | | $17,164.54 |

69.     In total, then, the Plaintiffs have thus far uncovered at least $105,324.23 in fraudulent cash transfers made by John Seibert to Julie Seibert from June 2010 to December 2013 (collectively, the "Julie Seibert Cash Transfers") knowing of his indebtedness or impeding indebtedness to Plaintiffs as a result of the Iowa RICO Action.

70.     John Seibert executed these transfers to Julie Seibert in the total amount of $105,324.23 without receiving reasonably equivalent value in exchange and with the intent to hinder, delay and defraud Plaintiffs (collectively, the "Julie Seibert Fraud Transfers").

71.     John Seibert retained effective control of these transferred assets, however, by using Julie Seibert's credit card to incur his personal expenses and then paying off that credit card using the fraudulently transferred assets held in Julie Seibert's bank account.  See Decl., Ex. 8 at 11-15.

72.     The total cumulative value of the Julie Seibert Fraud Transfers is not in excess of the total amount of the Seibert Judgments.

73.     John Seibert did not receive reasonably equivalent value in exchange for the Julie Seibert Fraud Transfers.

74.     Julie Seibert knew or should have known that she was benefitting from fraudulent activity in connection with the Julie Seibert Fraud Transfers.  Julie Seibert had actual knowledge of the Seibert Judgments, and she attended the hearing on Plaintiffs' motion for the 2012 Charging Order in the Hennepin County District Court before Judge Marilyn Rosenbaum on March 16, 2012, in Court File No. 27-CV-11-25199.

### 4.     John Seibert's Repeated, Fraudulent Attempts to Evade the Plaintiffs' Garnishment of his Wages While Employed by BriMark

75.     John Seibert's hospitality development and management company, JFS Development, was formally dissolved on December 31, 2011.

76.     On January 17, 2012, Plaintiffs' $77,928.68 federal court sanctions judgment against John Seibert was docketed in Hennepin County District Court (File No. 27-CV-11-25199) as a foreign judgment.

77.     John Seibert received contemporaneous notice of the domestication of this judgment in Minnesota.

78.     On March 16, 2012, and in connection with the domestication of this judgment, both John Seibert and Julie Seibert appeared at a charging order hearing before Judge Marilyn Rosenbaum in Hennepin County District Court.

79.     On March 21, 2012, the 2012 Charging Order issued charging John Seibert's equity interests in a variety of his assets with the $77,928.68 federal court judgment.

80.     The next day, March 22, 2012, Plaintiffs' counsel sent letters to all sources of John Seibert's equity identified in the 2012 Charging Order at their addresses on file with the Minnesota Secretary of State.

{S1051870.15}                                    19

81.     On April 20, 2012, Plaintiffs' $978,891.39 federal court judgment against JFS Development was likewise docketed in Hennepin County District Court (File No. 27-CV-12-6044) as a foreign judgment.

82.     John Seibert also received contemporaneous notice of the domestication of this judgment in Minnesota.

83.     John Seibert commenced employment at BriMark approximately one month later, on or about May 20, 2012.

84.     BriMark, and its related company Cobblestone Inn and Suites, LLC, are subsidiaries of the WHG Companies, LLC, a hotel development conglomerate founded by Brian Wogernese.

85.     John Seibert and Brian Wogernese are longtime friends and business colleagues.

86.     For more than a year, from approximately May 20, 2012, until June 21, 2013, John Seibert received regular, bi-weekly salary checks from BriMark in the gross amount of $910.00 and the approximate net amount of $768.31.

87.     At no point during this time period did John Seibert disclose to the Plaintiffs that he was employed by BriMark, or attempt to work out a periodic payment plan or other settlement with the Plaintiffs to satisfy or resolve their judgments against him.

88.     Instead, knowing that Plaintiffs were attempting to enforce their Iowa federal court judgments against him by commencing collection actions in Minnesota, as more fully identified and described in paragraphs 56-59 supra, John Seibert fraudulently endorsed these payroll checks over to his wife, Julie Seibert, in an attempt to evade the Plaintiffs' collection efforts.

89.     Julie Seibert then deposited these checks into her personal bank account to put them out of the reach of the Plaintiffs' garnishment efforts.

90.     There were at least 28 such checks, totaling $21,730.27.

91.     Thus far, Plaintiffs have uncovered bank records for 12 of those checks, totaling $9,388.99—all of which were endorsed by John Seibert with the directive "pay to the order of Julie Seibert" and deposited into Julie Seibert's bank account.

92.     Upon information and belief, and based on the pattern of conduct alleged in paragraphs 56-59 and 66-74, the remaining 16 BriMark checks, totaling $12,341.28, were likewise endorsed over to Julie Seibert and deposited in her bank account.

93.     John Seibert received his last BriMark check for his regular, bi-weekly salary in the gross amount of $910.00 on June 21, 2013, the same date that Plaintiffs served John Seibert with their first Notice of Intent to Garnish his wages.

94.     That day, as required by Minnesota law, Plaintiffs' attorney also sent a letter to John Seibert serving him with a Garnishment Exemption Notice and Notice of Intent to Garnish Earnings Within 10 Days (the "Notice of Intent to Garnish") before serving a Garnishment Summons on his employer.  See Decl., Ex. 9.

95.     Immediately after John Seibert was served with the Plaintiffs' Notice of Intent to Garnish, John Seibert's compensation structure with BriMark radically changed.  He stopped receiving a regular, bi-weekly gross salary of $910.00, and instead was paid only a "reimbursement of expenses."

96.     These checks from BriMark for "reimbursement of expenses" were made out to John Seibert, but were likewise endorsed over by John Seibert to Julie Seibert and subsequently deposited into her personal bank account.

97.     At that time, Seibert also began to receive irregular, commission-only payments of 2% of the value of each executed construction contract (typically between $2.5 and $5 million) plus 20% of each development fee collected (typically $150,000).

98.     These commissions were payable to John Seibert in installments: 50% on execution of documents at beginning of construction, and 50% upon issuance of a certificate of occupancy at the end of construction.

99.     Thus, the potential commission value to John Seibert of each BriMark "deal" was between $80,000 (2% x $2.5M + 20% x $150,000) and $130,000 (2% x $5M + 20% x $150,000) per project.

100.     The irregularity of these payments stymied Plaintiffs' garnishment efforts.  For example, between the date that Plaintiffs *served John Seibert* with the Notice of Intent to Garnish (June 21, 2013) and the date that Plaintiffs were permitted to serve their first Garnishment Summons on the *WHG Companies*, John Seibert received a large "commission" payment from BriMark in the amount of $25,927.90 that was allegedly due and owing to him (the "July 5, 2013 Commission Payment") but clearly timed to evade the garnishment.

101.     The July 5, 2013 Commission Payment and John Seibert's change to a commission payment only structure occurred *just after* John Seibert was served with Plaintiffs' Notice of Intent to Garnish on John Seibert but *just prior* to the time Plaintiffs could legally complete service of their Garnishment Summons on the WHG Companies, frustrating the Plaintiffs' ability to garnish that commission payment.

102.     John Seibert also attempted to use the corporate structure of the WHG Companies to evade Plaintiffs' garnishment efforts.  Initially, the Plaintiffs' Notice of Intent to Garnish did

not specifically name BriMark, because the Plaintiffs did not know that BriMark, a subsidiary of the WHG Companies, was the entity that officially employed John Seibert.

103.    That issue was corrected on July 30, 2013, when the Plaintiffs, after further investigating John Seibert's activities with BriMark, served a second Notice on the WHG Companies that *did* specifically name BriMark.

104.    This second notice prompted BriMark  President, Brian Wogernese, to send an email to his attorney (later forwarded in its entirety by Wogernese to John Seibert)[2] stating, "[l]ooks like we have one for BriMark today," which prompted BriMark's attorney to respond back to Wogernese, "[t]hat actually makes this much less complicated… you should simply come clean and not try to delay the inevitable.  Employer liability for failure to respond to garnishments is pretty steep—in some cases the entire responsibility for the judgment has been passed on to the employer.  Even though none of the entities originally named are technically John's employer, your role as executive in each and Brimark would require disclosure of all relevant facts." Decl., Ex. 10.

105.    Wogernese then forwarded this entire email chain to John Seibert, with the message "Please read below, they sent one for BriMark, LLC," suggesting that Wogernese and Seibert had, in a prior conversation, discussed the fact that the Notice of Garnishment had not yet named the right corporate entity.

106.    Seibert responded, "[n]ot a problem…." to Wogernese's email.  Decl., Ex. 10.

107.    This restructuring of John Seibert's compensation, in the face of Plaintiffs' garnishment efforts, done with both the knowledge and approval of John Seibert's friend, WHG and BriMark President Brian Wogernese, and especially in light of BriMark's attorney urging

---

[2] Wogernese waived the attorney-client privilege over this communication by forwarding it to John Seibert —who was not in the control group of the WHG Companies.

Wogernese to "come clean" and "not try to delay the inevitable," demonstrates that these efforts were undertaken by John Seibert with the intent to hinder, delay and defraud Plaintiffs and thwart Plaintiffs' attempts to garnish John Seibert's BriMark income.

108.    John Seibert's efforts to frustrate Plaintiffs' garnishment efforts, however, did not end there.  On June 30, 2013, John Seibert formed a new corporate entity, Trinity.  Decl., Ex. 11.

109.    John Seibert's wife, Julie Seibert, a hairdresser with no prior experience in construction or hotel development, was named the President of Trinity and made its sole shareholder.

110.    Defendant John Seibert was named Trinity's Vice-President.

111.    Because Julie Seibert had no construction or hotel development experience, John Seibert retained complete control over Trinity's business activities.

112.    Immediately after Trinity was formed, and in response to the Plaintiffs' efforts to garnish John Seibert's wages from BriMark, John Seibert began negotiating with BriMark to have his wages from his work with BriMark paid *to Trinity* in an effort to fraudulently avoid the Plaintiffs' garnishment efforts.

113.    Specifically, John Seibert sought to repackage his BriMark wages as "commissions" in an amount sufficient to cover his and Julie Seibert's annual living expenses, and that would elude garnishment by Plaintiffs by virtue of being paid to Trinity instead of to Seibert.

114.    On November 19, 2013, John Seibert got approval from BriMark to receive his BriMark income as an independent contractor, which would pay to a separate entity to avoid the Plaintiffs' garnishment.

115.     John Seibert, however, ultimately opted *not* to use the Trinity entity to receive his BriMark income because he learned that doing so would expose Julie Seibert to personal liability as a fraud transfer defendant if this scheme was ever brought to light.

116.     John Seibert continued to search for methods to shelter his incoming wages and commissions from Plaintiffs' collection efforts.  For example, in a December 13, 2013 meeting agenda that John Seibert drafted, he noted, "They [Plaintiffs] know about Crookston and Salem," two projects that had complete investor commitments, from which he expect income soon.  See Decl., Exs. 12 and 13.

117.     The same meeting agenda also listed several potential methods to shelter his income from these projects, including by BriMark employing and paying Julie Seibert, sheltering assets in a qualified plan or opening and using yet another shell entity.  Decl., Ex. 14.

118.     On January 1, 2014, John Seibert formed another new entity, Preferred, and made himself the President and sole shareholder.  See Decl., Ex. 15.

119.     John Seibert intended to use Preferred  to form an independent contractor consulting relationship with BriMark and to receive his income from BriMark in order to fraudulently shield that income from garnishment by the Plaintiffs.

120.     On or about January 17, 2014, John Seibert received another large "commission" payment from BriMark, this time in the net amount of $13,851.00 (the "January 17, 2014 Commission Payment").

121.     Less than a month after receiving the January 17, 2014 Commission Payment, on February 12, 2014, BriMark attorney, Robyn Hansen, sent a letter to Plaintiffs' attorney stating that John Seibert had "terminated his employment with BriMark, LLC" as of February 11, 2014. See Decl., Ex. 16.

**5.      John Seibert's Use of Various Alter Ego Entities to Evade the Plaintiffs' Collection Efforts**

     **i.      Preferred**

122.      On Friday, December 13, 2013, John Seibert directed his lawyer, Thomas F. Miller, to "go ahead and set this company up… I am assuming that you will be the registered agent and incorporator.  The more you can keep my name out of public documents, the better."

123.      Preferred was registered with the Minnesota Secretary of State's office on December 18, 2013.  <u>See</u> Decl., Ex. 17.

124.      Preferred obtained its employer identification number from the Internal Revenue Service on December 23, 2013.

125.      No corporate formalities were observed for Preferred.   No Articles of Incorporation, Operating Agreement or Subscription Agreement were created, no board of directors meetings or annual meetings were held, and no minutes in lieu of such meetings were kept.

126.      Preferred had a principal place of business and a registered business address at the Seibert Homestead—the same address as John Seibert's personal residence.

127.      As discussed above, John Seibert set up Preferred as a vehicle to receive consulting fees and commissions from BriMark in an effort to evade the Plaintiffs' garnishment of his wages, which had begun only a few months earlier, on June 21, 2013, while John Seibert was directly employed by BriMark.

128.      As John Seibert admitted in an email, "I am still trying to figure out our cash flow through the end of this year.  I have a number of bills that need to get paid, so I can burn up a fair amount of the cash that I will get yet this year….  Again, any way that you can keep my name out of any of this the better in reference to public records, as I am sure my 'buddies' [a reference

to the Plaintiffs, who had been garnishing his wages and otherwise attempting to attach Seibert's assets] are watching for anything that comes across the internet or elsewhere."

129.    In early January 2014, John Seibert proposed a Sales Representative Agreement between Preferred and BriMark for the sole purpose of receiving John Seibert's commission payments from BriMark as an independent contractor, rather than as an employee, and evading the Plaintiffs' garnishments.

130.    This Agreement modeled the prior arrangement that John Seibert had earlier proposed to BriMark using Trinity, which BriMark had previously approved.

131.    Preferred served as a new entity through which to funnel and shield John Seibert's BriMark earnings, but without the risk of implementing his wife Julie Seibert and/or "her" company, Trinity.

132.    On January 14, 2014, BriMark attorney Robyn Hansen indicated in an email to John Seibert that BriMark was "working on" setting up the Sales Representative Agreement between Preferred and BriMark.

133.    John Seibert directed BriMark's billing department, in a February 16, 2014 email, that all reimbursements for his expenses were to be made "in a check made out to Preferred Business Consulting Corp. and NOT to me personally."  Decl., Ex.18.

134.    One of these Preferred expense reimbursements was for a January 23, 2014 investor meeting that John Seibert held in furtherance of a hotel development project in Crosby, Minnesota.  Decl., Ex. 19.

135.    Another of the Preferred expense reimbursements was for a January 24, 2014 investor meeting that John Seibert had in furtherance of a hotel development project in Monticello, Minnesota.  Id.

136.   On February 11, 2014—the very same day that John Seibert voluntarily "terminated" his employment with BriMark —John Seibert attempted to become an independent contractor by forming a consulting relationship between BriMark and Preferred, which he had formed a month earlier for this very purpose.

137.   John Seibert's attempt to "terminate" his employment and then funnel his BriMark wages through Preferred constituted another "badge of fraud"—an effort by John Seibert to fraudulently conceal his income from garnishment by the Plaintiffs.

138.   On February 11, 2014, BriMark's attorney Robyn Hansen emailed Wogernese, copying Seibert, and attaching a redlined "Preferred Business Consulting Corp. Consulting Agreement" between BriMark and Preferred, pursuant to which Seibert's BriMark wages and commissions would be paid through Preferred.

139.   As the parties negotiated, John Seibert continued his development efforts on BriMark's behalf— despite having supposedly "terminated" his employment with BriMark.

140.   For example, on February 16, 2014, John Seibert sent an email to Melissa Kissinger at BriMark attaching expense reports and indicating, "[h]ere is last weeks.  This should catch me up now.  Again, note that all future expense reports will be made payable to Preferred Business Consulting Corp."  Decl., Ex. 18.

141.   On February 17, 2014, Kissinger responded to Seibert stating, "I heard it from Brian [Wogernese] so I am copying Robyn to confirm.  Since you're an independent contractor, you will submit invoices to BriMark to pay and not employee expense reimbursement forms."  Decl., Ex. 18.

142.   Thus, as of February 17, 2014, Brian Wogernese, Robyn Hansen and John Seibert all anticipated that Seibert's work for BriMark would be performed as an independent contractor,

that Seibert would work solely on commission and have his "expenses" reimbursed, and that Seibert's alter-ego, Preferred, would thereafter be the entity invoicing BriMark for all work performed by John Seibert.

143.    On March 24, 2014, John Seibert sent letters on behalf of Cobblestone/BriMark to mayors regarding the possibility of siting a Cobblestone hotel in their towns.  These letters were written on Preferred letterhead identifying John Seibert as its "President."

144.    Ultimately, however, John Seibert's scheme was derailed when Plaintiffs discovered through their investigation of social media and the Internet that, despite having allegedly "resigned," John Seibert was, in reality, continuing to perform work for BriMark.

145.    Specifically, Plaintiffs' attorneys uncovered online meeting minutes of the City Council of the City of Orrville, Ohio from a meeting held on February 19, 2014—a week *after* BriMark's attorney had represented to Plaintiffs' counsel that John Seibert's employment with BriMark had been terminated.  Those meeting minutes revealed that on February 19, 2014, John Seibert appeared before the City Council of Orrville, Ohio and spoke at the meeting *on behalf of BriMark and its affiliate, Cobblestone Hotels*.

146.    On March 18, 2014, Plaintiffs' attorneys sent an email to BriMark's attorney, Robyn Hansen, inquiring whether John Seibert had been re-hired by BriMark, and providing Attorney Hansen with a link to the website containing the Orrville, Ohio City Council meeting minutes.

147.    BriMark's attorney, Robyn Hansen, sent an email reply to Plaintiffs' counsel later on that same day, March 18, 2014, representing, on behalf of BriMark that "John Seibert had not been re-hired by the Brimark or Cobblestone entities."  In this email exchange, however, Hansen did not disclose the BriMark-Preferred consulting arrangement.  Decl., Ex. 20.

148.    The very next day, March 19, 2014, BriMark president Brian Wogernese forwarded to his former employee John Seibert an email chain between Brian Wogernese and BriMark's attorney Robyn Hansen discussing the Plaintiffs' discovery of Seibert's continuing work for BriMark.  In that email, Wogernese told Seibert, "I want you to see this before we meet. You need to stop development completely or do something else for us until we figure this out." Decl., Ex. 21.

149.    Earlier in the same email chain, Robyn Hansen had forwarded to Brian Wogernese her March 18, 2014 email to Plaintiffs' counsel (in which she represented that John Seibert had "not been re-hired by the BriMark or Cobblestone entities"), and Brian Wogernese responded: "Is this going to be a problem?"

150.    In response, Robyn Hansen warned Wogernese that if the Plaintiffs' attorney "claims that BriMark intentionally interfered with the garnishment by agreeing to hire John's new company, it will be a problem."

151.    Robyn Hansen's email also suggested that John Seibert tried to force BriMark to contract with Preferred by quitting and then telling BriMark that if BriMark wanted to continue to benefit from Seibert's contacts in the hospitality industry, BriMark would have to contract with Preferred.

152.    Thus, John Seibert first falsely claimed to be "terminating" his employment with BriMark on February 11, 2014, to avoid Plaintiffs' garnishment of his income and to throw the Plaintiffs off his employment trail.

153.    John Seibert then plainly continued to act on BriMark's behalf after "terminating" his employment with BriMark.

154.    He then sought an arrangement through which he could receive wages from BriMark through his alter-ego entity, Preferred, believing that this strategy would conceal his income from the Plaintiffs' garnishment efforts, and threatened to withhold his contacts in the hospitality industry from BriMark unless and until BriMark went along with this scheme and agreed to enter into a consulting arrangement with Preferred.

155.    On March 28, 2014, ten days after Robyn Hansen's cautionary email to Wogernese, John Seibert was re-hired as a BriMark employee.

156.    Plaintiffs received no information about John Seibert's earnings from BriMark from February 11, 2014 (the date that John Seibert allegedly "terminated his employment with BriMark, LLC," but continued to do work for BriMark) to March 28, 2014 (when John Seibert formally resumed individual employment with BriMark).

157.    It is unclear what compensation, commissions or bonuses John Seibert might have received from BriMark from February 11, 2014 to March 28, 2014, or the amount of such compensation that Plaintiffs were entitled to garnish.

158.    John Seibert then remained employed as a BriMark employee for five more months until August 2014, at which point John Seibert made yet another attempt to evade Plaintiffs' garnishment efforts.

159.    Specifically, on August 7, 2014, John Seibert and BriMark entered into an "Agreement of Resignation and Release," pursuant to which BriMark agreed to pay John Seibert "severance" in the following gross amounts: (a) $200,000, unrelated to any specific BriMark project, payable in equal installments and on regular pay dates over 18 months; and (b) $20,000 upon each "actual starting of existing potential projects in Pecos, Texas, Oberlin, Kansas and

Colorado City, Texas," if any of those projects reached an executed construction contract within 18 months of the execution of that agreement.  Decl., Ex. 22.

160.    Pursuant to the Agreement of Resignation and Release, John Seibert's employment with BriMark ended (for the second time) on August 8, 2014, but BriMark was to pay John Seibert severance in the approximate biweekly gross amount of $5,128.21 for 18 months from August 2014 to January 2016.

161.    Pursuant to the Agreement of Resignation and Release BriMark also paid to John Seibert the gross amounts of: (a) $20,000 on July 31, 2015; and (b) $20,000 on October 9, 2015.

162.    John Seibert never disclosed these arrangements to the Plaintiffs.

163.    Nevertheless, the Plaintiffs discovered this arrangement through their own efforts, and garnished these payments to John Seibert—but these facts, showing John Seibert's efforts to fraudulently evade Plaintiffs' legitimate garnishment efforts are another badge of fraud establishing John Seibert's fraudulent conduct, aimed at shielding his assets from Plaintiffs' collection efforts.

164.    John Seibert worked on at least five BriMark hotel projects—Charlestown, Indiana; Oberlin, Kansas; Stanton, Texas; Colorado City Texas and Pecos, Texas—during the time that the Plaintiffs' Notices of Garnishments were in place.

165.    It is unclear what income John Seibert received from BriMark related to those five projects, whether BriMark properly reported any income, commissions or bonuses that John Seibert received for those four projects in response to Plaintiffs' notices of garnishment, or what amounts of any such income Plaintiffs were entitled to garnish.

166.    The Oberlin, Kansas Cobblestone hotel broke ground on June 3, 2015 and opened to the public in early 2016, Decl., Ex. 23, which should have triggered an additional $20,000.00

"severance" payment to John Seibert under the Agreement of Resignation and Release.  The Plaintiffs were entitled to garnishment on this amount, but it is unclear whether they ever received it.

167.    Likewise, the Pecos, Texas Cobblestone hotel opened to the public on February 3, 2016, Decl., Ex. 24, which should have triggered an additional $20,000.00 "severance" payment to John Seibert under the Agreement of Resignation and Release.  The Plaintiffs were entitled to garnishment on this amount, but it is unclear whether they ever received it.

168.    The Stanton, Texas Cobblestone also hotel broke ground in March 2013, and opened to the public in June 2014, which should have triggered additional compensation to John Seibert.

169.    The Charlestown, Indiana Cobblestone opened in February 2013, which should have triggered additional compensation to John Seibert.

170.    Given John Seibert's known commission rates referenced above, the Charlestown, Indiana and Stanton, Texas projects should have produced between $80,000 (2% x $2.5M + 20% x $150,000) and $130,000 (2% x $5M + 20% x $150,000) of gross income to John Seibert— income that would have been subject to Plaintiffs' garnishment efforts. Accordingly, assuming that these projects were subject to the same commission structure, John Seibert should have received income streams of between $320,000 and $520,000 from these two BriMark hotel projects— which should have been available to satisfy Plaintiffs' judgments.

### ii.    Preferred's Post-BriMark 2014 Development Activity

171.    Based on a document entitled "Potential Projected Income for Preferred Business Consulting" found on John Seibert's laptop computer, in 2014, John Seibert's alter ego, Preferred, had 19 independent development projects underway with a total income expectancy of

$1,727,609 and expected payments in 2014 totaling $1,415,760. Decl., Ex. 25. More specifically, these projects, and John Seibert's individual commission expectancies through Preferred for each such project are detailed in paragraphs 168-209 <u>infra</u>.

172.   On a hotel development project with a contract price of $2,669,950 in Salem, Ohio, John Seibert had a commission expectancy of 2% of the contract price ($53,399) and 20% of the $150,000 development fee ($30,000), for a total fee of $83,399. $41,700 of this fee had already been paid to Preferred as of January 2014, with the remaining payment of $41,700 due in June 2014. That $83,399.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment. Decl., Ex. 24.

173.   On a hotel development project with a contract price of $2,669,950 in Charlestown, Indiana, John Seibert had a commission expectancy of 2% of the contract price ($53,399) and 20% of the $150,000 development fee ($30,000), for a total fee of $83,399. $41,700 of this fee was due to Preferred in February 2014, with the remaining payment of $41,700 due in August, 2014. Plaintiffs have discovered that the Charlestown, Indiana hotel opened to the public in February 2015, Decl., Ex. 26, triggering additional compensation to John Seibert. That $83,399.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment. Decl., Ex. 23.

174.   On a hotel development project with a contract price of $2,825,550 in Alexandria, Indiana, John Seibert had a commission expectancy of 2% of the contract price ($56,511) and 20% of the $125,000 development fee ($25,000), for a total fee of $81,511. $40,756 of this fee was due to Preferred in March 2014, with the remaining payment of $40,756 due in September, 2014. That $81,511.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment. <u>Id.</u>

175.    On a hotel development project with a contract price of $2,700,000 in Minerva, Ohio, John Seibert had a commission expectancy of 2% of the contract price ($54,000) and 20% of the $150,000 development fee ($30,000), for a total fee of $84,000.  $42,000 of this fee was due to Preferred in April 2014, with the remaining payment of $42,000 due in October, 2014. That $84,000.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment.  Id.

176.    On a hotel development project with a contract price of $2,700,000 in Shelby, Ohio, John Seibert had a commission expectancy of 2% of the contract price ($54,000) and 20% of the $150,000 development fee ($30,000), for a total fee of $84,000.  $42,000 of this fee was due to Preferred in April 2014, with the remaining payment of $42,000 due in October 2014. That $84,000.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment.  Id.

177.    On a hotel development project with a contract price of $2,700,000 in Crosby, Minnesota, John Seibert had a commission expectancy of 2% of the contract price ($54,000) and 20% of the $150,000 development fee ($30,000), for a total fee of $84,000.  $42,000 of this fee was due to Preferred in April 2014, with the remaining payment of $42,000 due in October 2014. That $84,000.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment.  Id.

178.    On a hotel development project with a contract price of $2,700,000 in Orrville, Ohio, John Seibert had a commission expectancy of 2% of the contract price ($54,000) and 20% of the $150,000 development fee ($30,000), for a total fee of $84,000.  $42,000 of this fee was due to Preferred in May 2014, with the remaining payment of $42,000 due in November 2014.

That $84,000.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment.  Id.

179.    On a hotel development project with a contract price of $2,500,000 in Winamac, Indiana, John Seibert had a commission expectancy of 2% of the contract price ($50,000) and 20% of the $125,000 development fee ($25,000), for a total fee of $75,000.  $37,500 of this fee was due to Preferred in May 2014, with the remaining payment of $37,500 due in November 2014.  That $75,000.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment.  Id.

180.    On a hotel development project with a contract price of $2,700,000 in Glencoe, Minnesota, John Seibert had a commission expectancy of 2% of the contract price ($54,000) and 20% of the $150,000 development fee ($30,000), for a total fee of $84,000.  $42,000 of this fee was due to Preferred in May 2014, with the remaining payment of $42,000 due in October 2014. That $84,000.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment.  Id.

181.    On a hotel development project with a contract price of $2,700,000 in Cynthiana, Kentucky, John Seibert had a commission expectancy of 2% of the contract price ($54,000) and 20% of the $150,000 development fee ($30,000), for a total fee of $84,000.  $42,000 of this fee was due to Preferred in June 2014, with the remaining payment of $42,000 due in December 2014.  That $84,000.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment.  Id.

182.    On a hotel development project with a contract price of $2,500,000 in Farmington, Minnesota, John Seibert had a commission expectancy of 2% of the contract price ($50,000) and 20% of the $125,000 development fee ($25,000), for a total fee of $75,000.

$42,000 of this fee was due to Preferred in May 2014, with the remaining payment of $42,000 due in October 2014.  That $75,000.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment.  Id.

183.    On a hotel development project with a contract price of $2,700,000 in Staples, Minnesota, John Seibert had a commission expectancy of 2% of the contract price ($54,000) and 20% of the $150,000 development fee ($30,000), for a total fee of $84,000.  $42,000 of this fee was due to Preferred in June 2014, with the remaining payment of $42,000 due in December 2014.  That $84,000.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment.  Id.

184.    On a large-scale development project with a contract price of $7,300,000 in Lawrence, Indiana, John Seibert had a commission expectancy of 2% of the contract price ($146,000) and 20% of the $300,000 development fee ($60,000), for a total fee of $206,000. $103,000 of this fee was due to Preferred in April 2014, with the remaining payment of $103,000 due in December 2014.  That $206,000.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment.  Id.

185.    On a hotel development project with a contract price of $2,500,000 in St. Charles, Minnesota, John Seibert had a commission expectancy of 2% of the contract price ($50,000) and 20% of the $125,000 development fee ($25,000), for a total fee of $75,000.  $37,500 of this fee was due to Preferred in July 2014, with the remaining payment of $37,500 due in 2015.  That $75,000.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment.  Id.

186.    On a hotel development project with a contract price of $2,700,000 in Danville, Indiana, John Seibert had a commission expectancy of 2% of the contract price ($54,000) and

20% of the $150,000 development fee ($30,000), for a total fee of $84,000.  $42,000 of this fee was due to Preferred in July 2014, with the remaining payment of $42,000 due in 2015.  That $84,000.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment.  Id.

187.    On a large-scale development project with a contract price of $4,465,000 in Columbia City, Indiana, John Seibert had a commission expectancy of 2% of the contract price ($89,300) and 20% of the $200,000 development fee ($40,000), for a total fee of $129,300. $64,650 of this fee was due to Preferred in August 2014, with the remaining payment of $64,650 due in 2015.  That $129,300.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment.  Id.

188.    On a hotel development project with a contract price of $2,700,000 in Hartford City, Indiana, John Seibert had a commission expectancy of 2% of the contract price ($54,000) and 20% of the $150,000 development fee ($30,000), for a total fee of $84,000.  $42,000 of this fee was due to Preferred in September 2014, with the remaining payment of $42,000 due in 2015.  That $84,000.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment.  Id.

189.    On a hotel development project with a contract price of $2,700,000 in Arcadia, Florida, John Seibert had a commission expectancy of 2% of the contract price ($54,000) and 20% of the $150,000 development fee ($30,000), for a total fee of $84,000.  $42,000 of this fee was due to Preferred in November 2014, with the remaining payment of $42,000 due in 2015. That $84,000.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment.  Id.

190.    On a hotel development project with a contract price of $2,700,000 in Bartow, Florida, John Seibert had a commission expectancy of 2% of the contract price ($54,000) and 20% of the $150,000 development fee ($30,000), for a total fee of $84,000.  $42,000 of this fee was due to Preferred in December 2014, with the remaining payment of $42,000 due in 2015. That $84,000.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment.  Id.

191.    Defendant John Seibert fraudulently transferred all of these projects, and their contingent commission payments into his alter-ego shell company, Preferred, in an attempt to hinder, delay and defraud Plaintiffs in their efforts to garnish any and all income and/or commission payments due and owing to John Seibert on these projects.

192.    By mid-2014, the number of development projects John Seibert was handling through Preferred had grown from 19 to 26, and Seibert had taken on a partner, Jim Bortz, from the Cobblestone Hotel Group (another subsidiary of the WHG Companies).

193.    Another document recovered from John Seibert's laptop and last modified on July 31, 2014 updated the status of a number of the above-described projects previously referenced in the Potential Projected Income to Preferred spreadsheet.  Decl., Ex. 26.  That updated document indicates that the development projects in Salem, Ohio and Charlestown, Indiana had been "completed," and that John Seibert had already received the remaining expected commission payments of $42,799 (Salem) and $41,700 (Charlestown)—for a total of $168,996 in commissions on these two projects alone between late 2013 and mid-2014.  See Decl., Ex. 27. That $168,996.00, which has never been accounted for, should have been available to satisfy the Plaintiffs' judgment.

194.    In addition, this updated document indicates that John Seibert also received commission payments on three additional "completed" projects on which he collaborated with his new partner Jim Bortz—Oberlin, Kansas ($16,273); Colorado City, Texas ($26,596); and Pecos, Texas ($27,556)—for a total of $70,425 of additional commissions.  See id.  That $70,425.00, which has never been accounted for, should also have been available to satisfy the Plaintiffs' judgment.

195.    This updated July 2014 document also indicates that 15 other development projects had been "partially completed," triggering the payment of partial commissions to John Seibert (through his alter ego, Preferred).  According to this July 2014 document, the following additional partial commissions had been earned:

196.    On Crosby, Minnesota, $42,000.00 (now split 50/50 with Jim Bortz) producing a $21,000 commission payment to John Seibert.  Id.

197.    On Farmington, MN, $37,500 (now split 50/50 with Jim Bortz) producing an $18,750 commission payment to John Seibert.  Id.

198.    On Canton, South Dakota, (a Jim Bortz project unlisted on John Seibert's January 2014 spreadsheet), $37,500 (split 50/50 with Jim Bortz) producing an $18,750 commission payment to John Seibert.  Id.

199.    On Glencoe, Minnesota, $42,000 (now split 50/50 with Jim Bortz) producing a $21,000 commission payment to John Seibert.  Id.

200.    On Dennison, Ohio (a Jim Bortz project unlisted on John Seibert's January 2014 spreadsheet), $42,000 (split 50/50 with Jim Bortz) producing a $21,000 commission payment to John Seibert.  Id.

201.    On Orrville, Ohio, $42,000 (now split 50/50 with Jim Bortz) producing a $21,000 commission payment to John Seibert.  Id.

202.    On Minerva, Ohio, $42,000 (now split 50/50 with Jim Bortz) producing a $21,000 commission payment to John Seibert.  Id.

203.    On Marshall, Minnesota (a Jim Bortz project unlisted on John Seibert's January 2014 spreadsheet), $42,000 (split 50/50 with Jim Bortz) producing a $21,000 commission payment to John Seibert.  Id.

204.    On Grove, Oklahoma (a Jim Bortz project unlisted on John Seibert's January 2014 spreadsheet), $21,000 (split 50/50 with Jim Bortz) producing an $10,500 commission payment to John Seibert.  Id.

205.    On Winamac, Indiana $37,500 (now split 50/50 with Jim Bortz) producing an $18,750 commission payment to John Seibert.  Id.

206.    On Alexandria, Indiana, $40,756 (now split 50/50 with Jim Bortz) producing an $20,378 commission payment to John Seibert.  Id.

207.    On Cambridge, Ohio (a Jim Bortz project unlisted on John Seibert's January 2014 spreadsheet), $62,489 (split 50/50 with Jim Bortz) producing a $31,244 commission payment to John Seibert.  Id.

208.    On Canal Fulton, Ohio (a Jim Bortz project unlisted on John Seibert's January 2014 spreadsheet), $37,500 (split 50/50 with Jim Bortz) producing a $18,750 commission payment to John Seibert.  Id.

209.    On Chardon, Ohio (a Jim Bortz project unlisted on John Seibert's January 2014 spreadsheet), $42,000 (split 50/50 with Jim Bortz) producing a $21,000 commission payment to John Seibert.  Id.

210.    On Shelby, Ohio, $42,000 (now split 50/50 with Jim Bortz) producing a $21,000 commission payment to John Seibert.  Id.

211.    Accordingly, based on John Seibert's updated July 30, 2014 spreadsheet, John Seibert had earned an additional $321,033 in commission payments from the above-mentioned projects.  Id.

212.    That $321,033.00 has never been accounted for by John Seibert and should have been available to satisfy the Plaintiffs' judgment.

213.    Finally, the updated July 30, 2014 spreadsheet notes that the Staples, Minnesota ($79,000); St. Charles, Minnesota ($75,000); and Hartford City, Indiana ($75,000) projects were still pending, and that three new Jim Bortz projects, Delphi, Indiana ($75,000); Tower, Indiana ($75,000); and Winsted, Minnesota ($75,000) were also pending, producing an additional commission expectancy to John Seibert of 50 percent of each of those expected total fees, or $227,000.  Id.

214.    In addition, for all of these 26 projects, the spreadsheet notes that these fees are payable "To John" as opposed to "To Preferred Business Consulting," further demonstrating that Preferred was simply John Seibert's corporate alter-ego and that the two are really one and the same.

215.    The Plaintiffs first discovered Preferred's additional activities in the late summer of 2014.

216.    After the Plaintiffs discovered the existence of Preferred, the development rights to at least 12 of the Preferred projects including (1) Crosby, Minnesota; (2) Monticello, Minnesota; (3) Marshall, Minnesota; (4) Farmington, Minnesota; (5) Cynthiana, Kentucky; (6) Lawrence, Indiana; (7) Danville, Indiana; (8) Dennison, Ohio; (9) Minerva, Ohio; (10) Arcadia,

Florida; (11) Bartow, Florida; and (12) Canton, South Dakota, along with John Seibert's significant, six-figure commission income expectancies for each of these projects, were fraudulently transferred by John Seibert from his alter ego Preferred to a new John Seibert alter-ego, Royal, in order to evade the Plaintiffs' collection efforts.

217.    John Seibert and Preferred are alter egos of each other.

218.    Preferred was insufficiently capitalized to carry out its corporate purpose.

219.    Preferred failed to observe the necessary corporate formalities.

220.    Preferred failed to pay dividends.

221.    Preferred was insolvent at the time of each of the transactions in question.

222.    John Seibert siphoned funds and development rights from Preferred in a way that ignored all applicable corporate formalities.

223.    Preferred did not appoint other officers or directors, and did not hold officers' or directors' meetings or annual meetings.

224.    Preferred failed to keep proper corporate records.

225.    Preferred existed merely as a façade for John Seibert's individual business dealings.

226.    Recognizing Preferred as a valid corporate form that can shield John Seibert's assets from the Plaintiffs would be manifestly unfair and constitute injustice.

227.    Justice requires the Court to recognize that Preferred was a corporate fiction used to perpetrate a continuing fraud on the Plaintiffs and in an effort to defeat the Plaintiffs' rightful claims against John Seibert.

228.    Piercing Preferred's corporate veil would constitute an equitable result in this case as no innocent shareholders or creditors would be prejudiced.

229.    There is no alternative, adequate remedy to fully disgorge the proceeds of John

Seibert's work, paid to Preferred, to make those proceeds available to Plaintiffs.

### iii.    Royal

230.    John Seibert incorporated a new shell company, Royal, as a Minnesota

corporation, on August 19, 2014.  See Decl., Ex. 28.

231.    Defendant John Seibert is the CEO and sole shareholder of Royal.

232.    Royal develops lodging properties, apartment complexes and restaurants for

investor groups and individual ownership groups.

233.    Corporate formalities were not observed for Royal.  No Articles of Incorporation,

Operating Agreement or Subscription Agreement were created, no board of directors meetings or

annual meetings were held, and no minutes in lieu of such meetings were kept.

234.    Royal's funds were freely comingled with John Seibert's personal funds—as, for

example, Royal's funds were used to pay Julie Seibert's Platinum Visa credit card balance.  See

Decl., Ex. 29.

235.    Royal also had a principal place of business and a registered business address at

the Seibert Homestead—the same address as John Seibert's personal residence.

236.    John Seibert set up Royal as a new vehicle to receive John Seibert's commission

and bonus payments in a continuing fraudulent effort to evade the Plaintiffs' garnishment efforts.

237.    John Seibert explained his new arrangement with Royal to a hospitality contact in

a September 15, 2014 email, stating, "I have indeed resigned from BriMark/Cobblestone and I

am currently doing independent development work.  What that means is that I am able to

develop whatever product/franchise that seems to fit best in the marketplace."

238.     Through Royal, John Seibert also employed a new fee arrangement, as set out in Royal's Development Agreement, which established that "[t]he above services will be based upon a five percent (5%) [of the development contract price] overall project developer fee not to exceed Two Hundred Thousand dollars ($200,000).   Upon acceptance and signing of this contract, a Ten Thousand dollar ($10,000) retainer is due, which will be credited to the Developer fee as stated above.   A second payment of Ten Thousand dollars ($10,000) is due upon the raising of 75% of the equity required for the financing of the project and receiving a lending commitment, acceptable to both the owner and the developer, for the project.   The balance of the fee will be invoiced upon percentage of completion of the project via the normal monthly draws submitted to the lender once the construction draws commence.   If the project is not completed and construction is not commenced then the balance of the fee is forfeited and this contract shall become null and void and of no further force and affect [sic]."  See Decl., Ex. 30.

239.     On October 30, 2014, Jim Bortz (of Cobblestone Hotels) sent an email to John Seibert attaching executive summaries listing Royal as the developer for a joint project including five hotels in Shattuck, Oklahoma; Breckenridge, Texas; Jacksboro, Texas; Midland, Texas; and Lubbock, Texas.

240.     The referenced executive summary stated that Royal's "staff has been in the development business for over fifty years and has been involved in the development of over 300 hotels and restaurants."  See Decl., Ex. 31.

241.     This representation is demonstrably false: Royal had no "staff" other than John Seibert; John Seibert's history in the development business, by his own admission, began in 1978; and as of the time this representation was written, John Seibert had been involved in the development of less than 50 hotels and restaurants, nearly all of which had failed.

242.     On or about January 22, 2015, John Seibert, on behalf of Royal, sent a development agreement to Peter Scherer of Alpine Capital, LLC for the development of a 44-room hotel and suites lodging facility in Crosby, Minnesota.  Because this project was smaller, the development agreement contained a fee of five percent 5% of the development contract price, with the overall project developer fee not to exceed $150,000.  A $10,000 retainer was due upon signing, to be credited to the development fee.  A second payment of $10,000 was due upon the raising of 75% of the equity required for the financing of the project and the receipt of a lending commitment for the project acceptable to both the owner and the developer.

243.     Crosby, Minnesota, was a project previously being developed by Preferred, which was then fraudulently transferred to Royal.

244.     On March 2, 2015, a Confidential Investment Letter developed for the Crosby, Minnesota project listed Royal as the developer and disclosed that Royal would be developing the project "for a development fee of One Hundred and Fifty Thousand Dollars."

245.     On February 17, 2015, John Seibert sent an email to Tony Guidry of the First State Bank of Arcadia regarding their ongoing financing discussions connected to the construction of a hotel in Arcadia, Florida—another project that was previously being developed by Preferred.  See supra at ¶ 185.  The first email in this chain, from John Seibert to Tony Guidry dated January 22, 2014, showed John Seibert representing the Arcadia development project as Vice President of Development at *BriMark*.  See Decl., Ex. 32.

246.     Similarly, John Seibert's January 2014 spreadsheet entitled "Potential Projected Income for Preferred Business Development" showed the Arcadia development project as a Preferred project.  See Decl., Ex. 26.  Later emails in this chain, however, indicate that John Seibert was representing the Arcadia development project through Royal.  This single example

demonstrates how John Seibert cultivated relationships with towns and investor groups, took the steps necessary to develop each project, carried his valuable projects with him across his interchangeable alter-ego entities, and then, on the eve of a fee-producing event, transferred the project to whichever entity would best protect the project from his creditors.

247.    Based on documents recovered by the Plaintiffs in discovery thus far, John Seibert was also attempting to set up a corporate structure where both existing and future development projects would be held by Royal inside a Qualified Retirement Plan.   This arrangement would place all commissions earned by John Seibert for such development projects beyond the reach of the Plaintiffs, and permit John Seibert and Julie Seibert to bury earned commissions in the qualified plan pre-tax.

248.    On March 7, 2015, in an email to his accountant, John Seibert states, "I have attached the info on Royal Business Consulting, our new company.  We are also going to keep Trinity Business Consulting for at least 2014 filing year…. I think that we did a final on Preferred Business Consulting so that one should be ok.  Those are the only companies that we have out there right now that we need to be concerned about."

249.    This email reinforces the interchangeable nature of Seibert's shell companies that were being used to shelter his commissions, and further suggests that as of March 2015, the plan was to have Royal absorb the development projects from, and take the place of, both Preferred and Trinity.

250.    In August 2015, John Seibert engaged in a series of emails with J.M. Leek of Thoroughbred Capital Partners regarding Royal's current projects, which Seibert stated included Crosby, Minnesota; Marshall, Minnesota; Breckenridge, Texas; and Shattuck, Oklahoma.

251.    The Crosby and Marshall developments had been fraudulently transferred from Preferred to Royal without any consideration or respect for corporate formalities.

252.    On September 11, 2015, John Seibert emailed Brian Pellowski regarding the Marshall, Minnesota project and the various financing sources that John Seibert was pursuing, noting "we have not been able to get the final piece put together on that, which is to have a signature lead developer.  To that end, I have been aggressively trying to reach a settlement with the 'bad guys' out east [the Plaintiffs], so that I can be released and can sign the deal."  Decl., Ex. 33.

253.    It is clear from this email that Seibert was trying to time the Marshall deal so that its associated six-figure development fee would not accrue or be discovered by the Plaintiffs prior to the Plaintiffs settling with Seibert at their scheduled October 2015 settlement conference.

254.    Four days later, on September 16, 2015, John Seibert again engaged in a series of emails with J.M. Leek of Thoroughbred Capital Partners.  In those emails, wherein John Seibert discusses the structure of deals with Leek and Thoroughbred, John Seibert states, "If Julie and I are only able to receive a development fee on this first go around, we would be ok with that…. you would get an ownership position in exchange for assisting us in getting this financed…. we are fine with you having the entire other 30% ownership if that's what it takes to move these first few deals forward…. I am working to get my personal financial issue resolved with the 'bad guys' on the east coast…. We have a settlement conference scheduled for mid-October.  If I can get that resolved, then I will have more of an opportunity to personally participate in an ownership role." See Decl., Ex.33.

255.    It is likewise clear from this email exchange that John Seibert was avoiding taking any ownership stake in these entities because doing so would potentially expose his entire

ownership interest to discovery and attachment by the Plaintiffs, who were otherwise still unaware of the development fees quietly accruing to John Seibert through Royal.

256.    On September 22, 2015, John Seibert sent an email to Northland Securities regarding financing for the Crosby, Minnesota hotel development.   In that email, Seibert provided Northland with a "list of properties that are under development by us [Royal]," identified Marshall, Minnesota; Crosby, Minnesota; North Port, Florida; Cannon Falls, Minnesota; Monticello, Minnesota; and Breckenridge, Texas; and showed a combined development fee expectancy of $1,510,000 for those six projects. See Decl., Ex. 34.

257.    Attached to the September 22, 2015 email, John Seibert sent a confidentiality agreement, designed to protect his propriety information regarding his hotel developments. Decl., Ex. 35

258.    The Confidentiality Agreement asserted that, "[a]ny and all Information provided in connection with the potential investing and evaluation of the Project is confidential." Id.

259.    On September 23, 2015, a letter of intent was executed for the North Port, Florida project.   In the email correspondence with the realtor that followed, John Seibert specifically requested that the realtor "not use my personal name or our company name in any news release that you may choose to do." See Decl., Ex. 36.

260.    This again demonstrates that John Seibert was actively and fraudulently trying to conceal his (and Royal's) income-producing activities from discovery by the Plaintiffs, knowing that Plaintiffs were closely watching the Internet and social media outlets for any evidence of Seibert's income-producing activities.

261.    On September 25, 2015, John Seibert, acting as President of Royal, emailed Simon Calton of SkyWatch Group LLC ("SkyWatch")[3] concerning a financing package "on the six projects" [Marshall, Minnesota; Crosby, Minnesota; North Port, Florida; Cannon Falls, Minnesota; Monticello, Minnesota; and Breckenridge, Texas] as well as specific information about the Marshall, Minnesota hotel development *and* separate apartment complex development.

262.    Several days later, on October 1, 2015, John Seibert, on behalf of Royal, and Simon Calton, on behalf of SkyWatch, emailed about a potential hotel project in Ray, North Dakota.

263.    In an October 5, 2015 email to Phil Culler of SkyWatch, John Seibert reiterated why he and Royal were seeking liquid development fees, rather than equity shares in these various projects, as compensation.  In that email, John Seibert states, "[g]iven my personal financial situation… I have been faced with charging orders which have precluded us from being able to get any financial benefit from the projects.  Once we can reach a settlement, we would be interested in once again exploring that option.  Therefore, today we would not be seeing an ownership position, but would appreciate the opportunity to explore that at a later date."  Decl., Ex. 37.

264.    The next day, John Seibert and Phil Culler (of SkyWatch) discussed the Marshall, Minnesota and North Port, Florida projects.  John Seibert, on behalf of Royal, explained to Phil Culler that there was a Purchase and Sale Agreement for Marshall, Minnesota and a Letter of Intent for North Port, Florida, but that "[i]n both cases, I would prefer and have been advised by my attorney that I should not sign them, but rather have another third party sign them."  Decl., Ex. 38.

---

[3] SkyWatch has since changed its legal name to SW Land & Development LLC.

265.     This is yet another "badge of fraud" – i.e., the lengths to which John Seibert went to conceal his financial interests, and to hinder, delay and defraud the Plaintiffs from pursuing any interest or compensation he was to receive from his ongoing development projects.

266.     As of February 2016, John Seibert, through Royal, had actively continued its networking and development efforts and was in the process of developing 22 hotel properties, including 19 GrandStay-branded hotels, a Marriott hotel, a Hilton hotel, and three independent apartment complexes.  See Decl., Ex. 39.

267.     John Seibert treated each of these development projects as things having economic value, and considered the details and status of those development projects, including their locations, franchise affiliations, investor funding and bank relationships as business information that needed to be handed with the "upmost [sic] of confidentiality."  See id.

268.     John Seibert described each of these as projects that Royal had "in the works for 2016," and that he was "doing my best to hold off others, but we do have others that could be added to the list."  Id.

269.     John Seibert also stated that he was "still working on the finalization [sic] of seven of the hotel projects" which were being held up "until we have the funding lined up to proceed."  Accordingly, based on these statements, John Seibert considered 15 of the 22 hotel development projects as finalized and having the funding lined up to proceed.  Id.

270.     John Seibert also acknowledged that of the three independent apartment complexes, "[t]he only one of those that may not happen in 2016 is the 120 unit in Worthington." Id.

271.     On each of these development contracts, John Seibert was to be compensated with (1) a $10,000 retainer upon the execution of Royal's Development Agreement; (2) a second

$10,000 payment on the date that 75% of the required equity to finance a project was in place; (3) a fee based on 5% of the overall development contract price payable in monthly installments from each project's construction draws (based on the percentage of project completion); and (4) two potential additional incentive fees of $50,000 each if (a) the project was brought in on time; and (b) if the project was brought in at or below budget— with all such fees for John Seibert's work payable to Royal.

272.    John Seibert's expected base compensation for *each* of these projects, paid through his alter ego Royal, was between $200,000 and $500,000, plus an additional $100,000 in possible incentive bonuses— giving Royal a commission expectancy of up to $600,000 per project. The vast majority of these projects, however, had a commission expectancy of between $200,000 and $400,000 before incentives.

273.    During the spring and summer of 2016, John Seibert continued active cultivation and development of hotel and apartment development projects. Accordingly, as of August 2016, John Seibert, though Royal, had the following 37 hotel and apartment projects in active development.

274.    Royal was developing a 72-room GrandStay-branded full-service hotel and conference center in North Port, Florida. Royal's development contract for the project was expected to be signed in September 2016, triggering payment of a $10,000 retainer to Royal. An executed letter of intent for the property was in place, and Bank financing had been identified. Based on the project price, this project had a base development fee expectancy to John Seibert of $445,000.

275.    Royal was developing a 74-room GrandStay-branded hotel and event center in Columbus, Minnesota. Royal's development contract for the project was expected to be signed

in June 2016, triggering payment of a $10,000 retainer to Royal.  The property for the project had been identified, and Bank financing was pending.  Based on the project price, this project had a base development fee expectancy to John Seibert of $445,000.

276.    Royal was developing a 56-room GrandStay-branded hotel in Marshall, Minnesota in conjunction with SkyWatch.  Royal's development contract for the project was expected to be signed no later than July 2016, triggering payment of a $10,000 retainer to Royal. The property for the project was under a purchase and sale agreement, Bank financing had been identified, and a commitment letter from the bank was in place.  Based on the project price, this project had a base development fee expectancy to John Seibert of $445,000.

277.    Royal was developing a 71-room GrandStay-branded hotel in Owatonna, Minnesota in conjunction with SkyWatch.  Royal's development contract for the project was expected to be signed no later than July 2016, triggering payment of a $10,000 retainer to Royal. The property for the project had been identified and a purchase and sale agreement was pending. Bank financing had also been identified, and $1,500,000 of equity had already been raised for this project. Construction on the project was expected to begin on August 1, 2016. Based on the project price, this project had a base development fee expectancy to John Seibert of $300,000.

278.    Royal was developing a 61-room GrandStay-branded hotel in Columbia Heights, Minnesota in conjunction with SkyWatch.  Royal's development contract for the project was expected to be signed no later than July 2016, triggering payment of a $10,000 retainer to Royal. The property for the project had been identified, and bank financing was pending.  Construction on the project was expected to begin on September 1, 2016.  Based on the project price, this project had a base development fee expectancy to John Seibert of $300,000.

279.    Royal was developing a 75-unit apartment complex in Marshall, Minnesota in conjunction with SkyWatch.  Royal's development contract for the project was expected to be signed in August 2016, triggering payment of a $10,000 retainer to Royal.  The property for the project had been identified and a letter of intent on the property had been executed.  Bank financing had also been identified, and a commitment letter for the financing was in place.  Construction on the project was expected to begin on May 1, 2016.  This project had a base development fee expectancy to John Seibert of $260,000.

280.    Royal was developing a 56-room GrandStay-branded hotel in Mankato, Minnesota in conjunction with SkyWatch.  Royal's development contract for the project was expected to be signed no later than July 2016, triggering payment of a $10,000 retainer to Royal.  Construction on the project was expected to begin on September 15, 2016.  This project had a base development fee expectancy to John Seibert of $290,000.

281.    Royal was developing a 45-room GrandStay-branded hotel in Cannon Falls, Minnesota in conjunction with SkyWatch.  Royal's development contract for the project was expected to be signed no later than August 2016, triggering payment of a $10,000 retainer to Royal.  The property for the project had been identified and a letter of intent on the property had been executed.  Bank financing had also been identified.  Construction on the project was expected to begin on May 15, 2016.  This project had a base development fee expectancy to John Seibert of $225,000.

282.    Royal was developing a 44-room GrandStay-branded hotel in Crosby, Minnesota in conjunction with SkyWatch.  Royal's development contract for the project was expected to be signed no later than August 2016, triggering payment of a $10,000 retainer to Royal.  The property for the project had been identified and was under contract.  Bank financing had also

been identified and a commitment letter was in place. The Managing Member for the property, Pete Scherer, was in place, and $450,000 of equity had already been raised pursuant to a Confidential Investment Letter ("CIL") which was circulating. Construction on the project was expected to begin on July 15, 2016. This project had a base development fee expectancy to John Seibert of $225,000.

283.    Royal was developing a 56-room GrandStay-branded hotel in Osseco/Brooklyn Park, Minnesota in conjunction with SkyWatch. Royal's development contract for the project was expected to be signed in August 2016, triggering payment of a $10,000 retainer to Royal. Two workable sites for this development had been identified with contracts on the two parcels pending. Bank financing for the project was, likewise, pending. Construction on the project was expected to begin on September 1, 2016. This project had a base development fee expectancy to John Seibert of $275,000.

284.    Royal was developing a 61-room GrandStay-branded hotel in Hopkins, Minnesota in conjunction with SkyWatch. Royal's development contract for the project was expected to be signed no later than August 1, 2016, triggering payment of a $10,000 retainer to Royal. The property for the project had been identified, and bank financing was pending. Construction on the project was expected to begin on August 15, 2016. This project had a base development fee expectancy to John Seibert of $275,000.

285.    Royal was developing a 56-room GrandStay-branded hotel in Monticello, Minnesota in conjunction with SkyWatch. Royal's development contract for the project was signed on March 15, 2016, triggering payment of a $10,000 retainer to Royal. Property for the project had been identified, a letter of intent on that property had been executed, and bank financing for the project had been arranged. Construction on the project was expected to begin

on April 15, 2016.  This project had a base development fee expectancy to John Seibert of $275,000.

286.    Royal was developing a 56-room GrandStay-branded hotel in Bartow, Florida. Royal's development contract for the project was expected to be signed in October 2016, triggering payment of a $10,000 retainer to Royal.  This project had a base development fee expectancy to John Seibert of $275,000.

287.    Royal was developing a 45-room GrandStay-branded hotel in Breckenridge, Texas.  Royal's development contract for the project was expected to be signed in October 2016, triggering payment of a $10,000 retainer to Royal.  The property for the project had been identified.  This project had a base development fee expectancy to John Seibert of $225,000.

288.    Royal was developing a 40-room, two story GrandStay-branded hotel in Lindsborg, Kansas.  The property for the project had been identified, bank financing had been identified, and $400,000 of the required $1,200,000 in equity financing had been raised.   This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

289.    Royal was developing a 44-room, two story GrandStay-branded hotel in Dennison, Ohio.  The property for the project had been identified, and $200,000 of the required $1,400,000 in equity financing had been raised.  This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

290.    Royal was developing a 44-room, two story GrandStay-branded hotel in Minerva, Ohio.  Two workable parcels for siting the project had been identified, and $500,000 of the required $1,400,000 in equity financing had been raised.  This project's base development fee

expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

291.    Royal was developing a 41-room GrandStay-branded hotel in Shattuck, Oklahoma.  The property for the project had been identified, financing for the project had been arranged through an individual (Clay Stewart) and $500,000 of the required $1,200,000 in equity financing had been raised.  This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

292.    Royal was developing a 56-room GrandStay-branded hotel in Cottage Grove, Minnesota.  Royal's development contract for the project was expected to be signed on October 1, 2016, triggering payment of a $10,000 retainer to Royal. Bank financing for this project was pending.  This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

293.    Royal was developing a 45-room GrandStay-branded hotel in Canton, South Dakota.  Royal's development contract for the project was signed on February 15, 2016, triggering payment of a $10,000 retainer to Royal.  Two viable sites for the project had been identified, contracts on these parcels were pending, and bank financing for the project had been arranged.  This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

294.    Royal was developing a 56-room GrandStay-branded hotel in Blair, Nebraska. Royal's development contract for the project was signed on May 15, 2016, triggering payment of a $10,000 retainer to Royal.  Property for the project had been identified, a letter of intent on that

property had been executed, and bank financing for the project had been arranged.  This project had a base development fee expectancy to John Seibert of $260,000.

295.    Royal was developing an 80-room GrandStay-branded full-service hotel in Brooklyn Park, Minnesota.  Royal's development contract for the project was expected to be signed in August 2016, triggering payment of a $10,000 retainer to Royal.  Bank financing for this project had been identified.  This project had a base development fee expectancy to John Seibert of $475,000.

296.    As of June 2016, Royal had just started development on a 56-room GrandStay-branded hotel in Oconomowoc, Wisconsin.  Royal's development contract for the project was expected to be signed on October 15, 2016, triggering payment of a $10,000 retainer to Royal. This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

297.    As of June 2016, Royal had just started development on a 56-room GrandStay-branded hotel in Janesville, Wisconsin.  Royal's development contract for the project was expected to be signed on October 1, 2016, triggering payment of a $10,000 retainer to Royal. This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

298.    As of June 2016, Royal had just started development on a 56-room GrandStay-branded hotel in Baxter, Wisconsin.  Royal's development contract for the project was expected to be signed on October 1, 2016, triggering payment of a $10,000 retainer to Royal.  The contract for the purchase of land for this project was pending.  This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

299.    As of June 2016, Royal had just started development on a 56-room GrandStay-branded hotel in LaBelle, Florida.  Royal's development contract for the project was expected to be signed on November 15, 2016, triggering payment of a $10,000 retainer to Royal.  This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

300.    As of June 2016, Royal had just started development on a 56-room GrandStay-branded hotel in Arcadia, Florida. Royal's development contract for the project was expected to be signed on November 15, 2016, triggering payment of a $10,000 retainer to Royal.  This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

301.    As of June 2016, Royal had just started development on a 120-unit apartment complex in Worthington, Minnesota.  Royal's development contract for the project was expected to be signed on September 15, 2016, triggering payment of a $10,000 retainer to Royal.  This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

302.    As of June 2016, Royal had just started development on a 45-room GrandStay-branded hotel in Farmington, Minnesota.  Royal's development contract for the project was expected to be signed on November 1, 2016, triggering payment of a $10,000 retainer to Royal. This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

303.    As of June 2016, Royal had just started development on a 45-room GrandStay-branded hotel in Whiting, Indiana. Royal's development contract for the project was expected to be signed on November 1, 2016, triggering payment of a $10,000 retainer to Royal.  This

project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

304.    As of June 2016, Royal had just started development on a 45-room GrandStay-branded hotel in Farmington, Minnesota.  Royal's development contract for the project was expected to be signed on November 1, 2016, triggering payment of a $10,000 retainer to Royal. This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

305.    As of June 2016, Royal had just started development on a 45-room GrandStay-branded hotel in Levelland, Texas. Royal's development contract for the project was expected to be signed on November 1, 2016, triggering payment of a $10,000 retainer to Royal.  This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

306.    As of June 2016, Royal had just started development on a 45-room GrandStay-branded hotel in Lebanon, Kentucky.  Royal's development contract for the project was expected to be signed on November 1, 2016, triggering payment of a $10,000 retainer to Royal.  This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

307.    As of June 2016, Royal had just started development on a 45-room GrandStay-branded hotel in Cynthiana, Kentucky.  Royal's development contract for the project was expected to be signed on November 1, 2016, triggering payment of a $10,000 retainer to Royal. The property for the project had been identified.  This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

308.     As of June 2016, Royal had just started development on a 45-room GrandStay-branded hotel in Lawrence, Indiana.  Royal's development contract for the project was expected to be signed on November 1, 2016, triggering payment of a $10,000 retainer to Royal.  This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

309.     As of June 2016, Royal had just started development on a 45-room GrandStay-branded hotel in New Albany, Indiana.  Royal's development contract for the project was expected to be signed on November 1, 2016, triggering payment of a $10,000 retainer to Royal. The property for the project had been identified.  This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

310.     As of June 2016, Royal had just started development on a 45-room GrandStay-branded hotel in Danville, Indiana.  Royal's development contract for the project was expected to be signed on November 1, 2016, triggering payment of a $10,000 retainer to Royal.  This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

311.     Today, and at all times relevant to this Second Amended Complaint, Jon Kennedy is, and was, the President of GrandStay.

312.     Jon Kennedy and John Seibert are friends dating back to the time when they were business colleagues working for AmericInn (now Northcott Hospitality) where Jon Kennedy worked for 15 years, from 1994 to 2009, as the Senior Vice-President for Franchise Development, and John Seibert was working for AmericInn as the Vice-President for Real Estate.

313.    As Seibert stated in an October 21, 2015 email to J.M. Leek of Thoroughbred Capital, "I am as close as you can get [to the GrandStay senior people, Kennedy and Synstegaard].  Good friends as well as past businesses associates.  The President, Jon Kennedy … and I worked together for 15 years or so doing AmericInn Hotels….  I did the development work and Jon did the sales work…..  He would love to help us get back on top again!"  Decl., Ex. 40.

314.    John Synstegaard is the Vice-President of Brand Operations at GrandStay.

315.    John Synstegaard and John Seibert are also friends dating back to the time when they were business colleagues working for AmericInn where John Synstegaard worked for 20 years, from 1991-2011, as the Vice-President for Franchise Services.

316.    John Seibert, through Royal, also had a hotel project in development in Jamestown, North Dakota in conjunction with SkyWatch on land already owned by SkyWatch. This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

317.    John Seibert, through Royal, also had two different apartment complex projects in development in Jamestown, North Dakota in conjunction with SkyWatch on land already owned by SkyWatch.  These two projects' base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000 per complex, or $400,000 total.

318.    John Seibert, through Royal, also had a hotel project in development in Watford City, North Dakota in conjunction with SkyWatch on land already owned by SkyWatch.  This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

319.    John Seibert, through Royal, also had a hotel project in development in Makoti, North Dakota in conjunction with SkyWatch on land already owned by SkyWatch. This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

320.    John Seibert, through Royal, also had a hotel project in development in Ray, North Dakota in conjunction with SkyWatch on land already owned by SkyWatch. This project's base development fee expectancy to John Seibert is unknown, but based on Royal's standard development agreement, would have been no less than $200,000.

321.    Based on John Seibert's aforementioned *known* development projects from 2015-16 alone, John Seibert had 36 GrandStay hotel projects in development, three apartment complexes in development, and three non-GrandStay flagged hotels under development – for a total of 42 projects.

322.    Pursuant to the requirements of the standard Royal Business Consulting Development Agreement ("Royal Development Agreement"), each of these projects would have produced a $10,000 non-refundable retainer immediately upon signing. These retainers alone would have produced no less than $420,000 in income to John Seibert, through Royal, in 2015-16.

323.    Based on the terms of the Royal Development Agreement, setting Royal's development fee at no less than 5% of the contract price of each development, these projects had an aggregate commission expectancy to John Seibert of no less than $10,395,000.00.

324.    Incentive fees for these 42 projects could have added an additional $4,200,000.00 to that commission expectancy, making the total potential value of these deals to John Seibert, through Royal, approximately $14,595,000.00.

325.    The payment of any of these proceeds to Royal constitutes a fraudulent transfer, in that the work generating these payments was done by John Seibert or Preferred, but made payable to Royal (the latest iteration of John Seibert's alter ego) with the intent to hinder, delay and defraud the Plaintiffs, and to evade the Plaintiffs' collection efforts.

326.    John Seibert and Royal are alter egos of each other.

327.    Royal was insufficiently capitalized to carry out its corporate purpose.

328.    Royal failed to observe the necessary corporate formalities.

329.    Royal failed to pay dividends.

330.    Royal was insolvent at the time of each of the transactions in question.

331.    John Seibert siphoned funds and development projects from Royal in a way that ignored all applicable corporate formalities.

332.    Royal did not appoint other officers or directors, and did not hold an annual meeting, or officers' or directors' meetings.

333.    Royal failed to keep corporate records.

334.    Royal existed merely as a façade for John Seibert's individual business dealings.

335.    Recognizing Royal as a valid corporate form that can shield John Seibert's assets from the Plaintiffs would be manifestly unfair and constitute injustice.

336.    Justice requires the Court to recognize that Royal was a corporate fiction used to perpetrate a continuing fraud on the Plaintiffs and in an effort to defeat the Plaintiffs' rightful claims against John Seibert.

337.    Piercing Royal's corporate veil would constitute an equitable result in this case as no innocent shareholders or creditors would be prejudiced.

338.    There is no alternative, adequate remedy to fully disgorge the proceeds of John Seibert's work, paid to Royal, to make those proceeds available to Plaintiffs.

### iii.    Trinity

339.    John Seibert caused Trinity to be incorporated on June 30, 2013— nine days after Plaintiffs first served their notice of garnishment of John Seibert's income on BriMark.

340.    When incorporating Trinity, John Seibert made his wife Julie Seibert, a hairdresser with no education, background, or prior experience in hotel development, the President and sole shareholder of Trinity.

341.    John Seibert made himself Trinity's Vice-President.

342.    Although John Seibert made his wife Julie the sole shareholder of Trinity, John Seibert controls Trinity.  He oversees Trinity's daily affairs and guides Trinity's decision-making, only including Julie when it is necessary to maintain the facade of Julie Seibert's ownership. See, e.g., Decl., Ex. 41.

343.    John Seibert alone has the ability to operate Trinity, as it is John Seibert alone who has the customer and industry contacts and relationships with the hotel franchisors, banks and investors and industry experience to make Trinity function as a going concern.

344.    Accordingly, John Seibert is the equitable owner of Trinity's stock.

345.    On September 5, 2013, during his initial negotiations with BriMark to avoid the Plaintiffs' garnishment of his wages, John Seibert prepared an agenda for a meeting with BriMark in which he proposed using Trinity as the vehicle to form an independent contractor relationship with BriMark.

346.    This meeting agenda also provided John Seibert's rationale for proposing this structure—namely (1) to permit John Seibert to reduce the amount of income he was taking

directly; (2) to direct a large portion of that income to a qualified retirement plan (which BriMark did not offer its employees); and (3) to permit Julie Seibert, through Trinity, to take a 25% equity stake in the properties John Seibert developed for BriMark.  See Decl., Ex. 42.

347.     This scheme, undertaken with the intent to hinder, delay and defraud the Plaintiffs, would have fraudulently sheltered John Seibert's commission income earned from BriMark from the reach of Plaintiffs, by garnishment or otherwise.

348.     On September 13, 2013, Trinity took in its first $10,000 in income—from the Briggs Companies.  These proceeds had no connection whatsoever to Trinity.  This was consulting income, earned by John Seibert in connection with his sale of the Elk River Lodge & Suites hotel in which he was the sole shareholder.

349.     Pursuant to 11 U.S.C. 341, during John Seibert's First Meeting of Creditors on August 8, 2016, John Seibert testified, under oath, *intentionally and falsely*, that the only project Trinity had ever been involved in, as of the date of that hearing, was a Columbus, Minnesota hotel project referred to as the "Aces Hotel" project.  John Seibert testified, under oath, at that hearing that Trinity had never been involved in any other project before the Aces Hotel project.

350.     At John Seibert's Second Meeting of Creditors on September 13, 2016, Bankruptcy Trustee Randy Seaver, armed with evidence received from the Plaintiffs about the Elk River transaction, re-questioned John Seibert under oath about Trinity, and about this transaction in particular.

351.     When confronted with the Briggs check and his emails about it, John Seibert then *changed his sworn testimony* and admitted that Trinity had, in fact, been involved in a prior project to convert a hotel into short-term lodging in Elk River, Minnesota in 2013.

352.    John Seibert also admitted that Trinity had, in fact, collected $10,000 in income for that project.

353.    John Seibert then further admitted that he had directed Briggs to pay over that $10,000 to Trinity for his consulting work on that project.

354.    Documents uncovered by the Plaintiffs reveal that in 2013, John Seibert provided "consultant services" to the Briggs Companies in connection with his sale of the Elk River Lodge & Suites, LLC, in which John Seibert had been the owner and sole shareholder, to the Briggs Companies.

355.    When it was time for John Seibert to receive payment for the services he rendered to the Briggs Companies, in April 2013, more than two months before Trinity was even formed, Pat Briggs of the Briggs Companies (which was handling the Elk River conversion) sent an email to John Seibert asking, "Who would you like me to write the $10,000 earned consulting service invoice to?"

356.    The Briggs Companies then made out the check for John Seibert's consulting services—which, again, were completed before Trinity even existed—to Trinity for $10,000. That was the check that Trinity received on September 13, 2013.

357.    John Seibert fraudulently transferred this commission payment to Trinity in order to hinder, delay and defraud the Plaintiffs and evade the Plaintiffs' collection efforts.

358.    Trinity then went dormant from September 2013 until the spring of 2016—for two reasons. First, John Seibert was counseled not to use Trinity to shelter his commission income from his creditors, as doing so would potentially expose both Trinity and his wife Julie Seibert to fraudulent transfer claims by the Plaintiffs, who were actively pursuing collection efforts against him.

359.     Second, John Seibert sequentially used two other alter-ego shell companies to shelter his commission income from his creditors.  First, he used Preferred, which was created on December 18, 2013 and used until the Plaintiffs discovered John Seibert's use of it and levied on his stock in it.  He then used Royal from August 19, 2014 until March 2016, when Plaintiffs discovered Royal, levied on John Seibert's stock in it on March 30, 2016, and scheduled its sale. See Decl., Ex. 43.

**John Seibert's Relationship with SkyWatch (through Trinity)**

360.     In the spring of 2016, John Seibert began a new business relationship with SkyWatch.

361.     SkyWatch is a Wyoming LLC formed in July 2015.

362.     SkyWatch's principal place of business is 11109 Zealand Ave N, Champlin, Minnesota.

363.     SkyWatch is comprised of group of investors and developers focused on hotel and multi-family development projects.

364.     The ownership of SkyWatch is comprised of four quarter shares.

365.     One quarter share of SkyWatch is held by RCS Development, which is held 50% by Randy Semingson, and 50% by Cindy Semingson, Randy's wife.

366.     Randy Semingson is an investor with prior business and construction experience.

367.     One quarter share of SkyWatch is held by Rycal Development, which is held 50% by Ryan Whitefield, and 50% by Simon Calton.

368.     Simon Calton's role in SkyWatch is to serve as the liaison to lenders and as its funding structure strategist.

369.    Ryan Whitefield's role in SkyWatch is as its Project Executive—with full operational management and fiscal operating responsibilities for pending projects.

370.    One quarter share of SkyWatch is held by Calton James SkyWatch Inn, which is held 40% by Simon Calton, 33% by Ryan Whitefield, and 19% by Robert Holmes.

371.    Robert Holmes is an investor in SkyWatch.

372.    One quarter share of SkyWatch is held by ND5, which is held 50% by Phil Culler and 50% by Larry Rodarte.

373.    Phil Culler is a former regional and/or divisional CFO for three national residential homebuilding companies.  Culler's role in SkyWatch is as a planning and acquisition strategist.

374.    Larry Rodarte is an investor in SkyWatch.

375.    SkyWatch, which had initially begun a relationship with John Seibert through his prior alter-ego shell entity, Royal, hired John Seibert, through *Trinity*, as a primary development consultant for hotel development, site analysis and to serve as liaison between SkyWatch and its general contractors.

376.    John Seibert drafted the section of the Executive Summary for SkyWatch describing Trinity and its role in SkyWatch.

377.    That Executive Summary states that Julie Seibert is Trinity's "owner and president," and that Julie Seibert "develops lodging properties and restaurants for investor groups as well as individual ownership groups."  See Decl., Ex. 44.

378.    It continues, "Julie started the company [Trinity] in June of 2013 after having worked with John in the development businesses in prior years…. having operated her own company for 19 years, her desire was to form a new company that continued with her business

knowledge and the knowledge that John was able to provide to her company.  John joined her in her company after its startup to assist in the development business."

379.    In fact, it was John Seibert who formed Trinity in June 2013, and installed his wife Julie Seibert as its President.

380.    The "company" that John Seibert touts (in the SkyWatch Executive Summary) as having been "operated for 19 years" by Julie Seibert was, by Julie Seibert's own sworn admission, a part-time, home-based beauty salon.

381.    On November 2, 2016, Julie Seibert's then-attorney, Phillip Cole of Lommen Abdo, filed an affidavit with this Court attaching a copy of Defendant Julie Seibert's 2015 Response to Plaintiffs' Requests for Production of Documents (Set 1).  Request 3(e) thereto asked Julie Seibert to fully list and identify any "[b]usiness(es) in which you have had any interest since January 1, 2008," and, among other things, to provide any and all documents "establishing the interest you previously had and/or presently maintain in said business(es)" and "provide all financial records for any such business since January 1, 2008."

382.    Julie Seibert's response to this request stated, "I used to have a home-based business at 9520 James Ave. N., called Spectrim's Beauty Salon…. It was a part-time business…. I closed this salon sometime around the summer 2008 because I went to work at Vivid Details salon.  Additionally, I have Juli-uli Artisan Soap Co, LLC.  While the company is not closed, I am presently not marketing my soap.  I make it for our own use."  Decl., Ex. 45.

383.    Julie Seibert listed no other prior business experience in her responses.

384.    At the time Trinity was formed in 2013, Julie Seibert had no development experience, in the hotel/hospitality industry or any other industry.

385.    Trinity is just functioning as another alter-ego/front for John Seibert to permit him to collect commissions, hinder, delay and defraud the Plaintiffs, and evade the Plaintiffs' collection efforts.

386.    Nowhere was this more apparent than in connection with a business trip to Singapore that John Seibert took for Trinity/SkyWatch in April 2016.

387.    From April 6, 2016 until April 13, 2016, John Seibert and Ryan Whitefield traveled to Singapore to solicit Singaporean investment in U.S.-based Trinity/SkyWatch projects.

388.    Singapore is a well-known international haven for offshore banking, tax avoidance, and unregulated investment.

389.    Seibert and Whitefield hoped to raise $20 million U.S. dollars in Singaporean investment in U.S.-based Trinity/SkyWatch development projects during that trip.

390.    During the trip, John Seibert corresponded by email with his wife Julie, purportedly the "owner" and "President" of Trinity.  In an April 10, 2016 email, John Seibert updated Julie Seibert on the progress of his funding efforts, noting that  "[t]hings are going ok here, but not as well as we had hoped so far.  I think that we are only around a 1M so far.  A long way from the $20M that we had anticipated, but the trip is not over yet.  We have two more meetings today, Monday…." Decl., Ex. 46.

391.    Julie Seibert responded, "I am glad you will be home soon, the house is way too quiet.  I colored Judy's hair this morning and cut Jill's while it processed.  Then I went shopping for a while.  I made cream of asparagus soup and I am going to play that scrabble crossword game and then go up to bed… Sounds bland compared to what you are doing.  I am so bummed that all you have is a 1 million dollar commitment…. Don't give up just keep on trying." Id.

392.    These emails demonstrate that Julie Seibert made no contribution to the business strategy and was totally uninvolved in Trinity's efforts to raise capital for the SkyWatch projects.

393.    Later, on May 8-9, 2016, John Seibert and Ryan Whitefield engaged in a substantive email exchange about John Seibert's intended role with SkyWatch, and more importantly, his compensation structure with SkyWatch.

394.    This email chain, identified by the Court-appointed forensic examiner Rick Stieghorst by its subject line "Proposed Comp for JS" in a prior search of John Seibert's laptop computer, had been intentionally spoliated from John Seibert's laptop prior to the Plaintiffs' August 2016 Court-ordered data collection.  Fortunately, a copy of the same, unspoliated email chain was produced by SkyWatch pursuant to a subpoena issued to SkyWatch by Bankruptcy Trustee Randy Seaver.

395.    Inside that email chain, Ryan Whitefield stated, "I was finally able to sit down with John and run through the potential of him coming on board full time as the CEO.  Within this role, he will take on the day to day running and operations of the company [SkyWatch] from dealing with cash flow with Jim to the press and ongoing correspondence with various officials." Decl., Ex. 47

396.    Ryan Whitefield's May 8, 2016 email further describes John Seibert's compensation package from SkyWatch as follows: "He will need $10,700 per month as per the budget provided to Phil and Simon.  This amount will just come off of his fee for one of the projects if like now we don't have something going he will still need to be paid and will come out of his fee once a project starts." Id.

397.    Ryan Whitefield's May 8, 2016 email continues that for future projects, John Seibert would also be paid 3% of the total costs of a project, plus 5% of the net profits once a

hotel was open, plus 3% of the net profit when the hotel is sold with an option to be bought out earlier upon his retirement.

398.    Although John Seibert's monthly $10,700 fee for his work for SkyWatch was paid to Trinity, none of any of this correspondence regarding the future structure of the SkyWatch leadership team makes *any* mention of Julie Seibert contributing *anything* of substantive value to SkyWatch.

399.    John Seibert was already working for SkyWatch in May 2016 as demonstrated by the May 6, 2016 letter he wrote to Development Services Director Katie Lima to appeal Lima's revocation of building permit #2582 for the construction of a 100 room hotel in Ray, North Dakota.  John Seibert submitted this appeal letter on SkyWatch letterhead and signed this letter "John F. Seibert, SkyWatch Group."  Decl., Ex. 48.

400.    In a May 20, 2016 email to Taro Ito, the General Manager of the Running Aces Harness Racing Facility in Columbus, Minnesota regarding the potential development of the Running Aces hotel and casino, John Seibert attached a Royal "company profile" that provided background on Royal.  As of that time, it is clear that the Running Aces had been developed by Seibert through Royal.  See Decl., Ex. 49.

401.    The Plaintiffs, however, had just discovered Royal and levied on its stock a few weeks earlier.

402.    Accordingly, two weeks later, on June 3, 2016, when John Seibert engaged in another email exchange with Taro Ito regarding the development of the Running Aces casino and hotel and Ito sent John Seibert an application listing Royal as the developer for the project—John Seibert responded to Ito advising Ito that it would be *Trinity*, not Royal, which would be signing the contract for the Running Aces casino and hotel.  See Decl., Ex. 50.

403.    Thus, the Running Aces casino and hotel project was fraudulently transferred from Royal to Trinity in furtherance of John Seibert's goal of hindering, delaying and defrauding the Plaintiffs collection efforts.

404.    On May 29, 2016, in an email to Simon Calton, John Seibert included an Executive Summary for SkyWatch that lists Trinity as the "developing consultant" for SkyWatch, and referencing eleven current SkyWatch/Trinity projects including: (1) Ray, North Dakota (100-room hotel); (2) Watford City, North Dakota (112-room hotel); (3) Jamestown, North Dakota (140-room hotel, conference center and franchised restaurant); (4) Jamestown, North Dakota (retail sites around hotel); (5) Jamestown, North Dakota (408-unit 6-building apartment complex); (6) North Port, Florida (74-unit hotel and event center); (7) Marshall, Minnesota (56-room hotel); (8) Crosby, Minnesota (44-room hotel); (9) Owatonna, Minnesota (71-room hotel); (10) Blair, Nebraska (56-room hotel); and (11) Mankato, Minnesota (56-room hotel).

405.    The North Port, Florida 74-unit hotel and event center project had previously been worked on and advanced by Royal before being fraudulently transferred to Trinity in an effort to hinder, delay and defraud the Plaintiffs and to evade the Plaintiffs' collection efforts.

406.    The Marshall, Minnesota 56-room hotel project had previously been worked on and advanced by both Preferred *and* Royal before subsequently being fraudulently transferred to Trinity in an effort to hinder, delay and defraud the Plaintiffs and to evade the Plaintiffs' collection efforts.

407.    The Crosby, Minnesota 44-room hotel project had previously been worked on and advanced by both Preferred *and* Royal before subsequently being fraudulently transferred to

Trinity in an effort to hinder, delay and defraud the Plaintiffs and to evade the Plaintiffs' collection efforts.

408.    The Owatonna, Minnesota 71-room hotel project had previously been worked on and advanced by Royal before being fraudulently transferred to Trinity in an effort to hinder, delay and defraud the Plaintiffs and to evade the Plaintiffs' collection efforts.

409.    The Blair, Nebraska 56-room hotel project had previously been worked on and advanced by Royal before being fraudulently transferred to Trinity in an effort to hinder, delay and defraud the Plaintiffs and to evade the Plaintiffs' collection efforts.

410.    The Mankato, Minnesota 56-room hotel project had previously been worked on and advanced by Royal before being fraudulently transferred to Trinity in an effort to hinder, delay and defraud the Plaintiffs and to evade the Plaintiffs' collection efforts.

411.    A PowerPoint presentation for SkyWatch investors recovered from John Seibert's previously undisclosed, cloud-based Dropbox account reveals an even greater fraudulent transfer of former Royal projects to Trinity/SkyWatch.  In addition to the six projects listed above, the PowerPoint presentation also acknowledges the following former Royal projects as having been fraudulently transferred to Trinity/SkyWatch in an effort to hinder, delay and defraud the Plaintiffs and to evade the Plaintiffs' collection efforts: (1) Columbus, Minnesota; (2) Monticello, Minnesota—which started as a Preferred project that was first fraudulently transferred to Royal, and *then* fraudulently transferred to Trinity; (3) Brooklyn Park, Minnesota; (4) Columbia Heights, Minnesota; (5) Osseo, Minnesota; (6) Fort Myers, Florida; (7) Hopkins, Minnesota; (8) Bartow, Florida – which started as a Preferred project that was first fraudulently transferred to Royal, and *then* fraudulently transferred to Trinity; (9) Breckenridge, Texas; (10) Janesville, Wisconsin; (11) Canton, South Dakota – which started as a Preferred project that was

first fraudulently transferred to Royal, and *then* fraudulently transferred to Trinity; (12) Cannon Falls, Minnesota; (13) Arcadia, Florida – which started as a Preferred project that was first fraudulently transferred to Royal, and *then* fraudulently transferred to Trinity; and (14) Danville, Indiana - which started as a Preferred project that was first fraudulently transferred to Royal and *then* fraudulently transferred to Trinity.  See Decl., Ex. 51.

412.     Documents recovered from John Seibert through November 2016 establish that no fewer than 20 former Royal projects had been worked on and developed by John Seibert through Royal, and then fraudulently transferred to Trinity by late May 2016 in an effort to hinder, delay and defraud the Plaintiffs and to evade the Plaintiffs' collection efforts.

413.     On May 31, 2016, John Seibert emailed his wife Julie attaching Royal's Development Agreement, and stating: "Hi Julie, Per your request is the development agreement that we have used in the past, for your use"—further evidence that the Seiberts were, at this time, conspiring to fraudulently transfer projects from Royal (John's "company"/alter-ego) to Trinity (Julie's "company"/John's alter-ego), to the point that the two companies *even used the same development agreement*, in an effort to hinder, delay and defraud the Plaintiffs and to evade the Plaintiffs' collection efforts.

414.     Pursuant to the requirements of the standard Royal Development Agreement, each of these 20 projects fraudulently transferred into Trinity would have produced a $10,000 non-refundable payment upon receipt of 75 percent of the investor funding required by the bank loan commitment.  These payments, in the aggregate, would have produced as much as $200,000 in income to Trinity from fraudulently transferred Royal development projects.

415.     Then, based on the terms of the Development Agreement setting a development fee commission at no less than 5% of the contract price of each development, *each* of these 20

projects would throw off no less than an additional $125,000 to as much as $400,000 in commissions. This would produce between $2,500,000 and $8,000,000 in commission income to Trinity from fraudulently transferred Royal projects.

416.   Incentive fees for these 20 projects could add an additional $2,000,000.00 to that commission expectancy, making the potential total value of these fraudulent transfers into Trinity as much as $10,400,000.

These project proceeds should all have been available to satisfy Plaintiffs' judgments against John Seibert but for John Seibert directing the fraudulent transfer of the Trinity Stock to Julie Seibert and the fraudulent transfer of development projects from Royal to Trinity on the eve of his personal bankruptcy, and in an obvious effort to hinder, delay and defraud the Plaintiffs and to evade the Plaintiffs' collection efforts.

417.   Alternatively, if the compensation structure from Whitefield's May 8, 2016 email to John Seibert was used, John Seibert, through Trinity, was to be paid a monthly retainer of $10,700, plus 3% of the total costs of a project, plus 5% of the net profits once a hotel was open, plus 3% of the net profit when the hotel was sold. This, likewise, would have put the net value to Trinity of each of these fraudulently transferred Royal projects well into six figures *per project*, and in the millions of dollars in the aggregate.

418.   With respect to each of these projects transferred from Royal to Trinity, John Seibert transferred his relationships with the individual franchisors, the individual financing banks, the individual sellers of the properties for the hotel sites, and the investors and investment groups—and all of the trappings required to maintain these relationships—as well as all of his trade secrets, confidential information, industry knowledge and contacts, intangibles and goodwill from Royal to Trinity.

419.    Each of these ongoing development projects, in their various states of development, involved a collection of valuable work product, and is an asset capable of being fraudulently transferred. See, e.g. Decl., Ex. 53, 54, 55, 56 and 57.

420.    John Seibert, his entities and the professionals he worked with treated development projects as property by protecting such information with confidentiality agreements and/or confidential investment letters.  Decl., Ex. 52, 58, 59 and 60.

421.    John Seibert required a Confidentially & Non-Circumvent Agreement be signed before working with Bollinger Project Solutions in 2014. Decl., Ex. 61.

422.    John Seibert required a Confidentially & Non-Circumvent Agreement be signed before working with Northland Securities in 2015. Decl., Ex. 62.

423.    SkyWatch entities also used a confidentiality agreement.  Decl., Ex. 63.

424.    In addition, after this transfer of the totality of Royal's assets, the new entity (Trinity) used the same assets, office, serviced the same projects, individual franchisors, individual financing banks, individual sellers of the properties for the hotel sites, and investors and investment groups, and relied on the same principal (John Seibert) to do so as the transferring entity (Royal).

425.    After the transfers, nothing was left of Royal but an empty shell.

426.    Trinity, as an operating entity, arose directly out of the going concern assets of Royal.

427.    Accordingly, Royal's business, as a going concern, was transferred to Trinity.

428.    A business, as a going concern, is also a property interest and an asset capable of being fraudulently transferred.

**John Seibert Declares Chapter 7 Personal Bankruptcy on June 30, 2016**

429.    John Seibert declared Chapter 7 personal bankruptcy on June 30, 2016, just a couple of weeks after completing the fraudulent transfers of all of his ongoing development projects from his company, Royal, to his wife's "company" Trinity.

430.    At item 19 of Schedule B of his Bankruptcy Schedules, John Seibert was required to disclose all "[n]on publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture."

431.    At item 42 of Schedule B, John Seibert was required to disclose "interests in partnerships or joint ventures."

432.    John Seibert's bankruptcy schedules did not disclose any joint venture or any other reference to his involvement with SkyWatch.

433.    At Schedule I of his bankruptcy schedules, John Seibert described his occupation as a "developer" and his employer's name as "Royal Business Consulting."  He did not disclose any relationship either with SkyWatch or with Trinity, the entity purportedly owned by his spouse and for which, at all times relevant to this matter, he directed the activities of and served as its Vice-President.

434.    By the time John Seibert declared bankruptcy, Royal been drained of all of its assets, including goodwill, business contacts, ongoing projects and contingent income from that work, and reduced to an empty shell.  All of those assets, goodwill, business contacts, ongoing projects and contingent income were fraudulently transferred by John Seibert into Trinity.

435.    At item 27 on his statement of financial affairs, John Seibert was required to disclose, among other things, whether he was "an officer, director or managing executive of a 'corporation.'"  In his response to that item, John Seibert failed to disclose *any* such connection either to Trinity or to SkyWatch.

436.    John Seibert, however, is also a corporate officer (Vice-President) of Trinity.

437.    In at least the several months prior to his filing for bankruptcy on June 30, 2016, John Seibert was actively involved in a business venture with SkyWatch.

438.    As part of that venture, in April 2016, John Seibert traveled to Singapore with other SkyWatch representatives where he made presentations on behalf of SkyWatch in an effort to raise investor dollars for SkyWatch projects.

439.    John Seibert and the other SkyWatch representatives, by John Seibert's own admission, raised at least $1,000,000 in investment capital for SkyWatch projects on that trip.

440.    Shortly before he filed for bankruptcy on June 30, 2016, John Seibert was actively engaged in negotiations with SkyWatch regarding compensation for services he had rendered, and intended to continue rendering in furtherance of the SkyWatch venture or ventures.

441.    On Schedule 1 of his bankruptcy schedules, John Seibert was also required to provide employment details for his non-filing spouse (Julie Seibert).  On that schedule, John Seibert described Julie Seibert's occupation as "cosmetologist" and her employer as Vivid Details Salon, Inc.

442.    John Seibert made no disclosure on his Bankruptcy Schedules of Julie Seibert's purported ownership of or involvement in Trinity as its President and sole shareholder.

443.    Further, the only income that John Seibert disclosed on his Bankruptcy Schedules for his wife Julie Seibert was $442 per month in gross wages, salary and commissions—all of which is attributable to her work as a hairdresser.

444.    On November 2, 2016, Julie Seibert's attorney, Phillip Cole of Lommen Abdo, filed an affidavit with this Court to which was attached a copy of Defendant Julie Seibert's 2015 Response to Plaintiffs' Requests for Production of Documents (Set 1).  Request 3(e) thereto

asked Julie Seibert to fully list and identify any "[b]usiness(es) in which you have had any interest since January 1, 2008," and, among other things to provide any and all documents "establishing the interest you previously had and/or presently maintain in said business(es)" and "provide all financial records for any such business since January 1, 2008."

445.    In her response, Julie Seibert made *no* disclosure to the Court of her purported ownership of Trinity, which had been organized two years earlier in June 2013, and which, by the time she responded to these requests, had already received a $10,000 payment in September 2013 from the Briggs Companies and filed three years of corporate tax returns which Julie Seibert personally signed.

446.    On July 5, 2016, John Seibert emailed Simon Calton of SkyWatch with the loan application for Cap One financing on the North Port, Florida hotel project.  This email included the executive summary for North Port, a former Royal project that had been fraudulently transferred to Trinity, which now listed Trinity as the developer.

447.    Similarly, on July 12, 2016, John Seibert emailed Jon Kennedy, his friend and the President of GrandStay Hotels, on behalf of Trinity/SkyWatch to advise Kennedy that Seibert had negotiated a letter of intent on the Owatonna property.  Owatonna was another former Royal project that had been fraudulently transferred to Trinity.

448.    On July 14, 2016, just 14 days after he filed for personal bankruptcy on June 30, 2016 and produced sworn schedules to the bankruptcy court that made no mention of either SkyWatch or Trinity (in relation to either his own required disclosures or Julie Seibert's required disclosures), John Seibert delivered a $10,700 invoice to SkyWatch for his services rendered, with directions that the money be paid over to Trinity in an effort to hinder, delay and defraud the Plaintiffs and to evade the Plaintiffs' collection efforts.  See Decl., Ex. 64.

449.    SkyWatch then delivered a check for $10,700 to Trinity, which was deposited into Trinity's bank account.

450.    Trinity's bank account is controlled by Julie Seibert and as such, prior to the amendment to this lawsuit adding Trinity as a defendant, was beyond the reach of John Seibert's creditors.

451.    On July 27, 2016, notwithstanding the fact that John Seibert, through Royal, had done all of the development work for the project thus far, Trinity sent a $20,000 invoice to the Aces Hotel for the retainer on the development contract for the project.  See Decl., Ex. 65.  John Seibert directed that the money for his "consultant services" be paid to Trinity instead of to him in order to evade the Plaintiffs' collection efforts.

452.    On July 29, 2016, less than a month after John Seibert declared personal bankruptcy, and after all of the development work on the project had been performed by John Seibert through Royal, *Trinity,* through Julie Seibert, signed the $300,000 development contract with Aces Hotel for the construction of the hotel connected to the Aces Casino in Columbus, Minnesota.  See Decl., Ex. 66.

453.    This Aces Hotel project had been a Royal project which was fraudulently transferred to Trinity, in an effort to hinder, delay and defraud the Plaintiffs and to evade the Plaintiffs' collection efforts, just prior to John Seibert filing for personal bankruptcy.

454.    This Aces Hotel development contract had a $200,000 base development fee, and $100,000 in incentive bonuses, all of which should have been available to satisfy the Plaintiffs' judgments against John Seibert but for his fraudulent transfer of this project to Trinity.

455.    On August 15, 2016, Trinity again submitted a $10,700 invoice to SkyWatch for John Seibert's services rendered.  See Decl., Ex. 67.

456.    SkyWatch then delivered a check for $10,700 to Trinity, which was deposited into Trinity's bank account on August 24, 2016, which is controlled by Julie Seibert and prior to the amendment to this lawsuit adding Trinity as a defendant, was beyond the reach of John Seibert's creditors.

457.    On September 8, 2016, Trinity again submitted a $10,700 invoice to SkyWatch for John Seibert's services rendered.  See Decl., Ex. 68.

458.    SkyWatch then delivered a check for $10,700 to Trinity, which was deposited into Trinity's bank account on September 9, 2016, which is controlled by Julie Seibert and, prior to the amendment to this lawsuit adding Trinity as a defendant, was beyond the reach of John Seibert's creditors.

**John Seibert's Projection of Trinity's 2016-17 Income from Ongoing Development Projects**

459.    On September 10, 2016, John Seibert (again, with no involvement from Julie Seibert) drafted a spreadsheet projecting Trinity's income from its ongoing projects, and how that income was expected to be received over the coming year.  See Decl., Ex. 69.

460.    John Seibert's projections established an expected income to Trinity from September 2016 to December 2016 of $255,000 from just five active projects (Aces Hotel, North Port, Jamestown, Marshall and Jordan).  Id.

461.    Seibert's projections for Trinity also established an expected income to Trinity of $1,831,100 in 2017 from projects that were active as of September 2016 (Aces Hotel, North Port, Jamestown, Marshall, Jordan, Monticello, Owatonna, New Richmond, Blair and Crosby).  Id.

462.    Plaintiffs, however, now know that there are as many as 25 hotel projects that were in active development and fraudulently transferred from Royal to Trinity.

463.    The Cannon Falls, Minnesota hotel project was, as of late 2016, in active development, and is scheduled to open in winter 2017-2018 under the GrandStay flag.  <u>See</u> Decl., Ex. 70.

464.    Based on John Seibert's spreadsheet of active projects, <u>see</u> Decl., Ex. 69, Royal's commission structure, <u>see</u> Decl., Ex. 30, and Trinity's adoption and use of Royal's commission structure, <u>see</u> Dec., Ex. 71,   the Cannon Falls project will produce a significant, six-figure development fee to Trinity.

465.    Further, in a November 20, 2016 email sent from Julie Seibert's counsel, Phillip Cole, to undersigned counsel, Attorney Cole admitted that based on representations made to him by the Seiberts, six additional hotel projects: (1) Menominee, Minnesota; (2) Mankato, Minnesota; (3) Hopkins, Minnesota; (4) Columbia Heights, Minnesota; (5) Baxter, Wisconsin; and (6) Hudson, Wisconsin were, as of that date, also "active" Trinity projects.  <u>See</u> Decl., Ex. 72.

466.    Four of these additional six development projects in "active" development— Mankato, Hopkins, Columbia Heights and Baxter - had also been fraudulently transferred to Trinity from Royal.

467.    Thus, based on Trinity's own counsel's representations, Trinity's actual projected income in 2017 is likely to be *much greater* than the $1,831,100 shown on John Seibert's September 10, 2016 spreadsheet, since the actual number of active Trinity projects may be at least double that shown in September 2016.

468.    In fact, documents recovered from John Seibert's laptop computer reveal that as of mid-2016, Trinity was managing no fewer than 24 hotel and apartment building projects in various stages of the development process.  <u>See</u> Decl., Ex. 69.

469.    On September 22, 2016, Trinity was expecting receipt of a $10,000 progress payment from the Aces Hotel project, as the Aces Hotel general ledger shows monthly $10,000 payments committed to Trinity.  See Decl., Ex. 73.  These proceeds should have been available to reduce the Plaintiffs' judgment against John Seibert but for his fraudulent transfer of this project to Trinity in an effort to hinder, delay and defraud the Plaintiffs and to evade the Plaintiffs' collection efforts.

470.    On October 3, 2016, Trinity again submitted a $10,700 invoice to SkyWatch for John Seibert's services rendered.  See Decl., Ex. 74.

471.    SkyWatch then delivered a check for $11,651.11 to Trinity, which was deposited on October 7, 2016, into Trinity's bank account which is controlled by Julie Seibert and prior to the amendment to this lawsuit adding Trinity as a defendant, was beyond the reach of John Seibert's creditors.

472.    On October 11, 2016, Julie Seibert, at the direction of John Seibert, completed a payroll set-up and w-4 filings for Trinity.  Pursuant to this scheme, John Seibert was to be paid a salary of $5,500.00 per month, and Julie Seibert was to be paid a salary of $4000.00 per month out of Trinity.  See Decl., Ex. 75.

473.    The money used to pay John Seibert's and Julie Seibert's salaries out of Trinity, however, was derived from the Aces Hotel progress payments to Trinity—which in turn were the product of the fraudulent transfer of the Aces Hotel project by John Seibert from Royal to Trinity less than a month before he declared bankruptcy.  Accordingly, the entirety of this salary scheme was fraudulent, and has been conducted to in an effort to hinder, delay and defraud the Plaintiffs and to evade the Plaintiffs' collection efforts.

474.   On October 18, 2016, Trinity deposited a $10,000 check from the Aces Hotel project into the Trinity bank account.

475.   On November 1, 2016, Trinity again submitted a $10,700 invoice to SkyWatch for John Seibert's services rendered.  See Decl., Ex. 76.

476.   SkyWatch then delivered a check for $10,700 to Trinity, which was deposited into Trinity's bank account beyond the reach of John Seibert's creditors.

477.   On November 26, 2016, Trinity deposited a $10,000 check from the Aces Hotel project into the Trinity bank account.

478.   On January 17, 217, Trinity deposited a $15,000 check from the Aces Hotel project into the Trinity bank account.

479.   On February 22, 2017, Trinity deposited a $15,000 check from the Aces Hotel project into the Trinity bank account.

480.   On March 21, 2017, Trinity deposited a $15,000 check from the Aces Hotel project into the Trinity bank account.

481.   On May 22, 2017, Trinity deposited a $15,000 check from the Aces Hotel project into the Trinity bank account.

482.   On June 16, 2017, Trinity deposited a $15,000 check from the Aces Hotel project into the Trinity bank account.

483.   On August 9, 2017, Trinity deposited a $10,700 check from SkyWatch into the Trinity bank account.

484.   Based on information uncovered by the Plaintiffs thusfar, Trinity has deposited $163,651.11 of development project proceeds into its bank account and beyond the reach of John Seibert's creditors:

| Date of Deposit | Project | Check Value |
|---|---|---|
| 12/17/2013 | Briggs Companies | $ 10,000.00 |
| 7/28/2016 | Aces Hotel | $ 20,000.00 |
| 8/24/2016 | SkyWatch | $ 10,700.00 |
| 9/9/2016 | SkyWatch | $ 10,700.00 |
| 10/7/2016 | SkyWatch | $ 11,651.11 |
| 10/18/2016 | Aces Hotel | $ 10,000.00 |
| 11/26/2016 | Aces Hotel | $ 10,000.00 |
| 1/17/2017 | Aces Hotel | $ 15,000.00 |
| 2/22/2017 | Aces Hotel | $ 15,000.00 |
| 3/21/2017 | Aces Hotel | $ 10,000.00 |
| 5/22/2017 | Aces Hotel | $ 10,000.00 |
| 6/16/2017 | Aces Hotel | $ 10,000.00 |
| 8/9/2017 | SkyWatch | $ 10,700.00 |
| | **Total:** | **$153,751.11** |

485. These project proceeds should have been available to satisfy Plaintiffs' judgments against John Seibert but for his directing the fraudulent transfer of the Trinity Stock to Julie Seibert and the fraudulent transfer of development projects from Royal to Trinity on the eve of his personal bankruptcy, and in an obvious effort to hinder, delay and defraud the Plaintiffs and to evade the Plaintiffs' collection efforts.

486. Instead, however, Julie Seibert withdrew the proceeds of these fraudulent transfers, in cash, on a monthly basis, totaling $70,522.79:

| Date | Cash Withdrawal |
|---|---|
| 12/24/2013 | $ 3,000.00 |
| 1/3/2014 | $ 2,000.00 |
| 7/22/2016 | $ 2,000.00 |
| 7/28/2016 | $ 2,000.00 |
| 8/5/2016 | $ 2,000.00 |
| 8/19/2016 | $ 1,000.00 |
| 8/24/2016 | $ 2,000.00 |
| 8/31/2016 | $ 2,000.00 |

| | |
|---|---|
| 9/8/2016 | $ 2,000.00 |
| 9/9/2016 | $ 2,000.00 |
| 9/14/2016 | $ 2,000.00 |
| 10/14/2016 | $ 2,000.00 |
| 10/18/2016 | $ 2,000.00 |
| 11/21/2016 | $ 2,000.00 |
| 12/19/2016 | $ 2,000.00 |
| 12/23/2016 | $ 2,000.00 |
| 1/17/2017 | $ 2,000.00 |
| 1/20/2017 | $ 2,000.00 |
| 1/21/2017 | $ 1,000.00 |
| 1/21/2017 | $ 1,000.00 |
| 1/27/2017 | $ 2,000.00 |
| 2/22/2017 | $ 2,000.00 |
| 2/24/2017 | $ 2,000.00 |
| 3/9/2017 | $ 2,000.00 |
| 3/13/2017 | $ 2,000.00 |
| 3/21/2017 | $ 2,000.00 |
| 3/28/2017 | $ 2,104.17 |
| 4/3/2017 | $ 2,000.00 |
| 4/4/2017 | $ 2,000.00 |
| 5/22/2017 | $ 2,000.00 |
| 6/7/2017 | $ 2,000.00 |
| 6/16/2017 | $ 2,000.00 |
| 6/19/2017 | $ 2,000.00 |
| 7/11/2017 | $ 2,000.00 |
| 7/19/2017 | $ 418.62 |
| 8/9/2017 | $ 2,000.00 |
| 8/16/2017 | $ 2,000.00 |
| **Total** | **$70,522.79** |

iv.    **John Seibert Perjures Himself at his Section 341 Creditors' Hearing**

487.    During his first Section 341 Creditors Conference in Bankruptcy Court on August 8, 2016, John Seibert testified that he would never deposit any check he received because he did not want the Plaintiffs to levy on his bank accounts, so he would cash checks at the Bank of Elk River and live in cash to avoid his creditors gaining access to his funds.  See Decl., Ex. 77 at 4-5.

This is yet another "badge of fraud"—demonstrating both John Seibert's blatant disregard for judicial authority, and the extent to which he is willing to go to hinder, delay and defraud the Plaintiffs and to evade the Plaintiffs' collection efforts.

488.    John Seibert also testified at his first Section 341 Creditors Conference on August 8, 2016 that the Running Aces project "was the only project" that Trinity had, and that Trinity had never been involved in any other development projects.  Id.

489.    John Seibert provided this testimony notwithstanding the fact that he sent an email to Simon Calton of SkyWatch just a month earlier, on May 29, 2016, which included an Executive Summary that John Seibert drafted, and which listed Trinity as the development consultant *for no fewer than 11 current projects*.  See Decl., Ex. 44 .

490.    Further, John Seibert sent an email to Simon Calton of SkyWatch on July 5, 2016 attaching a loan application package for Cap One financing for the North Port, Florida project. The executive summary for that project, which John Seibert also drafted, lists Trinity as the developer for *that* project—which John Seibert failed to disclose to the bankruptcy trustee at the Section 341 Creditors' Conference on August 8, 2016.

491.    Further, on July 12, 2016, John Seibert sent an email to Jon Kennedy at GrandStay advising that John Seibert had worked out a deal on a letter of intent on Trinity's Owatonna, Minnesota GrandStay hotel project.  See Decl., Ex. 78. John Seibert also failed to disclose *that* project to the bankruptcy trustee at the Section 341 Creditors' Conference on August 8, 2016.

492.    Most damningly, however, only a month after he testified under oath to the Bankruptcy Trustee that Trinity was only working on *one* development project, John Seibert drafted a spreadsheet on September 10, 2016 projecting $255,000 in income to Trinity for the

remainder of 2016, and $1,831,100 in income to Trinity in 2017 <u>from *ten* active projects</u>.  <u>See</u> Decl., Ex. 69.

493.     John Seibert similarly testified, at his first Section 341 Creditors Conference on August 8, 2016 that Royal had only one development project, in Crosby, Minnesota, and that "it never came together."

494.     As demonstrated above, however, Royal was actively pursuing at least 44 hotel and apartment development projects from 2014 to 2016, at least 24 of which were subsequently fraudulently transferred to Trinity just prior to his declaring bankruptcy, and which remain ongoing.

495.     Ironically, the Crosby, Minnesota project that John Seibert testified about at his Section 341 Creditors Conference on August 8, 2016 (and that he claimed "never came together") was projected, by John Seibert, to produce $130,000 in development fees for Trinity, including monthly progress payments beginning in July 2017, on the spreadsheet John Seibert produced *one month* after giving that sworn testimony at the August 8, 2016 Creditors Conference.  <u>See</u> Decl., Ex. 69.

**5.**     <u>**John Seibert Fraudulently Converts His Interest in his Family's Farm (a non-exempt asset) to Pay Down Equity on His Home (an exempt asset)**</u>

496.     On October 24, 2011, just *one month* after John Seibert claimed he had no funds to pay the $77,928.68 sanction awarded to Plaintiffs by the Iowa Court, and three weeks after the Court ordered him to pay the sanction over to the Plaintiffs, John Seibert finalized the sale of his interest in a family farm held in the Revocable Trust of Gordon R. Seibert and Lauretta H. Seibert of March 22, 1982.

497.    Pursuant to this sale of a non-exempt asset, which the Plaintiffs could have and would have executed upon to satisfy their judgment, John Seibert received $158,928.39.  <u>See</u> Decl., Ex. 79

498.    Based on emails and documents recovered by the Plaintiffs from Mr. Seibert's laptop computer, it is clear that this sale of John Seibert's share of his family's farm was in process during the time of the sanctions hearing in August 2011 when he claimed an inability to pay the Iowa Court's sanctions Order.

499.    Instead of using the proceeds to pay the Iowa Court's sanctions order, John Seibert obtained those proceeds and immediately secreted them away from the Plaintiffs by making an undisclosed $150,000.00 lump sum cash payment on the loan principal of his home mortgage held by the Bank of Elk River on October 26, 2011.  <u>See</u> Decl., Ex. 80.

500.    John Seibert made the $150,000.00 lump sum principal payment on his home mortgage just after suffering the $77,928.69 sanctions judgment in the Iowa Court – in an effort to transform non-exempt cash assets into exempt homestead equity, and with the intent to hinder, delay or defraud his creditors, and avoid paying Plaintiffs the $77,928.68 sanction ordered by the Iowa Court.

## <u>CAUSES OF ACTION</u>

### <u>COUNT I – FRAUDULENT TRANSFERS – JOHN SEIBERT (Equity in Home)</u>
**[Transfer or Obligation Voidable - Minn. Stat. §§ 513.44(a)(1) and 513.47]**

501.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

502.    Plaintiffs have standing to assert the claims herein because, at all times material hereto, Plaintiffs held unliquidated claims against John Seibert and JFS Development in the Iowa RICO Action or liquidated claims in the form of the Seibert Judgments.

503.    John Seibert fraudulently liquidated and transferred his non-exempt interest in his family's farm, valued at $158,928.39, and used the proceeds of this sale to make an unscheduled principal paydown on the mortgage on his residence located at 16271 Royal Road, Ramsey, MN 55303 (the "Seibert Homestead").

504.    As specifically alleged in this Second Amended Complaint, including but not limited to paragraphs 34 and 468 to 472, John Seibert made this transfer with the actual intent to hinder, delay and defraud the Plaintiffs.

505.    Several of the so-called "badges of fraud" are present with respect to this transfer, including (1) that the transfer was to himself, and converted a non-exempt asset to an exempt asset; (2) John Seibert retained possession or control of the property transferred after the transfer; (3) the transfer was concealed from the Iowa Court and the Plaintiffs even though it occurred proximately to a hearing in which John Seibert was ordered by the Iowa Court to pay a judgment to the Plaintiffs that could have been satisfied from the proceeds of this transfer; (4) the assets themselves were concealed from the Court and the Plaintiffs; (5) John Seibert had been sued by the Plaintiffs before the transfer was made; (6) the transfer occurred shortly after the Plaintiffs won a substantial judgment against John Seibert; and (7) the totality of the circumstances in which this transfer took place amply demonstrates that the transfer was made with the actual intent to hinder, delay, and defraud the Plaintiffs.

506.    As a result of the foregoing, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47 by:  (a) avoiding this transfer free and clear from any claimed interest of John Seibert, (b) obtaining a lien or attachment against John Seibert's equity in the Seibert Homestead sufficient to recover the amount of this transfer; (c) an injunction against further disposition of this attached equity by John Seibert or any other transferee; (d) a further

injunction from the Court ordering John Seibert to liquidate this equity in the amount of $158,928.39 plus prejudgment and post-judgment interest, attorneys' fees and costs at statutory rates, to permit the Plaintiffs to recover this amount in damages on this claim, and to use those proceeds to offset their judgments against John Seibert; and (e) such other and further relief as this Court may order to provide an effective remedy that would put the Plaintiffs back in the position they would have been in had this fraudulent transfer not occurred.

## COUNT II – FRAUDULENT TRANSFERS – JULIE SEIBERT
### [Actual Fraud – Minn. Stat. §§ 513.44(a)(1) and 513.47]

507.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

508.    Plaintiffs have standing to assert the claims herein because, at all times material hereto, Plaintiffs held unliquidated claims against John Seibert and JFS Development in the Iowa RICO Action or liquidated claims in the form of the Seibert Judgments.

509.    As demonstrated by the multiple badges of fraud specifically alleged in this Second Amended Complaint, including but not limited to paragraphs 56-74, the Julie Seibert Fraud Transfers represent transfers that were made with actual intent to hinder, delay or defraud John Seibert's creditors, including Plaintiffs to whom John Seibert was indebted on or after the date of the Julie Seibert Fraud Transfers.

510.    Julie Seibert is an initial transferee of the Julie Seibert Fraud Transfers and cannot satisfy her burden that she took the Julie Seibert Fraud Transfers for value and in good faith.

511.    As a result of the foregoing, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47:  (a) avoiding and preserving the Julie Seibert Fraud Transfers free and clear from any claimed interest of Julie Seibert, (b) directing that the Julie Seibert Fraud Transfers be set aside, (c) recovering the Julie Seibert Fraud Transfers in the amount of at least

$105,324.23 for the transfer of non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert in the Julie Seibert Fraud Transfers, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Julie Seibert.

### COUNT III – FRAUDULENT TRANSFERS – JULIE SEIBERT
### [Constructive Fraud – Minn. Stat. §§ 513.44(a)(2)(i) and 513.47]

512.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

513.     Plaintiffs have standing to assert the claims herein because, at all times material hereto, Plaintiffs held unliquidated claims against John Seibert and JFS Development in the Iowa RICO Action or liquidated claims in the form of the Seibert Judgments.

514.     At all times material hereto, and as specifically alleged above including but not limited to paragraphs 12 through 23, John Seibert engaged in business or transactions, or was about to engage in business or transactions, for which the property remaining with him after the Julie Seibert Fraud Transfers were effectuated constituted unreasonably small capital.

515.     John Seibert received nothing of value in exchange for the Julie Seibert Fraud Transfers.

516.     Julie Seibert is an initial transferee of the Julie Seibert Fraud Transfers and did not take the Julie Seibert Fraud Transfers for value.

517.     As a result of the foregoing, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47:  (a) avoiding and preserving the Julie Seibert Fraud Transfers free and clear from any claimed interest of Julie Seibert, (b) directing that the Julie Seibert Fraud Transfers be set aside, (c) recovering the Julie Seibert Fraud Transfers in the amount of at least $105,324.23 for the transfer of non-exempt income and cash and/or the reasonably equivalent

value of all other cash and/or property transferred by John Seibert in the Julie Seibert Fraud Transfers, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Julie Seibert.

### COUNT IV – FRAUDULENT TRANSFERS – JULIE SEIBERT
### [Constructive Fraud – Minn. Stat. §§ 513.45(a) and 513.47]

518.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

519.    Plaintiffs have standing to assert the claims herein because, at all times material hereto, Plaintiffs held unliquidated claims against John Seibert and JFS Development in the Iowa RICO Action or liquidated claims in the form of the Seibert Judgments.

520.    At all times material hereto, and as specifically alleged above including but not limited to paragraphs 12 through 23, John Seibert, at the time of the Julie Seibert Fraud Transfers, was insolvent, or in the alternative, John Seibert became insolvent as a result of the Julie Seibert Fraud Transfers.

521.    John Seibert received nothing of value in exchange for the Julie Seibert Fraud Transfers.

522.    Julie Seibert is an initial transferee of the Julie Seibert Fraud Transfers and did not take the Julie Seibert Fraud Transfers for value.

523.    As a result of the foregoing, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47:  (a) avoiding and preserving the Julie Seibert Fraud Transfers free and clear from any claimed interest of Julie Seibert, (b) directing that the Julie Seibert Fraud Transfers be set aside, (c) recovering the Julie Seibert Fraud Transfers in the amount of at least $105,324.23 for the transfer of non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert in the Julie Seibert Fraud

Transfers, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Julie Seibert.

## COUNT V–ALTER EGO LIABILITY–PREFERRED BUSINESS CONSULTING CORP.

524.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

525.   John Seibert and Preferred are alter egos of each other, as demonstrated by the fact that (1) John Seibert was the sole shareholder of Preferred; (2) Preferred did not observe corporate formalities; (3) Preferred had no other functioning officers or directors; (4) Preferred did not hold annual meetings, directors meetings, keep minutes, or keep any corporate records; and (5) Preferred came into being and existed merely as a façade for the individual dealings of its sole shareholder, John Seibert.

526.   Justice requires recognizing the substance of the relationship between John Seibert and Preferred over the corporate form because, as specifically alleged in paragraphs 109-120, 358 and 359, the corporate fiction has been utilized to hinder, delay or defraud John Seibert's creditors with the particular intent to perpetrate a fraud on the Plaintiffs and frustrate the Plaintiffs' rightful claim over John Seibert's assets.

527.   Piercing Preferred's corporate form will produce an equitable result.

528.   There is no alternate remedy at law adequate to permit the Plaintiffs to reach John Seibert's fraudulently transferred assets.

## COUNT VI–ALTER EGO LIABILITY–ROYAL BUSINESS CONSULTING CORP.

529.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

530.     John Seibert and Royal are alter egos of each other, as demonstrated by the fact that (1) John Seibert was the sole shareholder of Royal; (2) Royal did not observe corporate formalities; (3) Royal has no other functioning officers or directors; (4) Royal does not hold annual meetings, directors meetings, keep minutes, or keep any corporate records; and (5) Royal came into being and existed merely as a façade for the individual dealings of its sole shareholder, John Seibert.

531.     Justice requires recognizing the substance of the relationship between John Seibert and Royal over the corporate form because, as specifically alleged in paragraphs 109-120, 358 and 359, the corporate fiction has been utilized to hinder, delay or defraud John Seibert's creditors with the particular intent to perpetrate a fraud on the Plaintiffs and frustrate the Plaintiffs' rightful claim over John Seibert's assets.

532.     Piercing Royal's corporate form will produce an equitable result.

533.     There is no alternate remedy at law adequate to permit the Plaintiffs to reach John Seibert's fraudulently transferred assets.

## COUNT VII – FRAUDULENT TRANSFERS – ROYAL BUSINESS CONSULTING CORP.
### [Actual Fraud – Minn. Stat. §§ 513.44(a)(1) and 513.47]

534.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

535.     Plaintiffs have standing to assert the claims herein because, at all times material hereto, Plaintiffs held unliquidated claims against John Seibert and JFS Development in the Iowa RICO Action or liquidated claims in the form of the Seibert Judgments.

536.     As demonstrated by the multiple badges of fraud specifically alleged in this Second Amended Complaint, including but not limited to paragraphs 230 to 338, the transfers of

development projects from John Seibert and/or Preferred to Royal were made with actual intent to hinder, delay or defraud the Plaintiffs.

537.    Royal was the initial transferee of the transfers of development projects from John Seibert and/or Preferred and cannot satisfy its burden that it took such transfers for value and in good faith.

538.    As a result of the foregoing, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47:  (a) avoiding and preserving the transfers free and clear from any claimed interest of Royal, (b) directing that the transfers to Royal be set aside, (c) recovering the transfers to Royal in the amount of at least $14,595,000.00 in commission income associated with the projects transferred to Royal Business Consulting plus non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Royal.

## COUNT VIII –FRAUDULENT TRANSFERS–ROYAL BUSINESS CONSULTING CORP.
### [Constructive Fraud – Minn. Stat. §§ 513.44(a)(2)(i) and 513.47]

539.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

540.    Plaintiffs have standing to assert the claims herein because, at all times material hereto, Plaintiffs held unliquidated claims against John Seibert and JFS Development in the Iowa RICO Action or liquidated claims in the form of the Seibert Judgments.

541.    At all times material hereto, and as specifically alleged above including but not limited to in paragraphs 12 through 23, John Seibert engaged in business or transactions, or was

about to engage in business or transactions, for which the property remaining with him after the transfers to Royal were effectuated constituted unreasonably small capital.

542.    John Seibert received nothing of value in exchange for the transfers to Royal.

543.    Royal was an initial transferee of the transfers and cannot satisfy its burden that it took the transfers from John Seibert for value and in good faith.

544.    As a result of the foregoing, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47:  (a) avoiding and preserving the transfers free and clear from any claimed interest of Royal, (b) directing that the transfers be set aside, (c) recovering the transfers of development projects to Royal in the amount of at least $14,595,000.00 in commission income associated with the projects transferred to Royal plus non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Royal.

## COUNT IX–FRAUDULENT TRANSFERS– ROYAL BUSINESS CONSULTING CORP.
### [Constructive Fraud – Minn. Stat. §§ 513.45(a) and 513.47]

545.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

546.    Plaintiffs have standing to assert the claims herein because, at all times material hereto, Plaintiffs held unliquidated claims against John Seibert and JFS Development in the Iowa RICO Action or liquidated claims in the form of the Seibert Judgments.

547.    At all times material hereto, and as specifically alleged above including but not limited to in paragraphs 12 through 23, John Seibert, at the time of the transfers to Royal, was insolvent, or in the alternative, John Seibert became insolvent as a result of the transfers to Royal.

548.    John Seibert received nothing of value in exchange for the transfer of 44 development projects to Royal.

549.    Royal is an initial transferee of the transfers and cannot satisfy its burden that it took the transfers from John Seibert for value and in good faith.

550.    As a result of the foregoing, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47:  (a) avoiding and preserving the transfers free and clear from any claimed interest of Royal, (b) directing that the transfers be set aside, (c) recovering the transfers in the amount of at least $14,595,000.00 in commission income associated with the projects transferred to Royal plus non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Royal and/or Julie Seibert.

## COUNT X– FRAUDULENT TRANSFERS – TRINITY BUSINESS CONSULTING, INC
### [Actual Fraud – Minn. Stat. §§ 513.44(a)(1) and 513.47]

551.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

552.    Plaintiffs have standing to assert the claims herein because, at all times material hereto, Plaintiffs held unliquidated claims against John Seibert in the Iowa RICO Action or liquidated claims in the form of the Seibert Judgments.

553.    As demonstrated by the multiple badges of fraud specifically alleged in this Second Amended Complaint, including but not limited to paragraphs 370 to 410 and 427 to 452, the transfers of development projects from John Seibert and/or Royal to Trinity were made with actual intent to hinder, delay or defraud the Plaintiffs.

554.     Trinity was the initial transferee of the transfers of development projects from John Seibert and/or Royal and cannot satisfy its burden that it took such transfers for value and in good faith.

555.     As a result of the foregoing, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47:  (a) avoiding and preserving the transfers free and clear from any claimed interest of Trinity and/or Julie Seibert, (b) directing that the transfers to Trinity be set aside, (c) recovering the transfers to Trinity in the amount of at least $10,400,000.00 in commission income associated with the projects transferred to Trinity plus non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Trinity.

## COUNT XI–FRAUDULENT TRANSFER – TRINITY BUSINESS CONSULTING, INC
### [Actual Fraud – Transfer of a Business as a Going Concern; Minn. Stat. §§ 513.44(a)(1) and 513.47]

556.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

557.     Plaintiffs have standing to assert the claims herein because, at all times material hereto, Plaintiffs held unliquidated claims against John Seibert in the Iowa RICO Action or liquidated claims in the form of the Seibert Judgments.

558.     As specifically alleged in this Second Amended Complaint, including but not limited to paragraphs 418-423, the transfers of development projects from John Seibert and/or Royal to Trinity constituted transfers of trade secrets, confidential information, goodwill, economic opportunities and other intangible assets.

559.     As specifically alleged in this Second Amended Complaint, including but not limited to paragraphs 418-423, John Seibert and/or Royal transferred its trade secrets, confidential information, goodwill, economic opportunities, and other intangible assets, which collectively formed its business as a going concern, to Trinity.

560.     As demonstrated in this Second Amended Complaint, including but not limited to paragraphs 339-492, this transfer from John Seibert and/or Royal to Trinity was made with actual intent to hinder, delay or defraud the Plaintiffs.

561.     Trinity was the initial transferee of the transfers and cannot satisfy its burden that it took the transfers from Royal for value and in good faith.

562.     As a result of the foregoing, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47:  (a) avoiding and preserving the transfers free and clear from any claimed interest of Trinity or Julie Seibert, (b) directing that the transfers be set aside, (c) recovering the transfers of development projects to Trinity in the amount of at least $10,400,000.00 in commission income associated with the projects transferred to Trinity plus non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Trinity and/or Julie Seibert.

## COUNT XII–FRAUDULENT TRANSFER – TRINITY BUSINESS CONSULTING, INC
### [Constructive Fraud – Minn. Stat. §§ 513.44(a)(2)(i) and 513.47]

563.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

564.     Plaintiffs have standing to assert the claims herein because, at all times material hereto, Plaintiffs held unliquidated claims against John Seibert and JFS Development in the Iowa RICO Action or liquidated claims in the form of the Seibert Judgments.

{S1051870.15}                                                102

565.    At all times material hereto, and as specifically alleged above including but not limited to in paragraphs 12 through 23 John Seibert and/or Royal engaged in business or transactions, or was about to engage in business or transactions, for which the property remaining with Royal after the transfers to Trinity were effectuated constituted unreasonably small capital.

566.    John Seibert and/or Royal received nothing of value in exchange for the transfers to Trinity.

567.    Trinity is an initial transferee of the transfers and cannot satisfy its burden that it took the transfers from Royal for value and in good faith.

568.    As a result of the foregoing, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47:  (a) avoiding and preserving the transfers free and clear from any claimed interest of Trinity or Julie Seibert, (b) directing that the transfers be set aside, (c) recovering the transfers of development projects to Trinity in the amount of at least $10,400,000.00 in commission income associated with the projects transferred to Trinity plus non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Trinity and/or Julie Seibert.

## COUNT XIII–FRAUDULENT TRANSFER – TRINITY BUSINESS CONSULTING, INC
### [Constructive Fraud – Minn. Stat. §§ 513.45(a) and 513.47]

569.    Plaintiffs have standing to assert the claims herein because, at all times material hereto, Plaintiffs held unliquidated claims against John Seibert and JFS Development in the Iowa RICO Action or liquidated claims in the form of the Seibert Judgments.

570.    At all times material hereto, and as specifically alleged above including but not limited to in paragraphs 12 through 23,John Seibert and/or Royal, at the time of the transfers to

Trinity, was insolvent, or in the alternative, John Seibert and/or Royal became insolvent as a result of the transfers to Trinity.

571.    John Seibert and/or Royal received no value in exchange for the transfer of the 24 development projects to Trinity.

572.    Trinity is an initial transferee of the transfers and cannot satisfy its burden that it took the transfers from John Seibert and/or Royal for value and in good faith.

573.    As a result of the foregoing, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47:  (a) avoiding and preserving the transfers free and clear from any claimed interest of Trinity and/or Julie Seibert, (b) directing that the transfers be set aside, (c) recovering the transfers in the amount of at least $10,400,000.00 in commission income associated with the projects transferred to Trinity plus non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Trinity and/or Julie Seibert.

## COUNT XIV – FRAUDULENT TRANSFERS – JULIE SEIBERT
### [Actual Fraud – Minn. Stat. §§ 513.44(a)(1) and 513.47]

574.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

575.    Plaintiffs have standing to asset the claims herein because, at all times material hereto, Plaintiffs held unliquidated claims against John Seibert in the Iowa RICO Action or liquidated claims in the form of the Seibert judgments.

576.    John Seibert possesses an equitable ownership interest in Trinity, as demonstrated by the many facts, including but not limited to paragraphs 339-334, alleged by Plaintiffs in this Second Amended Complaint that confirm John Seibert is in full control of Trinity, including but

not limited to: (a) Trinity is a family business comprised of only John and Julie Seibert;  (b) John Seibert is one of Trinity's two officers (Vice President) (c) John Seibert directs Trinity's daily affairs and decision making; (d) John Seibert's labor, hotel experience and connections within the industry produce all of Trinity's revenue; (e) John Seibert alone possesses the experience, connections, and business acumen and reputation necessary to run a hotel development business like Trinity; (f) Julie Seibert's inexperience in hotel development; and (f) John Seibert directs Julie Seibert's efforts on behalf of Trinity.

577.    John Seibert transferred his equitable interest in Trinity to his wife Julie Seibert by directing that all of Trinity's stock be issued to Julie Seibert (the "<u>Trinity Stock Transfer</u>").

578.    John Seibert executed the Trinity Stock Transfer with the intent to hinder, delay and defraud the Plaintiffs.

579.    Julie Seibert is an initial transferee of the Trinity Stock Transfer.

580.    As a result of the foregoing, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47:  (a) avoiding and preserving the transfers free and clear from any claimed interest of Trinity and/or Julie Seibert, (b) directing that the transfers be set aside, (c) recovering the transfers in the amount of at least $10,400,000.00 in commission income associated with the projects transferred to Trinity plus non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert, (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Trinity and/or Julie Seibert, and (e) finding that Julie Seibert held the title to the Trinity Stock in trust for the Plaintiffs and ordering immediate restitution of the Trinity Stock and its proceeds.

<u>**COUNT XV – CONSPIRACY – JULIE SEIBERT**</u>

581.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

582.    As specifically alleged above, including but not limited to paragraphs 342, 390-91 and 444-45, from June, 2012, to July, 2013, Julie Seibert and John Seibert agreed and knowingly and willfully conspired among themselves to hinder, delay and defraud Plaintiffs in the collection of their judgment against John Seibert.

583.    As specifically alleged above, including but not limited to paragraphs 56 through 74, Julie Seibert and John Seibert agreed to fraudulently transfer at least $105,324.23 of John Seibert's non-exempt income and cash to Julie Seibert in exchange for little or no consideration.

584.    Julie Seibert and John Seibert agreed to fraudulently transfer at least $105,324.23 of John Seibert's non-exempt income and cash to Julie Seibert pursuant to, and in furtherance of, the conspiracy and agreement to defraud the Plaintiffs described in this complaint.

585.    As a proximate result of the wrongful acts herein alleged, Plaintiffs have been generally damaged in the amount of at least $105,324.23 for the transfer of John Seibert's non-exempt income and cash and/or the reasonably equivalent value of all property transferred by John Seibert in the Julie Seibert Fraud Transfers.

586.    In addition, as specifically alleged above, including but not limited to paragraph 342, 390-91 and 444-45, from June 2013 when Trinity was first formed until the present, Julie Seibert and John Seibert agreed and knowingly and willfully conspired among themselves to hinder, delay and defraud Plaintiffs in the collection of their nearly $19 Million federal RICO judgment against John Seibert.

587.    Pursuant to this conspiracy, and as specifically alleged above, including but not limited to paragraphs 342, 390-91 and 444-45, Julie Seibert and John Seibert agreed to transfer at

least 24 hotel and apartment development projects, with least in $10,400,000.00 in associated commission income, plus non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property, from Royal into Trinity.

588.    Julie Seibert and John Seibert did the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy and agreement above to put these assets out of the reach of the Plaintiffs.

589.    As a proximate result of the wrongful acts herein alleged, Plaintiffs have been generally damaged in the amount of at least $10,400,000.00.

590.    At all times material hereto, Julie Seibert and John Seibert knew of Plaintiffs' claims against John Seibert, including entry of the Seibert Judgments, and knew that Plaintiffs claims could be satisfied by John Seibert's $10,400,000.00 in commission income, plus non-exempt income and cash and all other cash and/or property transferred into Trinity. Notwithstanding this knowledge, Julie Seibert and John Seibert intentionally, willfully, fraudulently and maliciously did the things herein alleged to defraud and oppress Plaintiffs. Plaintiffs are therefore also entitled to recover exemplary or punitive damages from Julie Seibert.

### COUNT XVI – CONSPIRACY – JOHN SEIBERT

591.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

592.    As specifically alleged above, including but not limited to paragraphs 56 through 74, from June, 2012, to July, 2013, Julie Seibert and John Seibert agreed and knowingly and willfully conspired among themselves to hinder, delay and defraud Plaintiffs in the collection of their judgment against John Seibert.

593.    As specifically alleged above, including but not limited to paragraphs 56 through 74, Julie Seibert and John Seibert agreed to fraudulently transfer at least $105,324.23 of John Seibert's non-exempt income and cash to Julie Seibert in exchange for little or no consideration.

594.    Julie Seibert and John Seibert agreed to fraudulently transfer at least $105,324.23 of John Seibert's non-exempt income and cash to Julie Seibert pursuant to, and in furtherance of, the conspiracy and agreement to defraud the Plaintiffs described in this complaint.

595.    As a proximate result of the wrongful acts herein alleged, Plaintiffs have been generally damaged in the amount of at least $105,324.23 for the transfer of John Seibert's non-exempt income and cash and/or the reasonably equivalent value of all property transferred by John Seibert in the Julie Seibert Fraud Transfers.

596.    In addition, as specifically alleged above, including but not limited to paragraphs 342, 390-91 and 444-45, from June 2013 when Trinity was first formed until the present, Julie Seibert and John Seibert agreed and knowingly and willfully conspired among themselves to hinder, delay and defraud Plaintiffs in the collection of their nearly $19 Million federal RICO judgment against John Seibert.

597.    Pursuant to this conspiracy, and as specifically alleged above, including but not limited to paragraphs 342, 390-91 and 444-45, Julie Seibert and John Seibert agreed to transfer at least 24 hotel and apartment development projects, with least in $10,400,000.00 in associated commission income, plus non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property, from Royal into Trinity.

598.    Julie Seibert and John Seibert did the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy and agreement above to put these assets out of the reach of the Plaintiffs.

599.    As a proximate result of the wrongful acts herein alleged, Plaintiffs have been generally damaged in the amount of at least $10,400,000.00.

600.    At all times material hereto, Julie Seibert and John Seibert both knew of Plaintiffs' claims against John Seibert, including entry of the Seibert Judgments, and knew that Plaintiffs claims could be satisfied by John Seibert's $10,400,000.00 in commission income, plus non-exempt income and cash and all other cash and/or property transferred into Trinity. Notwithstanding this knowledge, Julie Seibert and John Seibert intentionally, willfully, fraudulently and maliciously did the things herein alleged to defraud and oppress Plaintiffs. Plaintiffs are therefore also entitled to recover exemplary or punitive damages from John Seibert.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs prays for the following relief:

### Temporary Relief

601.    For such temporary relief as the Court may deem just and equitable in remedying the Plaintiffs 16 causes of action alleged above.

### Permanent Relief

602.    On Count I, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47 by:  (a) avoiding this transfer free and clear from any claimed interest of John Seibert, (b) obtaining a lien or attachment against John Seibert's equity in the Seibert Homestead sufficient to recover the amount of this transfer; (c) an injunction against further disposition of this attached equity by John Seibert or any other transferee; (d) a further injunction from the Court ordering John Seibert to liquidate this equity in the amount of $158,928.39 plus prejudgment and post-judgment interest, attorneys' fees and costs at statutory rates, to permit the

Plaintiffs to recover this amount in damages on this claim, and to use those proceeds to offset their judgments against John Seibert; and (e) such other and further relief as this Court may order to provide an effective remedy that would put the Plaintiffs back in the position they would have been in had this fraudulent transfer not occurred.

603.    On Count II, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47:  (a) avoiding and preserving the Julie Seibert Fraud Transfers free and clear from any claimed interest of Julie Seibert, (b) directing that the Julie Seibert Fraud Transfers be set aside, (c) recovering the Julie Seibert Fraud Transfers in the amount of at least $105,324.23 for the transfer of non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert in the Julie Seibert Fraud Transfers, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Julie Seibert.

604.    On Count III, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47:  (a) avoiding and preserving the Julie Seibert Fraud Transfers free and clear from any claimed interest of Julie Seibert, (b) directing that the Julie Seibert Fraud Transfers be set aside, (c) recovering the Julie Seibert Fraud Transfers in the amount of at least $105,324.23 for the transfer of non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert in the Julie Seibert Fraud Transfers, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Julie Seibert.

605.    On Count IV, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.45(a) and 513.47:  (a) avoiding and preserving the Julie Seibert Fraud Transfers free and clear from any claimed interest of Julie Seibert, (b) directing that the Julie Seibert Fraud

Transfers be set aside, (c) recovering the Julie Seibert Fraud Transfers in the amount of at least $105,324.23 for the transfer of non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert in the Julie Seibert Fraud Transfers, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Julie Seibert.

606.    On Count V, Plaintiffs are entitled to an Order of this Court finding that Preferred is the alter-ego of John Seibert, piercing Preferred's corporate veil and obtaining the assets of Preferred to satisfy the obligations of its controlling shareholder, John Seibert, to the Plaintiffs.

607.    On Count VI, Plaintiffs are entitled to an Order of this Court finding that Royal is the alter-ego of John Seibert, piercing Royal's corporate veil and obtaining the assets of Royal to satisfy the obligations of its controlling shareholder, John Seibert, to the Plaintiffs.

608.    On Count VII, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47:  (a) avoiding and preserving the transfers free and clear from any claimed interest of Royal, (b) directing that the transfers to Royal be set aside, (c) recovering the transfers to Royal in the amount of at least $14,595,000.00 in commission income associated with the projects transferred to Royal plus non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Royal.

609.    On Count VIII, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47:  (a) avoiding and preserving the transfers free and clear from any claimed interest of Royal, (b) directing that the transfers be set aside, (c) recovering the transfers of development projects to Royal in the amount of at least $14,595,000.00 in commission income associated with the projects transferred to Royal plus non-exempt income and cash

and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Royal.

610.  On Count IX, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.45(a) and 513.47:  (a) avoiding and preserving the transfers free and clear from any claimed interest of Royal, (b) directing that the transfers be set aside, (c) recovering the transfers of development projects to Royal in the amount of at least $14,595,000.00 in commission income associated with the projects transferred to Royal plus non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Royal

611.  On Count X, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47:  (a) avoiding and preserving the transfers free and clear from any claimed interest of Trinity and/or Julie Seibert, (b) directing that the transfers be set aside, (c) recovering the transfers made to Trinity in the amount of at least $10,400,000.00 in commission income associated with the projects transferred to Trinity plus non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Trinity.

612.  On Count XI, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47:  (a) avoiding and preserving the transfers free and clear from any claimed interest of Trinity and/or Julie Seibert, (b) directing that the transfers to Trinity be set aside, (c) recovering the transfers to Trinity in the amount of at least $10,400,000.00 in

commission income associated with the projects transferred to Trinity plus non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Trinity and/or Julie Seibert.

613. On Count XII, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47: (a) avoiding and preserving the transfers free and clear from any claimed interest of Trinity and/or Julie Seibert, (b) directing that the transfers to Trinity be set aside, (c) recovering the transfers to Trinity in the amount of at least $10,400,000.00 in commission income associated with the projects transferred to Trinity plus non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Trinity and/or Julie Seibert.

614. On Count XIII, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.45(a) and 513.47: (a) avoiding and preserving the transfers free and clear from any claimed interest of Trinity and/or Julie Seibert, (b) directing that the transfers to Trinity be set aside, (c) recovering the transfers to Trinity in the amount of at least $10,400,000.00 in commission income associated with the projects transferred to Trinity plus non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert, and (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Trinity and/or Julie Seibert.

615. On Count XIV, Plaintiffs are entitled to judgment pursuant to Minn. Stat. §§ 513.45(a) and 513.47: (a) avoiding and preserving the transfers free and clear from any claimed interest of Trinity and/or Julie Seibert, (b) directing that the transfers to Trinity be set

aside, (c) recovering the transfers to Trinity in the amount of at least $10,400,000.00 in commission income associated with the projects transferred to Trinity plus non-exempt income and cash and/or the reasonably equivalent value of all other cash and/or property transferred by John Seibert, (d) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Trinity and/or Julie Seibert, and (e) a finding that Julie Seibert held title to the Trinity stock in trust for the Plaintiffs, and the Court imposing a constructive trust over the Trinity stock and its proceeds in favor of the Plaintiffs, and providing restitution thereof to the Plaintiffs.

616.   On Count XV Plaintiffs are entitled to recover up to $10,505,324.23 in actual damages arising out of the conspiracy to defraud the Plaintiffs, plus because Julie Seibert and John Seibert intentionally, willfully, fraudulently and maliciously did the things herein alleged to defraud and oppress Plaintiffs, Plaintiffs are therefore also entitled to recover exemplary or punitive damages.

617.   On Count XVI, Plaintiffs are entitled to recover up to $10,505,324.23 in actual damages arising out of the conspiracy to defraud the Plaintiffs, plus because Julie Seibert and John Seibert intentionally, willfully, fraudulently and maliciously did the things herein alleged to defraud and oppress Plaintiffs, Plaintiffs are therefore also entitled to recover exemplary or punitive damages.

Dated:  November 10, 2017

**SHEEHAN PHINNEY, P.A.**

By: /s/ Robert H. Miller
    Robert H. Miller, *pro hac vice*
    Brian D. Thomas, *pro hac vice*
    Chloe F.P. Golden, *pro hac vice*
    1000 Elm Street, 17th Floor
    Manchester, NH  03105-3701
    Telephone:  603.627.8145
    Facsimile: 603.641.2380
    rmiller@sheehan.com
    cgolden@sheehan.com


**MASLON, LLP**

By: /s/ Amy J. Swedberg
    Amy J. Swedberg (MN #271019)
    Charles Frohman (MN # 038669)
    90 S. Seventh Street, Suite 3300
    Minneapolis, MN 55402-4140
    Telephone:  612-672-8335
    Facsimile:  612-642-8335

**ATTORNEYS FOR PLAINTIFFS**


**ACKNOWLEDGMENT**

    The undersigned hereby acknowledges that costs, disbursements and reasonable attorney and witness fees may be awarded to the party against whom the allegations in the pleading are asserted pursuant to Minn. Stat. § 549.211, subd. 2.


By /s/ Amy J. Swedberg
    Amy J. Swedberg